*George Allen* **exhibit B·1of2**

Q: HOW IS IT THAT YOU KNEW BOBBY? THROUGH JAIL.

Q WERE YOU THERE WHEN BOBBY WAS KILLED ℞
× NO

Q. DID BOBBY EVER THREATEN YOU AT ANY TIME?
A. NO

Q WHERE WERE YOU ON SAT 7-22-95?
A. AT BLACK TOP

Q WHAT'S BLACK TOP?
A. ITS A LITTLE AREA ON 57TH ST SE (CENTRAL AVE) AND ITS GOT ASPHALT ON IT.

Q WHERE ON 57TH ST SE IS IT?
A. 100 BLOCK.

Q WHAT TIME WERE YOU THERE?
A FROM 7:00 AM TO 6:00 OR 7:00 PM

Q WHO WERE YOU WITH?
A. BOTH NEICE'S, MAY, ST JOHN, GAIL, TONY
SHADORE, JINK, JICK, RICK, MELVIN JONES,
DERRICK, POP, PEANUT, SKIP, LITTLE NUT

NEICY #1 BRADFORD   396 2416   50TH ST SE
NEICY #2 BASKINS            57TH ST SE
MAY WILSON

*George Adams*

# Exhibit B

GAIL JACKSON
JONY RICHARDSON 5416 NOVR AVE - CAP. HGTS
SHANORE RICHARDSON       "              "
TINK
TICK     E. CAPITOL ST
RICK JACKSON  4323 DIX OR FOOJE
MELVIN JONTS
DERRICK BRADFORD  203 53 RD ST SE  581 0684
POP JEFFERY WILKINSON
PEANUT
SKIP
LITTLE NUT


Q  WHAT WERE YOU DOING ALL DAY?
A  SELLING DRUGS

Q.  WHAT KIND OF DRUGS
A.  HEROIN.

Q  DO YOU WISH TO ADD ANYTHING ELSE TO YOUR
    STATEMENT?
A.  NO,

$$\mathcal{E}x\,h\!:\,b\!:\!+\quad c$$

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CRIMINAL DIVISION - FELONY BRANCH

| | | |
|---|---|---|
| GEORGE ADAMS | : | |
| | : | |
| Defendant | : | |
| | : | |
| v. | : | Crim. Case. No. F=6136-95 |
| | : | |
| UNITED STATES | : | |

## AFFIDAVIT OF CARL CLARK

I, Carl Clark, having being duly sworn, do hereby aver that the following is true to the best of my personal knowledge:

1. I state for the record, that I am not being threatened nor am I being persuaded nor seeking proceeds. I am doing this freely and willing on my own accord.

2. On July 22, 1995, Saturday morning, between the hours of 8:00 a.m. to 10:00 a.m., I was sitting out on a wall in the back side of the 100 block of 56th & Central Avenue, S.E., Washington, D.C..
I and other individuals were having a conversation about the next event to come about, I was accompanied by a Robert Simms, known as "Cowboy"; Brother George Admas, the Defendant herein this criminal matter; Melvin, Tink and a few other individuals that I only come to know by nicknames.

3. On December 3,1996, I was subpened to come to court to be a witness in the matters of this criminal case and on behalf of george Adams, but once I got to the Court and Court Room, A Mr. Horton, I take as Brother George Adams' Counsel, told me that I did not have to come into the court room as to taking the witness stand in behalf of Brother George Adams.
I was never placed on the witness stand by Brother Adams' defense counsel as an alibi witness to testify to brother Adams' actual innocence in this criminal matter, why?.
When I asked Mr. Horton how was the case coming, Mr. Horton stated these words," What you think!."
The foregoing is true and correct to the best of my recollection

1 of 2

under the penalty of perjury.

_Carl Clark_
Carl Clark-Affiant

District of Columbia,          ss:

Signed and Affirmed before Me on this 19 day of May ,2003,
by Carl Clark.

_Bertha M. Williams_
NOTARY PUBLIC, D.C.

BERTHA M WILLIAMS
NOTARY PUBLIC
PRINCE GEORGE'S COUNTY
STATE OF MARYLAND
COMM. EXP. 12-01-05

My Commission expires:_____

# Exhibit D

George Adams,                      *
     Defendant

   v                          *     Criminal Case No. F-6136-95

United States of America     *

## Affidavit

I Jackie Wilson, having been duly sworn, do hereby declare that the following is true to the best of my knowledge:

1. I state for the record, that I am not being threatened, nor am I being persuaded, nor seeking proceeds. I am doing these statements freely and willingly, and on my own.

2. On July 22, 1995, I left my house about 8:45 to 9:00 a.m., enroute to the grocery store, which opens at 9:00 a.m. The grocery store is located in the one hundred block of Central Ave., and 56th Street. S.E. I first went to the black top (which is in between 57th Place and 56th Street), where I came in contact with Melvin Jones and George Adams (known as Bay Brother). We got into a heated argument over money. Five to fifteen minutes later, I went to the store. I received information a few days later, that he was incarcerated for homicide, at the same time that he was out on the black top. I cantacted his attorney, and gave hime this information, that I am swearing to now.

Affidavit Cont......

I asked his attorney, to send his investigator to me, so
that I could make the same statement to him. I also informed the
Attorney that he could subpeeanor me to come to court so that I
could testify in George Adams defence. I talked with his Attorney
on several occasion and his attitude was always indefferent
and negative.

The foregoing is true and correct to the best of my
recollection.

I state this under the penaty of perjury.

Mr. / Jackie Wilson

SUBSCRIBED AND SWORN TO BEFORE
ME THIS _23rd_ DAY OF _FEB_ _2004_

Jeanne S. Gault

JEANNE S. GAULT
NOTARY PUBLIC IN D.C.      _10-14-06_
MY COMMISSION EXPIRES _____

## Exhbt c + D

Superior Court of the District of Columbia
Criminal Division-Felony Branch

George Adams       *

v       *     Criminal Case NO. F-6136-95

United States of America       *

### Affidavit of George Adams

I, George Adams, Affiant, Defendant, being duly affirmed, depose and state as follows, to the best of my knowledge.

I state that every word, statements and fact contained herein this document titled Affidavit of George Adams is true and correct, and that I, George Adams, the Defendant in this criminal matter is Actual Innocent of the crime in which I have been convicted of, in this criminal matter.

On the moring of July 22, 1995, I left Mr. Receese house at 58th & Aim St. N.E., Washington D.C. about 8:00 to 8:20 a.m. I was walking toward the blacktop on the back side of 56th St. S.E., where I met up with Carl Clark, Robert Simms, and Melvin Jones (and a few other people, that I only know by nick-names). Melvin Jones and I walked to the top of the black top, where I came across Ms Jackie Wilson. We got into a heated argument about money. Ten minutes later, she walked away, and went back down the hill from where I came. My step-father Clarence Bradfor and I came walking up the back side, with his girlfriend (Ms Day). I stopped him, and asked him to loan me a few dollars and he left. I stayed there in that particular area up until noon.

The foregoing is true and correct and accurate, to the best of my knowledge.

George Adams-Affiant    2/4/04



Notary Public, State at Large, Kentucky
My Commission Expires 10/10

METROPOLITAN POLICE DEPARTMENT
Washington, D.C.

**COMPLAINANT/WITNESS STATEMENT**

P.D. 119 REV. 10/89

| | |
|---|---|
| **1. COMPLAINT NO.** | 95-436359 |

| 2. NATURE OF INVESTIGATION | 3. UNIT FILE NO. |
|---|---|
| HOMICIDE INVESTIGATION | HO95-837 |

| 4. STATEMENT OF: (Last, First, Middle) | 5. DOB | 6. SEX |
|---|---|---|
| JOHNSON, STERLING | 12/12/53 | MALE |

| 7. HOME ADDRESS | 8. HOME PHONE |
|---|---|
| 425 2ND STREET NW, WASHINGTON, DC | 202-393-1909 |

| 9. EMPLOYMENT (Occupation and Location) | 10. BUSINESS PHONE |
|---|---|
| | |

| 11. LOCATION STATEMENT TAKEN |
|---|
| HOMICIDE BRANCH |

| 12. NAME OF OFFICER TAKING STATEMENT (If other than block 18 include signature) | 13. DATE/TIME STARTED |
|---|---|
| SAUNDERS, ROBERT N. (2494) | 07/27/95 15:00 |

**14. STATEMENT**

Mr. Johnson, this office is investigating a complaint of a robbery that you are reporting and that you were a victim of, that occurred at North Capitol and NewYork Avenue on Monday July, 24, 1995 at approximately 1:00 or 2:00 pm in the afternoon. In your own words, will you please tell me exactly what happened on that day and who it was that robbed you.

A. Monday evening at approximately 1:00 or 2:00 that evening, Bay brother asked me how was Bill Blass dope and I told him that it was alright. He said that I looked like I was high and I told him that I was enrolled in the methadone clinic and that I was on 100mg and it won't do me any good because I won't feel it. At this time, he asked me foe three bags of Bill Blass and at that time I took out the stuff for him. As I looked up, he was cocking what appeared to be a 25 or a 22 semiautomatic pistol and said just give it to me, you don't want to end up like that white boy Bobby. As he takes the bags, he walked off towards NewYork Avenue, west bound and got inside of a black car with Maryland tag #245 which was the last three digits. On Tuesday morning approximately 8:00 and 9:00 am, I was conversing with a friend and was telling him about what happened to me on the day before and was describing the car that was used when I was robbed, and that's when I saw the same car again on N. street. At that time I walked over to get the tag number which was AME-245 MD, and then I saw Baybrother and another dude walking fast from out of the woods from where they robbed another guy of his $20.00. On the following day, which was Wednesday, they came back and robbed another guy, thinking that he was selling dope and they took his five dollars. The man don't even sell dope but they took his money any way. I did'nt see that robbery, but every body told about it.

Q. Who was the guy that got robbed in the woods on Tuesday?

**15.** I HAVE READ THIS STATEMENT GIVEN BY ME OR HAVE HAD IT READ TO ME. I FULLY UNDERSTAND IT AND CERTIFY THAT IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND RECOLLECTION. "I UNDERSTAND THAT MAKING OF A FALSE STATEMENT IS PUNISHABLE BY CRIMINAL PENALTIES (D.C, CODE SECTION 22-2514)".

*Sterling Johnson*
Signature of Person Giving Statement

| 16. DATE/TIME ENDED |
|---|
| 07/27/95 15:50 |

| 17. |
|---|
| Page 1 of 3 Pages |

| 18. OFFICER OBTAINING THE SIGNATURE IN BLOCK 15: | 19. PERSON WITNESSING THE SIGNATURE IN BLOCK 15: |
|---|---|
| *Robert Saunders* | |
| (Name and Signature) | (Name and Signature) |

1     street, run across New York Avenue and North Capitol Street.

2     Q     How far away would that be from where the robbery

3     occurred the day before?

4     A     Across the street.

5     Q     Did you see the same car?

6     A     Same car. That's how I got the first three

7     letters of the tag number.

8     Q     When you saw Bay Brother on July 5 -- the first

9     time you saw him -- where was he?

10     A     The 25th -- what day was that, Monday?

11     Q     That was Tuesday, the day after the robbery.

12     A     Oh, Tuesday? Okay, Tuesday, I was talking to the

13     cigarette man and telling him what happened and what kind of

14     car, it was a black car, like that, I remember the last three

15     numbers of the tag was 245.

16     And at that point in time, a black car had pulled

17     up and parked about 10, 15 feet away from us. And I was

18     explaining to the cigarette man -- his name is Tom -- that

19     the dude was driving -- I told him I got robbed, and he was

20     driving a black car with 245 was the tag number.

21     And I looked over, I said, "It's a tag number like

22     that car." I said, "Hold on, man, that's the car right

23     there."

24     So him and I walked up there together. I told him

25     -- I whispered to him, I said, "That's the car right here,

1    towards Chinatown.

2         Q    And when you're talking about Rock, do you know

3    Rock's real name?

4         A    To be honest with you, I don't know Rock; I just

5    always called him Rock, you know.

6         Q    Have you seen this person recently?

7         A    Oh, yes, I see Rock nearly everyday.

8         Q    Have you seen him down here in the courthourse?

9         A    He's out there this morning, uh-huh.

10        Q    ⋅And what, what were you doing that morning with,

11   with Rocky?

12        A    Well, I was waiting for the bus, P-6 bus myself.

13        Q    Uh-huh.

14        A    And Rock was just over there.  I don't know, I

15   don't know whether Rock -- Rock got a car, I don't think he

16   was waiting for no bus.  I don't know exactly what Rock was

17   doing personally.

18        Q    At some point, did, did anyone approach where you

19   were standing and Rock was standing?

20        A    Oh, yes.

21        Q    Do you remember where that person came from?

22        A    Yeah, out of a car.  A car pulled up, got out of

23   the car.

24        Q    Do you remember where that car pulled up?

25        A    Right there in front of him.  Right there at the

Exhibit H

1    bus stop.

2        Q    And what happened when this person came up to

3    where he was standing?

4        A    First he got out of the car, came up to Rock and,

5    and said nigger, give it up, robbery in other words.

6        Q    Did you -- did this person have a weapon that you

7    could see?

8        A    I didn't see no weapon per se but he had a hand

9    like in his pocket like he had a weapon, you know.

10       Q    And how far away were you from Rock at the time

11   that you heard this statement?

12       A    Two, three feet, because we were just standing

13   there talking.

14       Q    What did you do?

15       A    Well, while he was busy with Rock I ran.

16       Q    Which direction did you run?

17       A    I ran towards straight up North Capitol about a

18   half a block.  I ran across the street, New York Avenue and.

19   I got just about a half a block and I stopped, just stood

20   there and looked.

21       Q    Do you remember how much time passed between the

22   time you heard this statement that made you think it was a

23   robbery and the time that you ran?

24       A    How much time passed when I ran?

25       Q    Between, you said that you heard this person say

1    Q    In the morning hours of that day, do you remember

2    where you were?

3    A    Yes, I do.

4    Q    Where were you?

5    A    I was standing right on the corner in front of

6    the mailbox on N Street and First Street.

7    Q    I'm gonna show you what's been previously

8    admitted as Government's Exhibit Number one.  Mr. Facen, do

9    you recognize this exhibit?

10   A    Absolutely.

11   Q    What is it?

12   A    This is an aerial picture, aerial picture of the

13   entire right there.

14   Q    Is the place where you were located on the

15   morning of July 22nd pictured in this photograph?

16   A    Yes, it is.

17   Q    I'll turn back a sheet here.  For the record,

18   this lamination is Exhibit 1-D.

19   A    Okay.

20   Q    I would like, I'd like you to start by taking

21   this blue magic marker and writing your initials up in the

22   corner.

23   A    Up here?

24   Q    Yes.  All right.  Now I like you to take a look

25   at the picture and draw a circle around the spot where you

1    were standing on the morning of July 22nd.

2         A    The mailbox box is right there on the corner --

3              THE COURT:  Try to keep your voice up please.

4              THE WITNESS:  Oh, excuse me.  The mailbox is

5    right there on the corner of First Street and N and I was

6    standing right in front of the mailbox.

7              BY MR. BOHLING:

8         Q    Thank you, sir.  While you were standing in front

9    of the mailbox, Mr. Facen, did anything happen which

10   attracted your attention?

11        A    Yes, I heard a couple of shots.  And before the

12   shot I saw a friend of mine running out from back before

13   the shots and right out here, ran from out there.  I heard

14   a couple of shots and everybody just, it was chaos after

15   that and everybody just ducking and running and everything

16   else.

17        Q    I like to take you through what you just told us.

18   You said you saw a friend of yours run out?

19        A    Yes.

20        Q    Where did he run out from or she?

21        A    He came out through the front.  And if I recall

22   right, I believe he went down torwards McDonald's, and

23   about three or four minutes later he walked back up because

24   he was all scratched up, you know, trying, you know,

25   there's a lot of trees and shrubbery and, you know, just

1   was just right around the corner waiting and they left.

2       Q    Now, did you get any opportunity to see the car?

3       A    Oh, yes, the same car, the same car, the same

4   dark blue photo car with Maryland tag on it.

5       Q    At that point, do you remember if you had any

6   other talks and discussions with Rock?  Without telling us

7   what was said.

8       A    What, that day you're talking about?

9       Q    Right after, after the robbery.

10      A    Yeah, because after he left I, I went on back

11  over there, you know, see what, talk to Rock, see what, you

12  know, was he all right, what's happened, you know.

13      Q    Okay.  And did, did you have any discussions

14  about the car that the robber got in?

15           MR. HORTON:  Objection, Your Honor.

16           THE COURT:  Overruled.

17           BY MR. BOHLING:

18      Q    I'm not asking -- I don't want you to tell us yet.

19  what was said, just whether or not you talked to Rock about

20  the car.

21      A    Yeah, we, we, you know, mentioned the car, you

22  know.

23      Q    Did Rock give you any information about the car?

24      A    No.

25      Q    Okay.  Did there come a time when you saw this

coming out.

Q    All right.  I'd like to direct your attention to
after the robbery and ask you when you first talked to the
police about that robbery.

A    I had called -- the day I got robbed, I had called
then, because the word that was going around was that he was
shot with a .22 or a .25.

Q    You mean Bobby was shot with a .22 or .25?

A    Bobby was shot with a .22 or a .25.  And at
that point in time, I went and got on the phone -- and
that could have been the same weapon that killed Bobby.
He damn sure wasn't going to use it on me.  I'd make sure
of that.

Q    So you're saying you called the police on Tuesday,
the 24th?

A    I called them that Monday.

Q    I'm sorry, Monday.

A    I believe I called them the same day it happened.
I believe I did.

Q    Did you actually talk to an officer in person that
day?

A    Yes, I did.  I talked to Detective Leach.  *Monday*

Q    Do you recall that there was a time sometime later
in the week when you were asked to look at a photographic
spread?

Diversified Reporting Services, Inc.
918 16TH STREET, N.W. SUITE 803
WASHINGTON, D.C  20006
(202) 296-2929

*this is no reason to sus-
pect it was Adams
prosecutors coercion*

*Bad*

dark complexion, very close cut hair, wearing a dark t-shirt and baggy blue jeans or long shorts; front passenger -- black male, 18 -24 years of age, 5' 11", 160 pounds, medium dark complexion, close cut hair, wearing a burgundy or brown t-shirt; back seat driver's side passenger, young black male, 5'9" to 5'10".

5. Here are Patricia King's descriptions of the three people she saw get into the blue car: driver -- black male, 18-20 years old, 5'8", medium build, dark complexion, wearing a t-shirt, baggy blue jeans, and a baseball cap, appeared to have something in his right hand; rear driver's side seat -- black male, 17 to 18 years old, 6', medium build, medium complexion, short cut hair, clean shaven, tank top, long pants; right front passenger - black male, 5'9" to 5'10", medium complexion, unknown shirt, long pants, nothing in hand.

We also wish to extend the following plea offer in this case. If Mr. Adams pleads guilty to Second Degree Murder (unarmed), the government will dismiss all other charges in the indictment (including the severed armed robbery and related charges). This plea offer will expire if not accepted by the close of business on August 22, 1996.

SINCERELY,

JAMES CURT BOHLING
Assistant United States Attorney
Homicide Section -- Room 4848
(202) 514-5864

Enclosures

| 2. TYPE | ☒ ORIGINAL | 3. COMPLAINT NUMBER | 6. DATE OF REQUEST |
|---|---|---|---|
| ☐ EXPEDITE | | 436 359 | 7-22-95 |

☐ CAL LOOKOUT
☐ INTERSTATE TT
☐ ADMINISTRATIVE TT
☐ DETAIL (See Reverse)
☐

2. TYPE
☒ ORIGINAL
☐ EXPEDITE
☐ ADDITIONAL
☐ CANCEL
☐ CORRECTION
☐ REPEAT
☐ REPLY

3. COMPLAINT NUMBER
436 359

4. UNIT NUMBER

5.
☒ NOT FOR THE PRESS

6. DATE OF REQUEST
7-22-95

7. REQUESTING ELEMENT
CID / HOMICIDE

8.
☒ FLASH TT REQUESTED

**9. TO**
THE FORCE

| 10. NAME OF WANTED PERSON | 11. WANTED BY | 12. CHARGE |
|---|---|---|
| 13. COMPLAINANT'S NAME | 14. COMPLAINANT'S ADDRESS | |

**15. DESCRIPTION OF WANTED PERSON OR MESSAGE**

BE ON THE LOOK-OUT FOR A BRIGHT BLUE, TWO DOOR, PLYMOUTH DUSTER OR DATSUN BEARING
D.C. TEMPORARY TAGS DX73649.  THE VEHICLE WAS POSSIBLY USED IN CONNECTION WITH A
HOMICIDE SHOOTING WHICH OCCURRED ON 7-22-95 IN THE 1200 BLOCK OF 1ST STREET NE.
ALL OCCUPANTS SHOULD BE CONSIDERED ARMED AND DANGEROUS.  IF LOCATED IMPOUND VEHICLE
AND HAVE IT TOWED TO MOBILE CRIME.  IDENTIFY AND HOLD ALL OCCUPANTS FOR HOMICIDE.
CONTACT DETECTIVE A.J. LEECH ON 727 4347.

| SENDER-BADGE-ORG. ELM | AUTHORIZED BY-BADGE-ORG. ELM. | BUREAU HEAD'S APPROVAL |
|---|---|---|
| DET. A.J. LEECH D301 CID/HOM | Lt. Jerrin Jackson | |

COMMUNICATIONS DIVISION USE ONLY

| REMARKS | DATE AND TIME |
|---|---|
| | FILE |
| | TELETYPE NUMBER |

Distribution:    1- Communications Division        2- Element File Copy

1 Right?

2       A    Right.

3       Q    That's the description you gave to

4  Det. Leach.  Right?

5       A    Okay.

6       Q    Did you or did you not?

7       A    Yes.

8       Q    And you gave that description because that is

9  the appearance of Mr. Adams.  Right?

10      A    Correct.

11      Q    6/1, 6/2; 225 to 245; brown skin; that's the

12  man you know as Bey Brother, George Adams.  Right?

13      A    Correct.

14      Q    And Mr. Adams, he's a pretty big guy.  You

15  agree with me?

16      A    Correct.

17      Q    And he's kind of fat.  Right?

18      A    Correct.

19      Q    He was fat back then.  Right?

20      A    Correct.

21      Q    And he looks now just about like he looked

22  back then.  Right?

23      A    Right.

24           MR. HORTON:  No further questions.

25           THE COURT:  Any redirect?



*Executive Office for United States Attorneys*
*Freedom of Information/Privacy Act Staff*
*600 E Street, N.W., Room 7300*
*Washington, D.C. 20530*
*202-616-6757  Fax 202-616-6478*

NOV 3 0 2004

Requester:___**George Adams**_____Request Number:__**03-4098**_____

Subject of Request:__**Self / Specific Docs**_____

Dear Requester:

 Your request for records under the Freedom of Information Act/Privacy Act has been processed. This letter constitutes a reply from the Executive Office for United States Attorneys, the official record-keeper for all records located in this office and the various United States Attorneys' Offices.

 To provide you the greatest degree of access authorized by the Freedom of Information Act and the Privacy Act, we have considered your request in light of the provisions of both statutes.

 The records you seek are located in a Privacy Act system of records that, in accordance with regulations promulgated by the Attorney General, is exempt from the access provisions of the Privacy Act. 28 C.F.R. §16.81. We have also processed your request under the Freedom of Information Act and are making all records required to be released, or considered appropriate for release as a matter of discretion, available to you. This letter is a [ **X** ] partial release [   ] full denial.

 Enclosed please find:

___**22**____ page(s) are being released in full (RIF);
___**5**____ page(s) are being released in part (RIP);
_____ page(s) are withheld in full (WIF). **The redacted/withheld documents were reviewed to determine if any information could be segregated for release.**

 **Please note that nothing was found responsive to your request for 911 call regarding robbery of a "Sterling Johnson".**

 The exemption(s) cited for withholding records or portions of records are marked below. An enclosure to this letter explains the exemptions in more detail.

| Section 552 | | | Section 552a |
|---|---|---|---|
| [   ] (b)(1) | [   ] (b)(4) | [   ] (b)(7)(B) | [ **X** ] (j)(2) |
| [   ] (b)(2) | [   ] (b)(5) | [ **X** ] (b)(7)(C) | [   ] (k)(2) |
| [   ] (b)(3) | [   ] (b)(6) | [   ] (b)(7)(D) | [   ] (k)(5) |
| _____ | [   ] (b)(7)(A) | [   ] (b)(7)(E) | [   ] _____ |
| _____ | | [   ] (b)(7)(F) | |

 [   ] In addition, this office is withholding grand jury material which is retained in the District.

common scheme or plan, or absence of mistake or accident, and not merely to prove the defendant's bad character or propensity to commit bad acts. *Id.* at 1092.

The evidence relating to the armed robbery of Johnson was admissible to show Adams' identity as the perpetrator of the attempted armed robbery and murder of Hamilton. Evidence of other criminal acts may be admitted under the identity exception when "'there is a reasonable probability that the same person committed both crimes due to the concurrence of unusual and distinctive facts relating to the manner in which the crimes were committed.'" *Coleman v. United States*, 619 A.2d 40, 44 (D.C. 1993) (citations omitted); *Easton v. United States*, 533 A.2d 904 (D.C. 1987). Furthermore, the admission of other crimes evidence "need not depend on the presence of one distinctive similarity but the court can consider the totality of the factual circumstances which, amalgamated, lay a sufficient basis for admission under the *Drew* doctrine." *Gates*, 481 A.2d at 123. Here, there were numerous similarities between the attempted armed robbery and murder of Hamilton and the armed robbery of Johnson. During each robbery, Adams approached the victim, each of whom was a drug dealer in heroin, and inquired about the availability of drugs. During this inquiry, Adams abruptly produced a gun and demanded the drugs. Both robberies occurred in the same neighborhood, within blocks of each other, and only two days apart. Adams himself also revealed the connection between the two incidents by telling the victim in the second robbery that he did not want to end up like the victim in the first. Furthermore, the probative value of the evidence of the robbery of Johnson was not substantially outweighed by its prejudicial effect. The trial court gave a lengthy and thorough limiting instruction[12] immediately following the testimony which the jurors are presumed to have followed. *See Lawson v. United States*, 596 A.2d 504, 510 (D.C. 1991). Therefore, the trial court did not abuse its discretion in admitting evidence relating to the armed robbery of Johnson.

Adams finally argues that the trial court erred in denying his § 23-110 motion, alleging ineffective assistance of trial counsel, without a hearing. Adams alleged that trial counsel (1) failed to conduct an on-site inspection of the crime scene and immediate vicinity, (2) failed to exploit weaknesses in the government's case concerning disparities in the testimony about the description of the car involved in the charged offense and the description of the car involved in the subsequent robbery of Johnson, (3) failed to argue vigorously for exclusion of "other crimes" evidence of the robbery of Johnson, and failed to move for a mistrial once the evidence was introduced, and (4) failed to cross-examine Johnson about his offer not to testify against Adams in exchange for money.

Ordinarily, there is a presumption in favor of holding a hearing on a § 23-110 motion asserting a claim of ineffective assistance of counsel. *See Ready v. United States*, 620 A.2d 233, 234 (D.C. 1993). However, a hearing on a § 23-110 motion is not necessary "when the motion consists of (1) vague and conclusory allegations, (2) palpably incredible claims, or (3) allegations that would

---

[12] The limiting instruction given by the trial court instructed the jury that the testimony from Johnson that Adams allegedly robbed him of drugs should be considered only for the limited purpose of deciding whether it is likely that the person who robbed him also committed the offenses charged in the indictment. The trial court further instructed the jury that this evidence may not be considered to conclude that Adams has a bad character or a criminal personality.

1    time.

2      Q    Did you give him any cash?

3      A    No, I ain't give him any cash at all. I don't keep

4    cash on me.

5      Q    What did Bay Brother do or say after he took the

6    four bags of heroin from you?

7      A    He didn't say anything. He just took it and forced

8    it into his pocket, and he walked away from the bus stop with

9    the pistol his hand.

10      Q    Where did he go?

11      A    He went around the corner on the New York Avenue

12    side, he got into a black car. And the only thing I can

13    catch was a 245 number.

14      Q    Was it the same car that he pulled up in?

15      A    Correct. That's the same car he had pulled up in.

16      Q    Now, you said there was a person in the back seat

17    of that car; is that right?

18      A    Correct.

19      Q    Was there also a person driving the car?

20      A    Yes, it was.

21      Q    Did you get any type of good look at the person who

22    was in the back seat of the car?

23      A    I really couldn't. He had a hat over his head. He

24    seemed like a peanut, and the hat covered his whole face

25    almost.