UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

Let this
be filed

ESH 4/1/11

| | | |
|---|---|---|
| GEORGE LEON ADAMS | ) | |
| Plaintiff | ) | |
| | ) | Civil Action 101945 ESH |
| v | ) | |
| | ) | |
| UNITED STATES OF AMERICA | | |

SUPPLEMENTARY MOTION PURSUANT TO FED. R. CIV. P. 15(d)

Defendant makes this motion at this time because the events set forth in the supplemental are vital to the original pleading in the matter, They are sufficiently related to the issues and transaction that are already before the court that their joinder would not unduly delay the proceeding and would not prejudice any party. The court could not property determine the matters justly before it without consideration of these facts, and it is in the interest of justice that all of the issues between the parties be litigated in a single action.

## PROCEDURAL HISTORY

On November 3, 1995, a nine count indictment was handed down charg-
Mr. Adams with (1) Attempted armed robbery of Robert Hamilton in viol-
ation of D.C. code § 22-2902 and 3202 (count C); (2) First degree murder
while armed (Felony murder); (3) First degree murder while armed)(pre-
meditated) of Robert Hamilton in violation of D.C. § 22-2401 and 3202
(count E); (4) Assault with a dangerous weapon (pistol, Ronald Wright)
inviolation of D.C. Code § 22-502 (Count F); (5) Assault with a dangerous
weapon, Walter Brian Mountjoy, inviolation of D.C. Code § 22-3204(b)
(Count H); (7) Carry a pistol without a license in violation of D.C.
Code § 22-3204(A)(Count I); (8) Armed robbery of Sterling Johnson in
violaton of D.C. § 2901 (Count J); (9) Possession of a firearm during
a crime of violence (Armed robbery) inviolation of D.C. § 22-3204(b)
(K); and (10) carry a pistol without a license in violation of D.C.
Code § 22-3204(A)(Count L).

## Trial

On Feburary 27, 1996, Mr. Adams filed a motion to suppress
statement and identification testimony, and a seperate motion to
sever counts "C" through "I" of the indictment from count "J"
through "L". On April 5, 1996, the Honorable Judge Truman Morrison
granted Mr. Adams motion for severance. Following an evidentiary
hearing on November 25-26, 1996, the Honorable Judge Robert Richter

denied Mr. Adams' motion to suppress identification testimony. Mr Adams trial commenced on November 27, 1996, and on December 4, 1996, a jury convicted Mr. Adams on (7) counts of the indictment.

On January 29, 1997, prior to sencting, Mr. Adams pleaded guilty to count "N" of the indictment (robbery, a lesser included offence of "J", armed robbery of Sterling Johnson) in exchange for dismissal of Count "K" and "L". Judge Richter sentence Mr. Adams to the following terms of imprisonment:

> Ten to thirty years (Count C)
> Thirty to life (mandatory minimum)(Count D)
> One to three years (Counts F and G)
> Five to fifteen (Mandatory minimum)(Count H)
> One to three years (Count I)
> Five to fifteen (Count N)
> Twenty five years to life (Count M)
> Five years mandatory minimum

Following sentencing, Mr. Adams filed a timely notice of appeal, (No. 99-C-583. On February 21, 1197, Mr. Adams a pro se petition for a writ of Habeas Corpus, alleging ineffective assistance of trial counsel pursuant to D.C. Code §23-110. Thereafter, defendant filed a motion of abeyance with the court of appeal, requesting that his direct appeal be stayed until disposition of the §23-110 motion. The Court of Appeal's granted defendant request for a stay. On November 19, 1998, defendant court appointed lawyer filed a Supplementary Motion for a new trial based upon ineffective assistance of trial counsel pursuant to D.C. Code §23-110. The Court issued an order denying defendant's motion on April 26, 1999. Then, on May 19, 1999, the court of appeals issue an opion affirming this court's order denying defendant motion.

On June 27, 2001, defendant filed a motion for new trial based

upon prosecutorial misconduct and a moton for appointment of counsel. The court denied both motion.

On October 8, 2002, defendant filed a pro se motion to vacate, set aside his conviction based on ineffective assistance of counsel, motion for appointment of counsel, and moton to proceed in forma pauperis, while the In Forma Pauperis was granted, both §23-110 motion and the motion for appointment of counsel were denied on October 10, 2002.

On March 15, 2004, defendant filed yet another pro se Motion to Vacate, correct and/set aside convict and sentence Pursuant to D.C. Code §23-110. In that motion, defendant took issue with trial counsel's decision in cross-examing government witnesses, contenion similar to those raised in his two previous §23-110 motion, Defendant also question trial counsel's strategic decision to call particular witness. The third §23-110 motion was denied as successive and without merit. Defendant filed a timely appeal. (No-CO-415). On September 26, 2005, appeal court denied defendant appeal and issue a memorandum opinion and judgement, soo after defendant filed amoton for rehearing en banc, on January 31, 2006, appeal court denied motion

On October, 19 2006 defendant filed his sixth motion under §23-110. This time, defendant argue that the trial court should reenter its March 14, 1997 Judgement and Commitment Order, the Amended Order in which it corrected the mislabling of count "N" in its intial Judgement and Commitment Order, thereby restoring his right to appeal that Order and allowing him to argue to the Superior Court that, in his view the order erroneously vacated his second-degree murder conviction instead of his Felony Murder conviction.

On January 30, 2007, the tria court denied defendant motion, but
noted that defendant; second degree murder and attempted armed robbery
convictin had never been vacated following affirmance of his conviction
on direct appeal. According, that same day, the trial court issued and
amended Judgemnt and Commitment Order in which it vacated those con-
victions and an Order releasing defendant from custy on those counts.
On February 5, 2007, defendant filed a timely notice of appeal of the
Januray 30, 2007, Judgement and Commitment Order. Defendant now argue
that the trial court's refusal to vacate his felony murder conviction
was a abuse of discretion, and that the proscutor engaged in misconduct
during closing argument at the 1997 trial. On December12, 12, 2007 the
the Court of Appeals granted summary affirmance. On October 13, 2009,
defendant submitted his petition for recall of the mandate to the Dist-
rict of Columbia Court of Appeals, in which he alleged ineffective assist-
ance of appellate counsel, stating that he failed to raise the issue
that he requested. On October 29, 2009, the Court of Appeals denied the
petition for recall of mandate.

## STATEMENT OF FACTS

Government witness (1)

Ronald Wright, aquintance of the decedent and client of the meth-
adone clinic located across the street from the wooded area where the
robbery occured (Tr. 12/2/96 at 55. Wright entered the woods, alone,

to take drugs, when he saw the decedent and Brian Mountjoy preparing to take drugs as well (Tr. 12/2/96 at 57-58). After the decedent lowered his pant to inject the drugs, two men entered the area and asked him where did he get the drugs from. The men left for a few minutes and then returned with one of them holding a gun, telling Mountjoy, Wright and Hamilton to take everything out of their pocket, (Tr. 12/2/96 at 4). Mountjoy ran in one direction with the person chasing him, Wright began to run as well, but before he reached the end of the woods he heard a gun shot (Tr. 12/2/96 at 6-69). Wright saw the two robbers exit the woods and go halfway down the block, get into a small newly painted blue car and head south toward M Street, (Tr. 12/2/96 at 70). When asked, do you have any questions, this the man who pulled a gun on you on July 22, 1995? He look like him, (Tr. 12/2/96 at 77.

## CROSS-EXAMINATION

Wright testified that the man with the gun was 5'7" dark complected medium built, little mustach, age 35-40 (Tr.12/2/96). Wright stated that the defendant was alot toller, more heavior and and lighter, (Tr.12/2/96).


Witness (2)

Walter Brian Mountjoy, local resident and aquaintance of the decedent, testified that on July 22, 1995, between 9 oclock and 9/30 am he was looking for the decedent to by heroin, (tr.12/2/96 at 103). Upon locating the ceedent he went into the woods with him where he saw Ronald Wright and another male there already. He brought the drugs and began to shoot up when two other black males intered the area and asked the decedent whether did "he have anymore coke-cain left," to which the

the edcedent replied "no" (Tr. 12/2/96 at 103-105, 109). The men left
and returned within minutes, one of them holding a gun that looked like
a revolver (T. 12/2/96 at 112). Mountjoy ran, cutting his face on a
passing branch in the process, and heard a gun shot before he exit the
woods (Tr. 12/2/96 at 112). He called 911 from a parking lot, then later
he returned to the wooded area to speak with the police, (Tr. 12/2/96,
at 115-116. Walter Mountjoy was shown some photographs and could not
positive identify the person who had the gun, (Tr. 12/ 2/96, at 117-118).


CROSS-EXAMINATION

Walter Mountjoy provided a description of the person who had the
gun 5' 10", slight facial hair (like he haven't shaved) about 40 years
of age, and very dark complexion, (Tr. 12/2/126-127). Mountjoy testified
that he had seen the person with the gun on several occasion in the area
more than one place, (Tr. 12/2/96 at 128). Mountjoy could not identify
the person with the gun through the photo array even after Det, Leech
tolded him that his picture was in the photo spread, (Tr. 12/2/96 at 130.


Government witness (3)

Reginald Jackson, acquantance of the decedent and client at the
methodone clinic, testified that he saw the decedent on July 22, 1995,
in the methodone clinic between 9/00 oclack and 9/30 am, (Tr. 12/2/96
at 14-149). As a crowd gather, he saw two males run out of the woods,
jump into a gray/blue car parked on first street, and leave the area,
(Tr. 12/2/96 at 150-157). then two other individuals run out of the
woods; one was a white male with a bleeding scare who ran toward the

phone booth at McDonal's the other was Ronald Wright, (Tr. 12/2/96 at 153).

Reginald Jackson, testified that on July 22, 1995, while standing on first street when he heard what he heard what he thought was a firecracker (Tr. 12/22/96 at 154-155) saw four people run out the woods, one of them was a white fellow with a scare on his cheek and the other one was Ronald White, (Tr. 12/2/96 at 155). The other two, was two black males, that jumped into a car parked four or five spaces from the wooded area; facing the Grey Hound bus station, (Tr. 12/2/96 at 155-156). The two men jumped into a faded blue car that speeded off toward the bus station, (Tr. 12/2/96 at 157). Jackson could not identify the defendant "the only thing that he remember was that, the men was in their twenties. (Tr. 12/2/96 at 15).

Government witness (4)

Robin Fitzsimmons, an acquaintance of the decedent and a client of the Methadome Clinic, testified that in the morning of July 22, 1995, she saw the decedent while she was in the woods to use drugs,but left, (Tr. 12/2/96 at 166). In the wooed area were a black dude lives in a tent, (Tr. 12/2/96). As she was standing at the entrance to the woods Fitzsimms heard a gunshot from "from out of the woods," then she was re entering the woods, she saw two black men coming out of the wooded area, one was older man about 5' 7" tall (Tr. 12/2/96 at 170-171). Later on Det. Leech and Det. Hamil showed Ms Fitzsimms a photo array; she picked

out the defendant who bumped her as she re-entered the woods, (Tr.-12/2/96 at 175). She also identified a photograph of a car as the one that the men had gotten into after she had heard the shots, (Tr. 12/2/96 at 176).

## RE-DIRECT

Ms Fitzsimmons stated that she knew the defendant from divison avenue, and that the defendant looked like the older guy that bumped her coming out of the woods, (Tr. 12/2/96 at 206-207).

Government witness (5)

On July 24, 1995, Sterling Johnson, and another acquaintance of the decdeant and a client of the Methodone Clinic, was at a bus stop on New-York and North Capitol street N.E. at around 1/00 to 2/00 p.m., selling drugs,(Tr.12/2/96 at 213-217). A black male pulled up around the corner; Baybro exited and approached me asking for drugs, he then robbed me at gun point saying, " you don't want to end up like that white boy Bobby". (Tr. 12/2/96 at 21). Johnson told Det. Leech about the robbery and gave him the tag number of the car that was used in the robbery. When shown a photo array, he pick appellant's photograph immediately as the Baybro who had robbed him, (Tr. 12/2/96 at 225-227). Johnson identified defendant in open court, (Tr. 12/2/96 at 209-210).

Government witness (6)

Tommy Facen, who knew both decedent and Sterling Johnson, was standing alone on the corner of first and N. Street N.E. alone side a

mail box on the morning of July 22, 1995, (Tr. 12/3/96 at). He saw
Mountjoy "all scratched up running from the woods towards Mc Donalds,
then one or two minutes later, heard two gunshots, (Tr. 12/2/96 at 10).
He then saw two men run from the woods and enter a dark blue older model
car which drove towards McDonald's, (Tr. 12/3/96 at 12-14). Two days
later, on July 24, 1995, he stood with Sterling Johnson at a bus stop
on the corner of North Capiton and New York Av. N.E. when a dark blue
car with Maryland tags pulled up and jumped right out and said nigger
give it up, (Tr. 12/3/96 at 16-1, 20). Facen said that appellant got
out of the car and began to robb Johnson! He could not tell whether
appellant had a weapon, (Tr. 12/3/96 at 17-1, 20). He ran across the
street watched the robbery take place, and observed appellant go back
into the same car and leave the scene, (Tr. 12/3/96 at 20). On the
morning of July 25, 1995, while standing at the Methadone clinic with
Sterling Johnson, he recongized the same car in the area and were able
to get a full tag number, which was AMC-245, (Tr. 12/3/96 at 21). He
identified defendant in open court.

    The following day, July 26, 1995, Park Police officer Dowd
received a look out from Metropolitan Police Det. Arthur Leech for
a look out for a black Pontiac bearing Maryland tag AMC-245, as
having been involved in a homicide and or robberies, (Tr. 12/3/96
at 7/30 a.m.  On July 27, 1995, Dowd and another officer asked the
occupants (one of whom Dowd identified in open court as appellant)
to exit the vehicle, (Tr. 12/3/96 at 3). By requesting the indivi-
duals he learned appellant's name and nick name. He contacted Det.
Leech, who wanted to talk to the subject, and to detain appellant

and the driver in handcuff for 30 to 45 minutes until Det. Leech
arrived, (Tr. 12/3/96). Det. Leech arrived 30 to 45 minutes later,
took appellant to the homicide office.

"The court denied appellant's motion for judgement of acquitted"


Defense Witness (1)

Molly Gradill, an acquanintance of the decedent and client of the
Methadome clinic, stated that on the early morning of July 22, 1995.
she and Patricia Kins were in a van at the corner of First and N. St.
N.E. behind a small white car at a stop sign. she saw a female run
out of the woods screeming "shot" followed by several other people, all
of them running towards first street. She also saw three young black
individuals run out of the woods in the opposite direction. All three
got into and older blue/green Dodge Swinger or Plymouth Duster and the
driver threw what appeared to be a gun across from the front seat,(Tr.
12/3/96 at 75-7). Gardill followed the blue/green car to try to get the
tag number, but was unsuccessful despite the fact that she was ofter as
close as only four car lengths with no traffic between her and the blue/
green car, (Tr. 12/3/96 at 1, 92-94). She then returned to the crime
sceme and spoke with a police officer, she discovered the identity of
the homicide victim, a friend of her husband's, (Tr. 12/3/96 at 75-82).
Gardill also knew Ms. Robin Fitzsimmons, who tolded Gardill that she
had been in the woode when the shooting occured and that she had taken
decedent's money, (tr.12/3/96 at 83). Three individuals that Fitzsimmons
described to Garill matched the description of the three individuals
that she had seen leaving the woods, (Tr. 12/3/96).

Defense witness (2)

Hugo Rodriguez, an acquaintance of the decedent and a sometime client of the methadome clinic, testified that on July 22, 1995, he had gone to look for drugs on North Capiton and N. St.,(Tr. 12/3/96 at 103-105). He drove in the car with his brother-in-law and noticed a blue 1984 or 85 model car behind him,(Tr. 12/3/96 at 108). As he parked his car, the occupants of the other vehicle (who Rodriguez described as a black male age 30 to 40, height 5'8" and weighs about 180 lbs) got out as well, (Tr. 12/3/96 at 111-112). When Rodriguez heard that "Bobby" had been shot, he and his brother-in-law went into the woods and saw the decedent alive but bleeding, (Tr. 12/3/96 at 113/114). Rodriguez was not able to identify defendant as one of the occupants of the blue car that he had seen that morning, as he was not close enough to identify the faces of the occupants of that vehicle, (Tr. 12/3/96 at 114).

## STANDARD OF REVIEW

Writs of habeas corpus may granted by the Supreme Court, any justice thereof, the District Courts and any circuit judge within their respective jurisdictions..."Title 28 U.S.C. § 2241 (a) (2001).

"A prisoner authorized to move for relief pursuant to D.C. code § 23-110 may not pursue another venue of post-conviction relief in local or federal courts unless the 'remdy by motion is inadequate or ineffective to test the legality of his detention.'" Streater v. Jackson, 691 F.2d 1026, 1027 n 2 (1982) (quoting Swain v. Pressley, 430 U.S. 372, 97 S.CT. 1224, 51 L.ed 2d 411 (1977).

## The Remedy Under D.C. Code § 23-110 Is Inadequate Or Ineffective

Because the D.C. Court of Appeals held that Section 23-110 does not provide relief under the miscarriage of justice exception to the same extent required by the Supreme Court in federal habeas corpus, Section 23-110, as applied, is inadequat or ineffective to test the legality of Petitioner's detention. See Diamen v United States, 725 A.2d 501 (1999)(Ruiz, J., dissenting). Additionally, even without proving that D.C. Code § 23-110 is inadequate or ineffective, this Court's door for review of Petitioner's claim of Actual Innocence would be open notwithstanding any procedural bars. This has been rocognized by the U.S. Supreme Court in Schulp v Delo, 513 U.S. 298

(1995). In Schlup, the Supreme Court held that there is a "miscrriage of justice" exception to procedural bars in habeas corpus proceedings. Id. at 316-17. The miscarriage of justice exception mandates that a prisoner who raises a constitutional claim supplemented by a colorable showing of actual innocence may have his collateral challenge addressed on the merits, **regardless of procedural obstacles that otherwise would bar his claims.** In Dretke v. Haley, 158 L.ed 2d 659 (2004) Supreme Court held that a Federal Court faced with alegation of actual Innocence, whether of the sentence or of the crime charged must first address all none faulted claim for comparable relief and other grounds for cause to excuae the procedurally default. Normally, a Federal Court will not entertain a procedurally defaulted constitutional in a hapeas petition absent a showing of cause and prejudice to excuse the defact. however, the court recognizes a narrow exception to the general rule when the applicant can demonstrate actual innocence of the substantive office. "Murry v. Carrier 477 US 478, 496 91 L.ed 2d 397 106 S.Ct. 2639. Accord, Schlup v. Delo, 513 US 298, 130 L.ed 2d 808, 115 S.Ct. 851 (1995).

This avoidance principle was implicit In Carrier itself, where the court expressed confidence that, "for the most part, victims of fundamental miscarriage of justice will meet the cause and prejudice standard" 477 US, at 495-496, 91 L.ed 2d 397, 106 S.Ct 2639 (quoting Engle v. Isaac, 456, US 107, 135, 71 L.ed 2d 783 102 S.Ct 1558 (1982)). The Court's confidence was bolstered by the vailability of ineffective assitance of counsel claim-either as ground for cause or as a free stand claim for relief to safeguard against misscarriage of justice. The existence of such safeguard, may properly inform the court judge-

ment in determing [W]hat standard should govern the exercise of habeas court's equitable discretion with respect to procedurally defaulted claims Carrier, Supra, at 496, 91 L.ed 2d 397 106 S.Ct 2639 (quoting Reed v. Ross. 468 US 1, 9, 82 L.2d 1, 104 S.Ct 2901 (1984). In Engle v. Isaac, 456 US 107, 137, 71 L.ed 2d, The court held that in cases in which the cause and prejudice is inadequate to protect against fundamental miscarriage of justice, the cause and prejudice requirement "must yield to the imperative of correcting a fundamentally unjust incarceration".

The protection of the innocent against unjust incarceration is among the most fundamental principles of our criminal law. In Schlup, the U.S. Supreme Court stated:

> Concern about the injustice that results from the conviction of an innocent person has long been at the core of our criminal justice system. That concern is reflected, for example, in the "fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free."

Id. at 325 (quoting In re Winship, 397 U.S. 358, 372 (1970) (Harlan, J., concurring). Because of the importance of protecting the innocent, the Supreme Court has stated that where a prisoner has a colorable claim of actual innocence a court must, in certain instances, entertain a prisoner's collateral challenge on the merits, even though the claims otherwise would be procedurally barred.

The Schulp Court adressed the situation in which a prisoner all-
eges that his trial was constitutionally flawed, and supplement that
clain with a colorable showing of actual innocense. In such a situat-
ion, the prisoner can obtain reconsideration of an otherwise procedur-
ally barred consitutional claim by presenting new evidence showing that
"it is more likely than not that no reasonable juror would have convicted
him in light of the new evidence. "Id. at 327-28. This standard is less
strict than that set forth in Herrera v Collins, 506 U.S. 390 (1993).

Herra suggested that when a prisoner raises a collateral challenge to
a convition based on a free-standing claim of actual innocence (united
to any allegation of constitutional reeor a trial), only a "truely
persuasive demonstration of actual innocence'" would constitute a suff-
icient ground for federal habeas relief. Id. at 417. Schulp, however,
deals with a different situation--namely, the situation in which a claim
of actual innocence is used to support an allegation of constitutional
error at trial, 513 U.S. at 324-27. The Supreme Court stated that if a
prisoner makes such a showing, then a court must entertain the prisoner's
constitutional claim on the merits--despite any procedural bars--beacuse
it would constitute a miscarriage of justice to procedurally bar his
claim. See Kuhlmann v. Wilson, 477 U.S. 436, 454 (1986). This exception
to procedural bars in post-conviction review is known as the "miscarriage
of justice" exception.

In this case, Pititioner satisfies the requirement of the miscarriage
of justice exception set forth in Schulp. First, as the exception requires
Petition's claims are based on constitutional violations-namely, ineff-
ective assistance of trial counsel for failing to comply with DC rule

12.1, which resulted in counsel failure to put on stand two critical alibi witnesses, in violation of the due process clause of the Sixth Amendment, Prosecutor allowed false testimeny to go to the jury without correcting the testimony, in violation of the fifth amendment, abuse of the judge's discretion for allowing other crimes of evidence into trial before balancig the probative value of general propensity against the prejudicial effect of gerneral propensity evidence and Petitioner's right under the confrontation clause to cross-examine witness ragarding bias. Petition's constitutional claims are supplemented with newly discovered evidence. This evidence, if it had been available at trial, would have been very damaging to the government 's case, the results would have been different.

## ARGUMENT

## PETITION'S DUE PROCESS CLAUSE OF THE FIFTH
## AMENDMENT WAS VIOLATED

The Prosecuting Attorney represents a soverign whose obligation is to govern impartially and whose interrest in a particular case is not nessarily to win, but to do justice. It is the sworn duty of the prosecutor to assure that the defendant has a fair and impartial trial. See United States v. LaPage, 231 F.3d 488-492 (9th. cir. 2000).("A prosecutor has a special duty commensurate with a prosecutor's unique power, to assure

that defendants receive a fair trial. When the prosecutor allows false testimony to go to the jury uncorrected, he violates the due process of the fifth/fourtheenth amendment by not correcting the false testimony. See United States v. Mason, 231 F.3d 826 (2002). Also See..Barham v. United States, 595 F.2d 231 (2002).

The Due Process Clause of the fifth/fourteenth amendment forbids the government from knowing using, or failing to correct false testimony. See Giglio v United States, 405 US 150, 92 S.Ct 765, 31 L.ed 2d 104 (1972) (promise of lenience known to Assistant United Stattes Attorney who pre-semted case to the grandjury but not know to assistance who condutted trial). Even where defence counsel is aware of falsity, there may be a deprivation of due process if the prosecutor reinforce the deception by capitalizing on it in closing argument, United States v. Valentin, 820 F.2d 565 (2d cir. 1987); United States v. Sanfillipo, 564 F.2d 176-178 (5th cir. 1977) or by posing misleading question to the witness. United States v. Barham, 595 F.2d 231, 243 n. 17 (5th cir. 1997). False evidence includes untrue testimony going to the credibility of a witness. Napue, 360 US at 269-70, 97 S.Ct. at 1177: Debose v. Lefever, 619 F.2d 973-979 (2d cir. 1980).

[D]eliberate deception of a court and jurors by the presentation of known false evidence is incopatible with rudimentary demands of justice. "Giglio, 405 U.S. at 153, 92 S.Ct. 763 (citation and internal quoation marks omitted); accord United States v. Agurs, 427 U.S. 97 S.CT. 2392 49 ed. 342 (1976)("[T]he [Supreme] Court has consistently held that a conviction obtained by the knowing use of perjury testimony i fundament-ally unfair, and must set aside if there is any reasonable likelyhood

that the false testimony could have affected the judgement of the jury.").
(internal citation omitted); Napue, 360 U.S. at 269, 79 S.Ct. 1173). Also
See Money v. Holohan, 294 U.S. 103, 112, 55 S.Ct. 340, 97 L.ed 791 (1935)
(condeming "deliberate deception of court and jury by the presentation
of testimony of know to be perjuried); cf Brady, 373 U.S. at 87, 83 S.Ct.
1194 (nothing that nondisclosure violated due process when the suppressed
evidence is material of guilt.

* Sterling Johnson--testified in the grandjury 8/10/95 at 10, 5-9.

Q What did Bay brother do or say after he took the four bag of heroin
  from you?

A He didn't say anything. He just it and forced it into his pocket and
  he walked away from the bus stop with the pistol his hand.

* Steling Johnson--testified in trial 12/2/96 at 218, 20-25

Q What did he say after he took the drugs?

A He said, just give me the Billies. He cock a weapon. "He said, you don't
  want to wind up like that white boy Bobby.

* Sterling Johnson--testified in the grandjury 8/10/95 at 12, 12-25. He
toled Tommy Facen about the robbery the day after.

Q That was Tuesday, the day after the robbery.

A Oh, Tuesday? Okay, Tuesday, I was talking to the cigaritte man and telling
  him what happen and what kind of car, it was a black car, like that, I
  remember the last three number of the tag was 245, and at that point in
   time, a black car pulled up and parked about 10, 15, feet away from
  us. And I was explaining to  the cigarette man--his name is "Tom" that
  the dude was driving-I tolded him I got robbed, and he was driving a
  black car with 245 was the tag number. And I looked over, I said, "It's

the car right there.

* <u>Tommy Facen</u>--testified in trial in trial 12/3/96 at 18, 4-13. He was standing right next to rock when he got robbed.

Q What happen when this person came to up to where you where standing?

A First he got out the car, came up to rock and said nigger, give it up, robbery in other words.

Q And how far away were you from Rock at the time that you heard this statement?

A Two, three feet, because were just standing there talking.

The Prosecutor allowed Sterling Johnson and Tommy Facen to comitt prejury. Sterling Johnson and Tommy Facen testimony was crucial in the government case. (1) The allege statement that was said to Sterling Johnson "You don't want to wind up like the white boy Bobby". The government knew that the jury would misunderstand the statement as a statement of guilt and appeal's court used the statement as a connection to connect the two crimes together.(See Judge Schwlb opion) Tommy Facen testimony was crucial, first it places the car that was used in the robbery at the seen of the murder of Bobby Hamilton, two he positive ID plaintiff as the one getting into the car.

A conviction must be over turned which rest in part on the knowing use of false testimony, If there is any reasonable likelyhood that the false testimony could have affected the judgement of the jury. <u>United States v Agurs</u>, 427 US 97 SCt. 239-249.

In <u>Barham v. United States</u>, 595 F.2d 231, The courts held that when there are two irreciable stories there is one conclusion that can be drawn with absolute certainly from two conflicting tales, that some

one is not telling the truth. Especially, when you have two testimonys that contradict one another as you do in this case. See Sterling Johnson 8/10/95 at 8-11, Tommy Facen 12/3/96 at 16-20.


## ARGUMENT (2)


## PLAINTIFF'S SIXTH AMENDMENT RIGHT WAS VIOLATED


Plaintiff argues that his assigned counsel was ineffective and that because of his ineffectiveness, he cause this Plaintiff harn and pre-judice.


The Sixth Amendment right to counsel requires not only that a person accused of a crime have assistance of counsel for his defence, but also, that such assistance must be effective as stated in 21 AM Jur 2d Criminal Law § 1223. In order for Plaintiff's counsel to properly fulfill his re-sponsibilities he must act as a "meaningful adversary to the prosecution". Should this process lose its character as a confrontation between adver-saries, then the constitutional guarantee is violated. This is clearly stated in Criminal Law ¶ 46.6 as well as in the Supreme Court ruling in U.S. v. Cronic, 466 U.S. 659. 80 L.ed 2d 657 (1984).

According to the (A.B.A.) American Bar Association project on standards for defence function, Plaintiff's counsel should always familiarize him-self with all reports serving as foundation for trial and sentencing in advamce of any hearing. Counsel should assume access to such reports and

should make every effort to verify information contained within. So as to be able to supplement reports when incomplet and challenge them when they are considered inaccurate. Plaintiff also argues as stated by the U.S. Supreme Court in U.S. V. Pinkey, 551 F.2d 1242 (1976). "That defense counsel should be fully prepared to present to the court all factors and mitigating circumstances necessary to ensure a reasonable meaningful trial and hearing on sentencing and should present to the court any grounds which will assist in reaching a proper and correct disposition favorable to the accused."

The Supreme Court further extends in Pinkney supra at page 1249

> "That specific duties are owned by counsel to the client, such as counsel should confer with his client without delay and as often as necessary (with respect to) matters of defence and should discuss potential strategies and tactical choices with his client and that counsel must at all times conduct appropriate investigatiions both factual and legeal. To determine what matter of defence can be developed."

The Supreme Court further stated in Cronic supra page 661, that a Plaintiff can make out a claim of ineffective assistance of counsel by pointing out specific errors made by trial counsel.

Had trial counsel familiarize himself with all available reports "grandjury testimony, jenks material, police notes, Brady material and witness complaint form" as stated in Cronic supra 661, Pinkney supra 1249, Cosio v. United States, 927, A2d 1106 (2005, Jose Murguez Dist. Lexis 26355 (2009) and (ABA) American Bar Association project on standards for defence function, counsel would have been able to :

(1) Impeach Sterling Johnson with his grandjury statement that he informed Tommy (Tom) Facen about the robbery the day after it happen.

(2) The statement "you don't want to wind up like the white boy Bobby" was never said in the curse of the robbery.

[E]specially in view of the fact that Sterling Johnson admitted that his memorey was better in the grandjury, tr. 12/2/96 at 237 19-20.

(3) Robin Fitzsimmons testimony in trial 12/2/96 at 179, 20, that the day Bobby hamilton was killed she was high, on cocain, herion, xanaxes and taken lithium, she also has a chemical imbalance which causes her to have memorey problems. Cousel should have, after hearing her testimony, have her testimony stricken from the record and ruled her imcompetent to testified. Trial counsel allowed the prosecutor to lead her throughout her testimony. [E]specially after she informed the prosecutor that she was high and could'nt remember. Plaintiff was prejudice because the jury was lead to believe that the testimomy was true.

(4) Counsel should have been aware of the fact that Ms. Fitzsimmons was testifying for the government for exchange for leniency in her case. In United states v. Robin Fitzsimmsons, Case No. F-5486-96, M-3696-96 and M-7121-95 (August 22, 19996). Counsel for defendant Ms Angela Ramsay. The jury was never aware of the fact that the Prosecutor Mr. J.C. Bohling in this case offered her leniency in exchange for her testimony. See exhibit (1)

(5) Counsel failed to make proper pretrial investigation, and inter view witnesses, and present their testimony constitutes Constitutional Ineffectiveness. See Byrd v. United States, 614, A2d 25 (D.C. 1992). See exhibit (2).

This Plaintiff has demonstrated that he is innocent of the crimes aforesaid by presenting the court with a colorable claim of actual innocence supplemented with constitutional claims as articulated by the U.S. Supreme Court's decision in Schulp. Plaintiff is among the small but unnerving number of innocent persons serving long terms of incarceration based upon conviction for crimes they did not commit. See Generally, New York State Defenders Ass'n, Wrongful New York State Homicide Conviction Since 1965 (May 30, 1990)(documenting 59 homicide cases in New York States between 1965 and 1988, in which a defendant was wrongly convicted of homicide); Hugo Adam Bedau & Michael L. Radelt, Miscarriages of Justice in Potentially Capital Cases, 40 Stan. L. Rev. 21 (1987)(docummenting 350 potential capital cases involving wrongful of innocent people between 1900 and 1985); Edwin M. Borchard, Convicting the Innocent, Errors of Criminal Justice (1932)(docummenting 65 cases of defendant's wrongfully convicted of murder and other serious felonies).

It would be in the interrest of justice for the Court to entertain the prisoner's constitutional claims on the merits by way of granting him a hearing and allowing his mertious claim to be heard in open court.

---

It should be noted: On July 17, 1998, Plaintiff filded a motion to have his appellant counsel removed from his case citing irreconcilable difference. In response, counsel denied the allogation Judge Ritcher denied the motion without a hearing. In Nov. 1998, without consulting with Plaintiff, counsel filed a Supplementary motion. See Douglas v United States, 488 A2d 121, also Mathis v Hood, 937 F.2d 790 (2nd cir 1991). Cuyler v United States, 444 US at 345-50

## SUMMARY

Because counsel was not aware of the evidentiary D.C. rule
(1995) § 14-102(b) (which is identical of that of Fed. R. EVID.)
Counsel failed to discredit any of the government witnesses inview
of his opening statement. By not introducing Sterling Johnson grand
jury testimony as substantive evidence in support of facts in issue:
Fact (1)..Sterling Johnson tolded Tommy (Tom) Facen about the arm-
robbery that occured on the 24, of July 1995. Fact (2) During the course
of the robbery of Johnson, Bobby Hamilton name was never mention. Had
Defence counsel impeach Sterling Johnson with his grand jury testimony
he would have given the jury a bais to infer that the witness' charactor
is such that he would be less likely than average trustworthy citizen
to be truthful in his testimony. The jury could well believe that
Sterling Johnson's testimony in the grand jury was more truthful.
[E]specially after the fact that Sterling Johnson admitted that his
memory was more better in the grand jury. Also, the defence counsel
would have been able to contradict Tommy (Tom) Facen testimony in
trial, that he was standing right next to Sterling Johnson when he
was robbed; and he was standing on the corner of first st. when Bobby
Hamilton was killed. The jury could believe that if he was not telling
the truth about plaintiff being in a black when the robbery occured
he is not telling the truth about seeing plaintiff in a black car (murder).

Had counsel been aware of D.C. rule 12.1 "notice of the defendant's
intention to offer a defence of alibi" defence would have been able to
present to the jury....

exculapatory testimony that plaintiff was with them at the time of the murder of Bobby Hamilton. The Court is in possess of three affidavids from witnesses who were with plaintiff else where when someone other than plaintiff commited the crime for which he now stands convicted of. The declaration made in these affidavids are neighter vague and postulating no impeaching. The information directly call into question the validity of the verdict rendered in this case. Exculpatory test-mony was excluded in violation of the Campulsory Process Clause, U.S. Const. VI;(2) that complaintiff was deprived of effective assistance of counsel.

> Errors cause by counsel's ignorance of the law
> are errors that run afoul of the objective stand-
> ard of reasonableness. See Kimmelmen v Morrison,
> 477 U.S. 365, 385 91 L.ed 305. 106. S.Ct. 2574
> (1986) (rejecting argument that counsel's errors
> were strategic choices because they were based
> on ignorance of the law.

Plaintiff has demonstrated a reasonable probability that, but for his counsel's errors, the result of the trial would have been diff-erent. Complaintiff need not show; however, that if Clark, Simms, Ms. Wilson and Mr. Owens had testified, he would necessarily have been acquited. "The result of a proceeding can be rendered unrel-iable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome. "Strickland, supra 466 U.S. at 694, 104 S.CT. 2052

In this case plaintiff was convicted on false evidence and ineff-ective of counsel; and by a truelent Assistant United States Attorney

long prior to trial, after conviction, at sentencing, through dir-
ect appeal. Plaintiff however asserts his <u>Actual Innocents.</u>

## CONCLUSION

For the foregoing reasons, Plaintiff submit that his petition
for habeas corpus should be granted and his conviction vacated.

March 14, 2011

Respectfully Submitted
George Leon Adams
#12021-007
P.O. Box 1033
USP Coleman #1
Coleman, Florida 33521