UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

GEORGE LEON ADAMS,                    *
Petitioner/Movant,
                                      *

                                      *    Case No. 10-1945(ESH)
vs.
                                      *    (Underlying Criminal Case No.
                                           Superior Court of District of
UNITED STATES OF AMERICA,             *    Columbia F-6136-95)
              Respondent.
                                      *    (Remanded Appellate Case No.
                                           11-5268).
                                      *

                                      *

---

## MOVANT'S SUPPLEMENT TO HIS APPLICATION FOR A COA

COMES NOW, George Leon Adams, (hereinafter "Movant"), in the
above-styled cause, respectfully moves this Honorable Court to
consider the facts and supporting law contained herein before making
the determination as to whether or not a certificate of appealability
should be issued in light of his claim that appellate counsel was
ineffective in failing to argue on direct appeal that trial counsel
erred by not presenting an alibi defense. (See Order, United States
Court of Appeals for the District of Columbia; Case No. 11-5268;
Filed on April 25, 2012).

### FACTS AND LAW SUPPORTING ISSUANCE OF A COA

### I. Standard for a COA

The antiterrosim and Effective Death Penalty Act ("AEDPA")
provides that, in order to take an appeal from a final order denying
habeas corpus, a Certificate of Appealability must be obtained from

1



RECEIVED
Mail Room

- 7 2012

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

a circuit justice or from the district court judge. **28 U.S.C. 2253 (c)(1).**

In order to obtain a COA, the petitioner must make a "substantial showing of the denial of a constitutional right." **28 U.S.C. § 2253 (c)(2).** However, the petitioner need not show that he should prevail on the merits. See, e.g., **Lambright v. Stewart, 220 F.3d 1022, 1025 (9th Cir. 2000)** ["... [O]bviously the petitioner need not show that he should prevail on the merits. He has already failed in that endeavor"]. Rather, the petitioner is merely required to make the "modest" showing (**Lambright, supra, at 1025)** that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." **Slack v. McDaniel, 529 U.S. 473, 484 (2000).** As explained by the Ninth Circuit in **Jennings v. Woodford, 290 F.3d 1006 (9th Cir. 2002),** the substantial showing standard required for a COA is "relatively low." **Id. at 1011,** citing **Slack, supra.** Hence, a COA must issue if any of the following apply: (1) the issues are debatable among reasonable jurists; (2) another court could resolve the issues differently; or (3) the questions raised are adequate enough to encourage the petitioner to proceed further. And finally, "[T]he court must resolve doubts about the propriety of a COA in the petitioner's favor." **Jennings, supra**, citing **Lambright, supra, at 1025.**

## II. Arguments supporting issuance of COA.

The Movant in the case **sub judice**, initially filed a 28 U.S.C. § 2241 motion, of which this Court construed as a 28 U.S.C. § 2254 motion because Movant was challenging his sentences and convictions in the Superior Court for the District of Columbia for the crimes of

2

attempting to rob Ronald Wright, Brian Mountjoy and Robert Hamilton, and for the murder of Hamilton during the attempt to rob these people. The record reflects, Movant made several unsuccessful attempts to challenge these convictions in the past with **pro se** motions in the Superior Court; one such motion was filed under § 23-110 of the D.C. Code and the another was filed as a recall of the mandate. (See **Watson v. United States, 536 A.2d 1056, 1060 (D.C. 1987)** (en banc)(recall of mandate proper procedure in D.C. courts to litigate ineffective assistance of appellate counsel). His motion to recall the mandate was denied on October 29, 2009. (See This Court's Memorandum Opinion, Doc. 22, p. 3; Case No. 10-1945(ESH)).

Once Movant brought his habeas writ to this Court, it was denied on September 9, 2011. (Docs. 22 & 23). Subsequently, Movant filed a notice of appeal and an application for a COA to the United States Court of Appeals for the District of Columbia on September 30, 2011. (Case No. 11-5268). The appellate court held Movant's pleadings in abeyance until it was determined if this Court would first issue a COA.

On October 13, 2011, this Court denied Movant a COA, and the appeal was taken to the appellate court; to which the court of appeals upon review denied a COA on most of the issues raised; but did remand back to the district court to address whether a COA should be issued in light of appellant's claim that appellate counsel was ineffective for failing to argue on appeal that trial counsel erred by not presenting an alibi defense. (See Order; Filed April 25, 2012).

Movant posits that a COA should be issued for the reasons below:

**A. Standard of review for ineffective assistance of counsel**

The same two-part test set forth in **Strickland v. Washington,**

3

466 U.S. 668, 688 (1984), applies to ineffective assistance of appellate counsel on direct appeal. See **Evitts v. Lucey, 469 U.S. 387 (1985).** To establish ineffective assistance of counsel, a petitioner must show that: (1) counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. **Strickland, 466 U.S. at 688.** A "reasonable probability" is a standard of proof "somewhat lower" than a preponderance of the evidence. **466 U.S. at 694.**

Appellate counsel does not provide ineffective assistance when frivolous arguments are not raised on direct appeal. **Jones v. Barnes, 463 U.S. 745 (1983).** And in some instances, there may be no arguable issues to be raised on direct appeal, and appellate counsel may seek to withdraw and file a brief pursuant to **Anders v. California, 386 U.S. 738 (1976).** However, there may be instances where counsel fails to consult with his client, raising arguments on appeal that are not as strong as those he could have raised if he would have spoken with his client. Cf. **Strickland, 466 U.S. at 691** ("inquiry into counsel's conversation with the defendant may be critical to a proper assessment of counsel's ... decisions"); see also, **Peguero v. United States, 526 U.S. 23, 30 (1999)** (O'Connor, J., concurring) ("To require defendants to specify the grounds for their appeal and show they have some merit would impose a heavy burden on defendants who are often proceeding **pro se** in an initial [habeas] motion"); **Roe v. Flores-Ortega, 528 U.S. 470, 486 (2000)** ("conclud[ing] ... that it is unfair to **require** an indigent, perhaps **pro se**, defendant to demonstrate that his hypothetical appeal might have merit before any advocate has ever reviewed the

4

record in his case in search of potentially meritorious grounds for appeal."). (emphasis in the original).

The guarantee of ineffective assistance of counsel "cannot be satisfied by mere formal appointment" of an attorney. **Avery v. Alabama, 308 U.S. 444, 446 (1940); Evitts v. Lucey, 469 U.S. 387, 395 (1985)**. The benefit of effective assistance is the right of "counsel's examination into the record, research of the law, and marshalling of arguments on [his/hers client's] behalf." **Douglas v. California, 372 U.S. 353, 358 (1963); Evitts v. Lucey, at 395 n. 6.**

In **Jones v. Barnes, supra,** the Supreme Court held it was counsel's duty to decide what to raise or what not to raise on direct appeal, because the professional advocate must be allowed to decide what issues to press by evaluating and selecting the most promising issues for review. But, as case law has shown, not every attorney out there practicing law provides his client with effective assistance on direct appeal, and very often, defendants lose out on review of some very significant issues that would have warranted their cases to be reversed if appellate counsel would have only briefed the claim.

"Notwithstanding **Barnes**, it is still possible to bring a **Strickland** claim based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent." **Smith v. Robbins, 528 U.S. 259, 288 (2000)**; see, e.g., **Gray v. Greer, 800 F.2d 644, 646 (7th Cir. 1986)** ("Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome").

**B. Appellate counsel rendered ineffective assistance because counsel had stronger issues that could have been raised on direct appeal than the issues counsel raised.**

The record will reflect, Movant's counsel raised several frivolous arguments on direct appeal. The issues presented to the District of Columbia Court of appeals were:

> I. Whether the court abused its discretion in refusing to suppress indentification testimony that was the product of an illegal 10-hour detention amounting to an arrest without probable cause.
>
> II. Whether the court below erred in denying appellant's motion for a new trial without a hearing where the allegations established a **prima facie** claim for relief under D.C. Code § 23-110.
>
> III. Whether the court below erred in allowing testimony regarding a crime for which appellant was not on trial, which testimony was not relevant to any material issue in the case and which severely prejudiced appellant's defense.

See Brief For Appellant; Case Nos. 97-CF-633 & 99-CO-583; District of Columbia Court of Appeals; Filed by Richard S.Stolker, attorney at law.

The first issue counsel raised was totally frivolous and had no merit at all. The following two issues raised, issue numbers II and III, had some merit, but because counsel failed to advance the proper arguments - more stronger arguments relating to the issues raised - counsel rendered ineffective assistance. For example:

Counsel filed a Motion for a New Trial Based Upon Ineffective Assistance of Trial Counsel pursuant to D.C. Code § 23-110, supplementing Movant's **pro se** motion for ineffective assistance of counsel (labeled as a Petition for Writ of Habeas Corpus). In Movant's **pro se** motion, he raised, **inter alia**, trial counsel's failure to investigate and call alibi witnesses denied him the right to a fair trial, and constituted ineffective assistance. Movant also raised the claim that certain facts would have refuted Sterling Johnson's

6

testimony and impeached the Government's key witness on several important issues.

The Government admitted early on that, it needed to include the robbery of Sterling Johnson, that took place two days after the attempted robbery and murder of Bobby Hamilton, and without Johnson's testimony, the Government had no case. Therefore, Sterling Johnson's testimony was crucial to the Government's case; and the Government proved such in its closing argument. (See Exhibit A, at Pp. 5-6 & Exhibit 5 attached thereto).

In counsel's Supplementary Motion for a New Trial, counsel made a frivolous argument that trial counsel failed to make an on-site inspection of the crime scene. This was quickly rebutted by the Government with the trial transcripts and the affidavit from defense counsel, Ronald E. Horton, stating that he did make an on-site inspection of the crime scene. Counsel did, though, bring out the inconsistencies in the statements given by different witnesses as to the car the perpetrators of Hamilton's murder were driving, where several witnesses stated the perpetrators were driving a blue car - where as the Movant was arrested in a black car. (See United States' Reply To Petitioner's Response To Government's Motion To Dismiss Petitioner's Petition For Writ Of Habeas Corpus, Doc. 20, Exhibit 1-B, Doc. 20-1, at Pp. 14-15). But, appellate counsel dropped the ball by failing to bring out that trial counsel failed to call readily available alibi witnesses that would have placed George Leon Adams in another part of the city at the exact time and date that Adams was to have allegedly shot Bobby Hamilton; and in two of the affidavits procured by Movant, the affiants both stated they were

7

waiting outside the courtroom awaiting to testify. Furthermore, as noted in Movant's Exhibit A attached, included within these affidavits were the names of other potential alibi witnesses that trial counsel never investigated or interviewed. (See Exhibit A, Pp. 15-16 & Exhibit 1 attached thereto). Thus, as noted within Movant's Exhibit A, at pages 15 thru 20, there were several alibi witnesses that could have testified to George Leon Adams whereabouts on the morning of July 22, 1995, if a thorough investigation would have been by done by a competent attorney and had these witnesses been interviewed and brought to trial to testify. But, the record will reflect, that even though two alibi witnesses showed up, trial counsel never put them onto the stand; and now hides behind the shield of trial strategy for his incompetency. Of course, how else could an attorney explain such a monumental blunder? However, his excuse is a bunch of hog-wash!

Appellate counsel was also armed with additional evidence of trial counsel's ineffectiveness. Appellate counsel, Richard S. Stolker, had trial counsel's notes - including the interviews of several alibi witnesses and the Government's chief witness, Sterling Johnson. Thus, appellate counsel knew that the investigator for the Public Defenders' Office, Ms. Sarah Dumont, interviewed Carroll Maurice Jenkins (AKA - Mr. Rececce), and Jenkins told Ms. Dumont that George Adams was at his residence on the morning of July 22, 1995; and other potential witnesses were at Mr. Jenkins residence as well. But, due to the fact Jenkins sold drugs out of his residence, trial counsel chose not to call Jenkins or any other of the witnesses at Jenkins' residence that saw Movant that morning. Why? What would have been the difference in Jenkins testifying as opposed to all the admitted drug addicts the

Government placed onto the witness stand to convict Adams? There would have not been one iota of a difference! Thus, as the Supreme Court of the United States has clearly stated: An attorney **cannot** hide behind the shield of trial strategy for justifying all errors of counsel. (emphasis added); see **Wiggins v. Smith, 539 U.S. 510, 156 L.Ed.2d 471, 484, 123 S.Ct. 2527 (2003)**; see also, **Williams v. Taylor, 529 U.S. 362, 396 (2000)**. "In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. Even assuming [Ronald E. Horton] limited the scope of [his] investigation for strategic reasons, **Strickland** does not establish that a cursory investigation automatically justifies a tactical decision with respect to ... strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy." **Wiggins v. Smith, 156 L.Ed.2d at 488.**

Trial counsel's notes do not show that trial counsel went to any of the other witnesses listed within these affiants' affidavits to learn if they, too, would have been able to give testimony as to Adams being in another part of the city at the exact time and date that Adams was to have alleged to attempt to rob and murder Robert Hamilton. Trial counsel may have found additional witnesses to testify that were not drug dealers or drug addicts - if he would have made a proper investigation from the quantum of evidence already provided to him by those who were willing to take the witness stand in Movant's behalf.

As set forth in Movant's Exhibit A; trial counsel could have

9

called witnesses that would have testified that Adams left his residence around eight o'clock on the morning of July 22, 1995 (George Leon Adams's wife); that he left on foot, walking because he did not own a car nor had a drivers' licence; that he was walking the same direction he always walked in the mornings - towards Jenkins' residence. Then trial counsel could have called Carroll Maurice Jenkins, Sharon Henrey, Jeffery Wilkinson, and Sergeant (FNU) Williams, all who were at Mr. Jenkins' residence on the morning of July 22, 1995; they could have testified as to how long Adams stayed - what time he left - whether he was still on foot - and what direction Adams was walking. After calling these witnesses, trial counsel could have called the three witnesses that have given affidavits as to them being with Adams on 56th street and Central Avenue, as well as Robert (Cowboy) Sims, who was one of the witnesses that showed up for trial but was not called to testify, along with others listed in those affidavits, that were also in front of the projects on the morning of July 22, 1995, between the hours of 8:00 am and 10:00 am. Trial counsel could have, and should have, called all the witnesses who submitted an affidavit and all the witnesses that were listed within those affidavits, and Mr. Carroll Jenkins and those at his residence on the morning of July 22, 1995, and George Leon Adams' wife, giving the jury testimony of Adams' whereabouts from around 8:00 am to 10:00 am; especially due to the fact the call came into the police station about the Hamilton shooting around 9:39 am that same morning - but trial counsel did not. And the defense he put on, merely trying to discredit the Government's witnesses' testimony during cross-examination was a very weak defense at best. (See **Adams**

**v. Balcom, 688 F.2d 734, 738 (11th Cir. 1981)** (certain defense
strategies or decisions may be "so ill chosen" as to render counsel's
overall representation constitutionally deficient); **McQueen v.
Swenson, 498 F.2d 207, 217 (5th Cir. 1974)** ("The most able and
competent lawyer in the world cannot render effective assistance in
the defense of his client if his lack of preparation for trial results
in his failure to learn of readily available facts which might afforded
his client a legitimate ... defense.") [1]

In this case, trial counsel, Ronald E. Horton, failed his client
by failing to due a thorough investigation and by failing to place
onto the witness stand alibi witnesses who were willing to testify
that George Leon Adams could not have attempted to rob and murder
Robert Hamilton on July 22, 1995, because Adams was in another part
of the city at the exact date and time Hamilton was shot dead.

However, the above ineffectiveness was not the only facts that
appellate counsel had in his possession that were stronger issues
than the issues raised by appellate counsel on direct appeal.

The record reflects, as noted earlier, appellate counsel filed
a supplement to Movant's **pro se** motion for a new trial. For example:

Appellate counsel stated the following in his Supplementary
Motion For A New Trial that:

The government's case was built upon the largely questioned
assumption that the black Pontiac in which Sterling Johnson

---

Note 1: The Movant will not bore this Court by listing the plethora of case law
in every circuit as to trial counsels rendering ineffective assistance of counsel
at trial for failing to call alibi witnesses. Movant has cited to several cases
within his Exhibit 1 attached hereto, at pages 18-19, that should suffice as
supporting case law to establish jurists of reason would consider trial counsel's
acts of omission in the case **sub judice** to have fallen below professional norms
under the facts of this case. The prejudice is apparent - Adams was convicted.

had seen defendant, was somehow involved in the murder and attempted robbery of Bobby Hamilton two days earlier. Indeed, defendant's **convictions for the murder and attempted robbery were almost entirely based on the threat defendant made to Johnson**, "You don't want to wind up like that white boy Bobby." (Tr. 12/2/96 at 218) (emphasis added).

(See United States's Reply To Petitioner's Response ...., Doc. 20-1, at p. 15).

Appellate counsel had the record in his possession, including police reports of witnesses interviews and statements made by Sterling Johnson to the authorities and to trial counsel himself. Thus, appellate counsel had stronger issues than raised on direct appeal and in his Supplementary Motion to Movant's **pro se** motion for a new trial due to trial counsel's ineffectiveness. A review of the statements made to authorities by Sterling Johnson and to the authorities by other witnesses and potential witnesses, coupled with Sterling Johnson's proposal to trial counsel to sell his testimony for the right amount of money, establishes appellate counsel did not argue the ineffective assistance of counsel properly and that appellate counsel, himself, rendered ineffective assistance by failing to present stronger issues before the courts.

As Movant set forth in his attached Exhibit A, pages 6 thru 15, trial counsel was laboring under a conflict of interest due to the fact, trial counsel was placed into the unique position of becoming an Advocate-Witness in this case once Sterling Johnson, a drug addict and a drug seller, offered to sway his testimony for the right amount of money. This was included in trial counsel's notes of counsel's interview of Johnson, and counsel's notes were signed by Sterling Johnson himself. However, the record reflects that trial counsel

12

never notified the trial court or the Movant about this improper proposal by the Government's key witness. Only after Movant's direct appeal had been affirmed, did Movant receive all the paper work from his appellate attorney, and it was then that Movant made the discovery of trial counsel's notes with Sterling Johnson's signature on the notes. Clearly, trial counsel had a duty to the court and his client to bring this matter to the trial court's attention. And under prevailing case law, trial counsel should have known that he had been placed in the position to be called as a witness for the defense. Furthermore, as set forth in Movant's Exhibit A attached hereto, with such damaging testimony from an attorney as to the Government's key witness offering to sell his testimony to the highest bidder, trial counsel should have filed a motion to withdraw, allowed substitute counsel to be appointed, notified replacement counsel of the facts previous counsel was privileged to and allowed himself to be called as a witness in Adams' case to impeach the credibility of Sterling Johnson. See, e.g., **United States v. Kliti, 156 F.3d 150, 155-57 (2d Cir. 1998)** (cases cited within); **United States v. Irizzo, 786 F.2d 52, 57-59 (2d Cir. 1986); United States v. Edwards, 154 F.3d 915, 921 (9th Cir. 1998)**; see also Exhibit 1 attached hereto and cases cited therein.

"The advocate-witness rule prohibits an attorney from appearing as both a witness and an advocate in the same litigation." **United States v. Sayakhom, 186 F.3d 928, 943 (9th Cir. 1999)**. And "[I]f counsel were to cross-examine the witness as to [the witness's] conversations with him, argue the credibility of [the witness's] testimony to the jury, or suggest alternative interpretations of [the

witness's] account of the conversation, he would place himself in the position of an unsworn witness and implicitly put his own credibility at issue .... The Sixth Amendment interest of counsel of choice must give way when chosen counsel is so compromised."
**United States v. McKeon, 738 F.2d 26, 34-35 (2d Cir. 1984).**

Appellate counsel made a brief three-line statement about this issue in counsel's Supplementary Motion For A New Trial, at page 16, stating:

> Furthermore, on information and belief, government witness Sterling Johnson made an offer to trial counsel to not press charges in exchange for a payment of money. Counsel failed to examine the witness as to his extortionate out-of-court offer.

(See Doc. 20-1, at p. 16).

This statement in counsel Stolker's pleadings established that appellate counsel was put on notice of trial counsel's conflict of interest. And the mere three-line statement was insufficient to set forth with clarity the significance of trial counsel's failure to notify the trial court and a file a motion to withdraw to become a witness for the defense. Furthermore, appellate counsel cited no authority, such as **Cuyler v. Sullivan, 446 U.S. 335, 349 (1980)**, to support his argument for the lapse in trial counsel's representation. And contrary to appellate counsel's statement that "[Trial] Counsel failed to examine the witness as to his extortionate out-of-court offer," appellate counsel should have known in under the Advocate-Witness rule, trial counsel could not have cross-examined Johnson about this offer; because had Johnson denied ever making the offer, or change his story while on the stand, trial counsel would have put his credibility at issue before the jury.

Appellate counsel should have researched this issue and the case

14

law and adamantly argued this point before the Superior Court, moving the Superior Court for a new trial because trial counsel was laboring under a conflict of interest, and that trial counsel failed to offer significant impeachment testimony by refusing to notify the trial court and withdrawing from the case.

Appellate counsel spent more time arguing the court's failure to grant an evidentiary hearing than arguing the facts to support Movant's rights and reasons for the trial court'a abuse of discretion in denying an evidentiary hearing.

On direct appeal, appellate counsel once again argued that the trial court abused its discretion by failing to grant an evidentiary hearing as Movant's claims of ineffective assistance of counsel, (See Brief For Appellant, at Pp. 28-31), and that appellant alleged facts constituting a **prima facie** claim of ineffective assistance of trial counsel. (Ibid., at Pp. 32-35). Once again, appellate counsel spent most of the pages in his brief citing to case law, and a very minimal amount of time arguing the supporting facts of the case to prove why an evidentiary hearing was necessary. In fact, appellate counsel only stated the issues raised in his client's § 32-110 motion on pages 33 and 34, and failed to expound on the issues raised and why the trial court abused its discretion. This failure to raise trial counsel's failure to notify the trial court about trial counsel's conflict of interest under the Advocate-Witness rule, when appellate counsel had a copy of the trial counsel's affidavit submitted to the Superior Court and a copy of trial counsel's notes of Sterling Johnson's interviewed signed by Johnson himself, was clearly deficient performance on appellate counsel's part; and had appellate counsel

briefed this issue on direct appeal, rather than glossing over such a strong and significant issue, then there is a reasonable probability that the outcome of movant's direct appeal would have been different and the District of Columbia Court of Appeals would have remanded the case back to the Superior Court for a new trial. The record proves it was never explained into detail in both Movant's § 23-110 motion or in Movant's Brief For Appellant.

Thus, appellate counsel failed to (1) raise trial counsel's failure to call **numerous** alibi witnesses; (2) raise trial counsel's obvious conflict of interest under the advocate-witness rule and trial counsel's failure to notify the trial court and his client; (3) raise trial counsel's failure to properly impeach the Government's witnesses - especially Sterling Johnson - when trial counsel had much more impeachment material to discredit Johnson with (see Exhibit A, Pp. 6-11); and (4) appellate counsel failed to raise and brief stronger issues than the issues raised, and failed to expound into detail and clarify to the appellate court the issues he raised; and as a result, counsel's deficient performance fell below professional norms, denying Movant his Sixth Amendment right to effective assistance of counsel on direct appeal.

In most instances, ineffective assistance of counsel claims are best raised in post-conviction petitions. Ineffective assistance of trial counsel claims must be raised under D.C. Code § 23-110. (See **Williams v. Martinez, 586 F.3d 995, 996 (D.C. Cir. 2009)**). Ineffective assistance of appellate counsel claims, though, must be brought back to the appellate court through a motion to recall the mandate. **Id.** "Because the D.C. Court of Appeals has held that challenges to the

effectiveness of appellate counsel may not be brought pursuant to section 23-110, but instead be raised through a motion to recall the mandate in that court, we hold that section 23-110 does not deprive federal courts of jurisdiction over habeas petitions alleging ineffective assistance of appellate counsel." **Id.**; see also **Streater v. Jackson, 691 F.2d 1026, 223 U.S. App. D.C. 393 (D.C. Cir. 1982); Blair-Bey v. Quick, 151 F.3d 1036, 331 U.S. App. D.C. 362 (D.C. Cir. 1998).**

Thus, this Court has jurisdiction to entertain claims relating to ineffectiveness of appellate counsel, and section 23-110 does not bar Adams's habeas petition; and the court has jurisdiction to issue a COA.

### C. The D.C. Courts decisions were contrary to federal law and an unreasonable application of federal laws.

AEDPA limits a federal court's power to grant habes corpus relief to state prisoners. (See **Madley v. U.S. Parole Comm'n, 278 F.3d 1306, 1308-09, 349 U.S. App. D.C. 357 (D.C. Cir. 2002)** (holding that District of Columbia courts are deemed to be state courts for purposes of 28 U.S.C. § 2253)). Under 28 U.S.C. § 2254(d), a court may not grant a habeas petitioner relief

> with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Courtof the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. **28 U.S.C. § 2254(d).**

The concept of an "adjudication on the merirs" is corollary of the longheld requirements that a state prisoner first exhaust his

17

claims in state court. See **id. § 2254(b)(1)(A)** (requiring exhaustion of state court remedies); **Cone v. Bell, 556 U.S. 449, 129 S.Ct. 1769, 1780 (2009)** (calling exhaustion of state remedies prior to seeking federal habeas relief a "longstanding requirement"). Before asking the federal court to "correct" a state court's mistake, the petitioner must first give the state court an opportunity to rule on the merits of his claim. **Cone, 129 S.Ct. at 1780** ("When a petitioner fails to properly raise his federal claims in state court, he deprives the State of 'an opportunity to address those claims in the first instance' and frustrates the State's ability to honor his constitutional rights." (quoting **Coleman v. Thompson, 501 U.S. 722, 732 (1991)**)).

Implicit in this scheme lies the possiblity that the state court — presented with the petitioner's federal constitutional claim — may not rule on the merits of petitioner's claim. E.g., **Cone, 129 S.Ct. at 1784**. In those instances, AEDPA deference — that the federal courts may not grant habeas relief unless the state court's decision was "contrary to" or an "unreasonable application of" federal law — does not apply and federal courts evaluate the petitioner's claims **de novo**. **Id.** (citing **Rompilla v. Beard, 545 U.S. 374, 380 (2005); Wiggins v. Smith, 539 U.S. 510, 534 (2003)**).

A state court decision is "contrary to" federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." **Williams v. Taylor, 529 U.S. 362, 412-13 (2000)**.

18

An "unreasonable application" of federal law occurs when the "state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." **Id., 529 U.S. at 413.**

"Clearly established federal law" refers to the "holdings, as opposed to the dicta, of [the United States Supreme Court's] decisions as of the time of the relevant state-court decision." **Id., at 412.** Therefore, the state court's decision must be a reasonable application of "'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'" **Yarborough v. Alvarado, 541 U.S. 652, 661 (2004)** (quoting **Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003)**).

In the case **sub judice**, the courts have failed to not only follow United States Supreme Court laws as to the facts of Movant's case, but have also failed to follow the laws set forth for the District of Columbia. The law in the District of Columbia is: "We have said many times that where the court is faced with a claim of ineffective assistance of counsel, the statute creates a presumption that a hearing should be held, especially where the allegations of ineffectiveness relate to facts outside the trial record." **Long v. United States, 910 A.2d 298, 308 (D.C. 2006)** (quoting **Newman v. United States, 705 A.2d 246, 261 (D.C. 1997).** "Indeed, the statute states that '[u]nless the motion and files and records of the case **conclusively** show that the prisoner is entitled to no relief, the court **shall** cause notice thereof to be served upon the prosecuting authority, grant a prompt hearing thereon, determine the issues, and make findings of fact and conclusions of law with respect thereto.'

19

D.C. Code § 23-110(c)." **Long, 910 A.2d at 308** (emphasis in the
original). "While the decision whether to hold a hearing is committed
to the trial court's discretion, see **Little v. United States, 748
A.2d 920, 922 (D.C. 2000)**, the scope of that discretion is thus quite
narrow." **Id.** "'Any question regarding the appropriateness of a hearing
should be resolved in favor of holding a hearing." **Id.**, (quoting
**Newman, supra** (internal quotation marks and citations omitted). The
D.C. Court of Appeals "will affirm the trial court's denial of a
§ 23-110 motion without a hearing only if the claims (1) are palpably
incredible; (2) are vague and conclusory; or (3) even if true, do not
entitle the movant to relief." **Id.** "In other words, absent a procedure
bar ..., 'we must be satisfied that under no circumstances could the
petitioner establish facts warranting relief.'" **Id.**, (quoting **Joseph
v. United States, 878 A.2d 1204, 1209 (D.C. 2005); Ramsey v. United
States, 569 A.2d 142, 147 (D.C. 1990)**). And "[W]here the defendant
alleges that counsel failed to call a particular witness to testify
on the defendant's behalf, counsel may have had valid reasons for not
calling the witness, but because the reasons are usually not in the
record, an evidentiary hearing is normally required." **Ginyard v.
United States, 816 A.2d 21, 37 (D.C. 2003)** (quoting **Reaves v. United
States, 694 A.2d 52, 58 (D.C. 1997)**).

The United States Supreme Court has held, "where specific
allegations before the court show reason to believe that the petitioner
may, if the facts fully developed, be able to demonstrate that he is
... entitled to relief, it is the **duty** of the court to provide the
necessary facilities and procedures for an adequate inquiry." **Bracy
v. Gramley, 520 U.S. 899, 908-909 (1997)** (quoting **Harris v. Nelson,**

394 U.S. 286, 295 (1969)); see also **McFarland v. Scott, 512 U.S.**
**849, 859-60 (1994); Kenney v. Tamayo-Reyes, 504 U.S. 1, 14-15 (1992);**
**Spreitzer v. Peters, 114 F.3d 1435 (7th Cir. 1997)**, stating that,

> "**Townsend [v. Sain]** instructed: 'Where the facts are in
> dispute, the federal court in habeas corpus **must** hold an
> evidentiary hearing if the habeas applicant did not receive
> a full and fair evidentiary hearing ..., either at the time
> of trial or in collateral proceedings. In other words a
> federal evidentiary hearing is **required** unless the ...
> trier of fact has, after a full hearing, reliably found the
> relevant facts.'" **Id. 1456** (quoting **Townsend v. Sain, 372**
> **U.S. 293, 312-13 (1963)**) (emphasis added).

In the case **sub judice**, the prosecutor's case rested on a couple
eye witnesses' account of seeing two individuals running from the woods
where Robert Hamilton was shot. These witnesses observed this from
across the street. The record will reflect that these witnesses all
described the perpetrators of being around the ages of eighteen to
twenty-four  years old; and both being very black in skin color and
leaving in a blue (royal blue Plymouth Duster) car. The description
given to authorities of the men was that the two men were of a slight
build, weighing one hundred-fifty-five to one hundred-sixty pounds,
and between five foot-eight to five-ten tall. One witness, though,
testified  of  two groups of men fleeing the woods that day; one
group of two men and another group of three men - each running the
opposite direction.

When arrested for this crime, George Leon Adams was forty-two
years old; weighing over two-hundred pounds; and standing six foot-one
inches tall. And Adams is a medium brown black man - not a dark black
black man as the Government's witnesses described the men fleeing the
woods that day.

"[T]he vagaries of eyewitness indentification, and the potential

21

for wrongful convictions or adjudications based upon such evidence, have long been recognized in the District of Columbia." **Long v.United States, 918 A.2d 354, 409 (D.C. 2006); In re As.H, 851 A.2d 456, 459-50 (D.C. 2004)** (citing **United States v. Telfaire, 152 U.S. App. D.C. 146, 149-51, 469 F.2d 552, 555-57 (1972)** (per curium); **Crawley v. United States, 320 A.2d 309, 311-12 (D.C. 1974)**). "Even if the witness professes certainty, it is well recognized that the positive eyewitness is not necessarily the most reliable." **Long, at 409; Webster v. United States, 623 A.2d 1198, 1204 n. 15 (D.C. 1993)** (quoting **Crawley, supra, 320 A.2d at 312)** (quotation marks omitted).

In this case before the Court, Adams has made several unsucessful attempts through the years to prove his innocence of the attempted robbery and the actual murder of Robert Hamilton; all of these without the help of an investigator or an attorney. And the record will reflect, at the time of Adams's direct appeal, he moved the court to appoint him substitute appellate counsel due to irreconcilable differences, requesting that Richard S. Stolker be removed from his case. (See United States' Reply To Petitioner's Response ...., Doc.20, Ex. 2-B Attorney Stolker's affidavit in Response to defendant's Motion To Withdraw Appointment Of Counsel). Unfortunately, his motion for appointment for substitute counsel was denied. And as a result, the lower courts have turned a blind eye to alibi witnesses that could have, and should have, been called to trial by trial counsel; and appellate counsel, even though his client wanted to raise this issue on direct appeal, refused to do so - prompting Movant to file a motion to have Stolker removed as his attorney on direct appeal.

Subsequently, the record reflects, the courts have held that,

22

(1) even though Movant questioned "trial counsel's decision to call
particular witnesses[,] [E]ven if slightly different, Defendant's
instant motion fails to present a reason why he did not raise these
issues in either his appeal or in his previous motions. Therefore,
Defendant's motion is successive and without merit," (United States'
Rely to Petitioner's Response ...., Doc. 20-2, Ex. 2-B, at Pp. 2-3;
Order, Superior Court of the District of Columbia, Filed March 23,
2004); (2) upon Movant's motion for the District of Columbia Court of
Appeals to recall its mandate due to ineffective assistance of
appellate counsel, the court stated that, appellate counsel filed a
substantive, twenty page §23-110 motion, supplementing Movant's **pro
se** motion, arguing ineffective assistance of trial counsel on several
grounds, including two of the grounds that appellant was presently
raising; concluding that appellate counsel's decision to raise the
claims in his supplement motion was a strategic decision, and counsel's
decision and performance was clearly reasonable. The court of appeals
affirmed Movant's convictions and sentences, (United States' Reply to
Petitioner's Response ...., Doc. 20, Ex. 2-B; Memorandum Opinion And
Judgment, p. 3; Filed Oct. 29, 2009); **2/** and (3) in this Court's
Memorandum Opinion (Case No. 10-1945(ESH)), this Court concluded
that the two affidavits from Carl Clark and Jackie Wilson, both of
whom placed Adams in the vicinity of 56th Street and Central Avenue,
S.E., in Washington D.C., around the time of Hamilton's murder,

---

Note 2: On page 3, n. 4, of this Order, the court stated, in pertinent part, that
Movant had raised the failure of trial counsel to present **alibi** witnesses at trial.
However, the actual issue Movant raised was a brief statement with no supporting
facts about trial counsel's failure to "make a pretrial investigation, to interview
exculpatory witnesses and to present their testimony." (See United States' ....
Ex. 1-A, at page 12 of Doc. 20-1). Thus, for **arguendo's** sake, Movant was proceeding
**pro se** without the assistance of his appellate attorney, whom he tried to have
removed from his case for failing to properly brief this issue, and the record does
not actually state alibi witnesses as the court presumes it does.

was not "new" and does not support his claim of actual innocence.

Further, this Court stated that the recent affidavit of James (Tink) Owens, who saw Adams in the projects, which is located on 56th [P]lace and Central Avenue, S.E., around the time of Hamilton's murder, was no more useful than those of Clark and Wilson. And at best, these affiants place Adams across town at the time of Hamilton's murder. (See Memorandum Opinion, at p. 10; United States District Court for the District of Columbia; Doc. 22). This Court, some how, went one step further by stating, contrary to what is contained in these poorly drafted affidavits, that "[N]one of these affiants states that he or she was with Adams for any extended period of time; he arguably could have committed the offenses for which he was convicted and traveled to the East capital Dwellings afterwards. Even if true, their testimony does not make it more likely than not that no reasonable juror would have convicted him, and it does not establish his innocence." Ibid., at Pp. 10-11 (citation omitted).

Looking at these affidavits and what is stated within each of them, one would have to wonder just exactly what these individuals and potential alibi witnesses were attesting to, if they were not stating under the penalty of perjury that they were with George Leon Adams the morning of July 22, 1995, between the hours of 8:00 am and 10:00 to 10:30 am. For example, the latest affidavit from Owens, he clearly states he was with "other individuals" talking about "father's day" and a community event (a "cook out"); he "was accompanied by the defendant George Adams (baybro), Robert (cowboy) Sims, Carl Clark, Nise Baskins, Nise Bradford, and a few other individuals." Owens goes on to state that, "[A]bout 9:00 am Baybro (George Adams) walked

24

to the top of the hill, which is about ten to fifteen yards, in eye view. He was talking to a woman name Jackie and a dude name Melvin Jones. He talked for about ten minutes [10 minutes] to fifteen minutes [15 minutes] before he came back down the hill." (See Movant's Ex. A attached hereto, Ex. 1). If one takes the affidavit on its face value, Owens was claiming he was with Adams from 8:00 am to 10:30 am on the morning of July 22, 1995; also claiming that he watched Adams climb a hill, speak with one of the other affiants, Jackie Wilson, and a man by the name of Melvin Jones around 9:00 am; then after fifteen minutes or so, Adams returned down the hill. At no point or time does Owens state that Adams was out of his sight, or that Adams left to go some where and then returned; contrarily, Owens stated he was with Adams from between the hours of 8:00 am and 10:30 am, and clearly states he was with Adams around 9:15 when Adams returned from up on the hill. $\underline{3/}$ Thus, it would have been hard to imagine that Adams jumped into a phone booth, changed into a blue suit with a red S letter on his chest, flew faster than a speeding bullet across town (about an hour away), attempted to rob Bobby Hamilton, then murdered him, then flew like a speeding bullet back to the phone booth, and changed back into his street clothes without anyone noticing that Adams was gone - Adams was not, and is not, Superman!

Looking at Carl Clark's affidavit, he, too, attests that he was with Robert Sims, George Adams, Melvin Jones, James "Tink" Owens and a few other individuals that he only knew them by their nicknames,

Note 3: It should be noted by the Court that, in Adams's prior pleadings, he stated that Melvin Jones had requested Adams's attorney to send his investigator to speak with Jones on numerous occasions, but trial counsel failed to do so; Jones being named as a potential alibi witness in Owens affidavit. (See United States' Reply To Petitioner's Response ...., Doc. 20-2, Ex. 2-A, p.6 of 22).

on the morning of July 22, 1995, between the hours of 8:00 am and 10:00 am. Clark states that he was subpoenaed to come to court but was never placed onto the witness stand in behalf of George Adams. (See Movant's Exhibit A, and Ex. 2 attached thereto).

Looking at Jackie Wilson's affidavit, she, too, attested to the same as the other affiants. Stating under the penalty of perjury that, on July 22, 1995, she left her house to go to the grocery store, of which did not open until 9:00 am; the store was located in the one hundred block of Central Avenue and the 56th Street; she encountered Melvin Jones and George Adams (AKA Bay Brother); got into a heated argument over money, and then five to fifteen minutes later, she left to go to the grocery store. Ms. Wilson stated that a few days later she received information that Adams had been arrested for a homicide that took place on the morning and at the time that she Melvin Jones and Adams spoke that morning on July 22, 1995. Ms. Wilson stated she contacted Adams's attorney, gave him her information that she swore to in her affidavit, and asked Adams's attorney to send his investigator over to speak with her about the matter. Ms. Wilson further stated that she had told Adams's lawyer that he could subpoena her, but each time she spoke with the attorney, he seemed to have an indifferent attitude. (See Movant's Exhibit A, Ex. 3 attached thereto).

Thus, each and everyone of these witnesses have stated under the penalty of perjury that they were with George Leon Adams on the morning of July 22, 1995, between the hours of 8:00 am and 10:00 am at a location around an hour across town from the spot Robert Hamilton was murdered; and each affiant has corroborated the other affiant's

account of Adams being at 56th Street and Central Avenue on the morning of July 22, 1995; and each affiant has named others who were there, who also could have testified to the same - if only they would have been interviewed and subpoenaed to trial to testify; such as Melvin Jones. Indeed, "no more than (an affidavit) is necessary to make a **prima facie** case." **United States v. Kis, 658 F.2d 526, 536 (7th Cir. 1981).**

The record reflects, trial counsel has never had to give an explanation as to why he failed to investigate and call readily available alibi witnesses. The only thing appellate counsel has ever raised was the issue about trial counsel's failure to properly cross-examine key Government witness, Sterling Johnson, in reference to Johnson's offer to sell his testimony to the highest bidder.

As the D.C. Court of Appeals has stated several times, "[o]nce a movant has made a colorable claim which, if true, would provide a basis for relief, the trial court should not decided the matter summarily," (**Jones v. United States, 918 A.2d 389, 408 (D.C. 2006)** (quoting **Newman, supra, 705 A.2d at 262**)), and "[T]he statute [D.C. Code § 23-110(c)], itself requires a hearing '[u]nless the motion and files and records of the case **conclusively show** that the prisoner is entitled to no relief.'" **Id., Hilliard v. United States, 879 A.2d 669, 670-71 (D.C. 2005)** (quoting D.C. Code § 23-110) (emphasis in the original); see also, **Keeney v. Tamayo-Reyes, 504 U.S. 1, 14-15 (1992)** (O.Connor, J., dissenting) ("once a claim is properly before the district court ... a habeas petitioner [should be treated] ... like any civil litigant" for purposes of "right to a hearing [or, presumably, any other fact-development procedure] where

[the procedure] is necessary to prove the facts supporting his claims"). The Supreme Court's decision in **Bracy v. Gramley, 520 U.S. 899 (1997)**, clearly rejected any requirement of a "**prima facie**" case for relief, omitting any reference to **Harris v. Nelson**'s "**prima facie**" language, relying instead on a considerably more forgiving formulation of the "good cause" rule taken from the same case, which only requires some "'**reason to believe** that the petitioner may, **if** the facts are fully developed, be able to demonstrate that he is ... entitled to relief.'" **520 U.S. at 908-09** (emphasis added). In the Advisory Committee Note to Rule 6 of the Rules Governing § 2254 Cases, Rule 6 is "consistent" with **Harris**' discussion of the district courts' duty to order discovery in certain circumstances. See **Bracy v. Gramley, supra, 520 U.S. at 906-09 & n. 10.**

As "recognized previously [by the D.C. Court of Appeals] that the failure of trial counsel to investigate properly a case, 'to interview exculpatory witnesses, and to present their testimony constitutes ineffectiveness.'" **Jones v. United States, supra, at 408** (quoting **Lopez v. United States, 801 A.2d 39, 46 (D.C. 2002)**). [4]/

"The presumption in favor of a hearing 'is even stronger when the claim of ineffectiveness is based on facts that are not already disclosed in the record.'" **Jones, supra, at 403** (quoting **Lane v. United States, 737 A.2d 541, 548 (D.C. 1999)**). More importantly, the

---

Note 4: The D.C. Court of Appeals has stated, "[w]hile demonstration of the failure to investigate and call witnesses can establish ineffective assistance of counsel, we have required an affidavit or other credible proffer as to the alleged exculpatory nature of the prospective witnesses' testimony." **Forte v. United States, 856 A.2d 567, 577 (D.C. 2004); Lopez v. United States, 801 A.2d 39, 42 (D.C. 2002); Thomas v. United States, 772 A.2d 818, 824 (D.C. 2001); Spencer v. United States, 688 A.2d 412, 420 (D.C. 1997); Ready v. United States, 620 A.2d 233, 235 (D.C. 1993).**

D.C. Court of Appeals "have held, moreover, that where the exculpatory value of the evidence proffered by appellant turns at bottom on the credibility of the witnesses specifically identified in the § 23-110 motion whose proposed testimony was evidenced by signed statements, we can discern no grounds for negating the credibility of those witnesses merely on the basis of their written statements." **Jones v. United States, 918 A.2d at 403** (quoting **Newman, 705 A.2d at 261.** "To do so assumes the answer to the very question which an evidentiary hearing could illuminate." **id., Newman, at 261.**

"Here, if believed [at a required evidentiary hearing], the various affidavits attached to appellant's [previous pleadings and motion to recall the court's mandate], which provides alibis for the times of both [the attempted robbery and the murder of Robert Hamilton], present[ed] powerful assertions of innocence. Therefore, the allegations made by [Adams] in his motion[s], if true, demonstrated 'that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment.'" **Jones, 918 A.2d at 408** (quoting **Strickland, 466 U.S. at 687**) (other quotation marks omitted).

"Here, however, there is nothing in the record indicating that counsel's failure to call alibi witnesses was a sound tactical decision ...., [and] [T]he government did not produce any evidence explaining trial counsel's decisions or refuting [Movant's] claim that counsel ignored his requests to interview [alibi witnesses] and [Movant's] family member[] [and friends]." **Jones, at 409**; see also **Gillis v. United States, 596 A.2d 726, 729 (D.C. 1991)** (remanding because "[t]he record is devoid of any meaningful explanation as to

why a potential defense was not pursued" and "[a]t a minimum, there was serious question regarding the need for a hearing"). Thus, other than court rulings that have procedurally barred Movant's claims of actual innocence of the attempted robbery and the actual murder of Robert Hamilton; and one unexplainable statement by the Government, for an unapparent reason, Movant's last affidavit from James ("Tink") Owens was supposedly to be considered "patently frivolous," the courts have turned a blind to the evidence of Movant's actual innocence claim. How the courts can justify such reasoning is incomprehensible; especially reviewing the Government's witnesses used to convict Adams in the first place - such as Robin Fitzsimmons, who testified the day she viewed the men fleeing the woods from across the street from where she was standing, she was high on cocaine, heroine, xanax pills, and had taken lithium that morning, and she also had a chemical imbalance that caused her memory problems. (See Tr. T. 12/2/1996, at p. 179). And as outlined in Movant's Exhibit A attached hereto, the key witness for the Government, a known drug addict and seller of drugs, who was initially picked while selling prescription pills by the authorities, then released thereafter with no charges brought against him for unlawfully selling those pills, this witness's version of events of who he was with the morning he was robbed and what was said to him during the robbery has changed significantly as time progressed - changed to benefit the Government's theory of its case - a witness who offered to sell his testimony to the highest bidder. (See Movant's Ex. A, Pp. 4-10). Thus, how the courts can rule that Adams has not shown "good cause" for providing him with the "necessary facilities and procedures for an adequate inquiry," such as an investigator,

an attorney, and a darn hearing to put these alibi witnesses on the witness stand to determine if they are swearing to the truth as to Adams's whereabouts on July 22, 1995, between the hours of 8:00 am and 10:30 am is a travesty and a miscarriage of justice, and is contrary to not only D.C. state law, but also federal law.

In "extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime," a federal court may entertain a habeas action "despite a petitioner's failure to show cause for procedural default." **McClesky v. Zant, 499 U.S. 467, 494 (1991). McClesky v. Zant**, as well as other Supreme Court cases, have noted the courts duty to adjudicate cases where there has been "a fundamental miscarriage of justice." **Id.**; see **Schlup v. Delo, 513 U.S. 298, 321 (1995)** (explicitly tying the miscarriage of justice exception to the petitioner's innocence). "To be credible, ... a claim [of actual innocence] requires petitioner to support his allegations of constitutional error with new – reliable evidence – whether it be exculpatory scientific evidence, **trustworthy eyewitness accounts**, or critical physical evidence – that was not presented at trial." **Schlup, 513 U.S. at 324; Dretke v. Haley, 541 U.S. 386 (2004)** (holding that: "[w]hen a federal court, in a habeas corpus case, is faced with allegations by the prisoner of 'actual innocence,' whether of the sentence or of the crime charged, the federal court must first address all nondefaulted claims for comparable relief and other grounds for cause to excuse the procedural default."); **House v. Bell, 547 U.S. 518 (2006); In Re Troy Anthony Davis, 2009 U.S. LEXIS 5037 (Case Not. 08-1443 – Decided Aug. 17, 2009)** (remanding back for hearing of actual innocence claim where

31

reliability of affidavits would satisfy the threshold showing of actual innocence).

In the case **sub judice**, trial counsel's performance fell below professional norms when trial counsel made several serious errors during trial, one of the most egregious errors was counsel's failure to investigate and call readily alibi witnesses that would have proved it physically impossible for George Leon Adams to have attempted to rob and then murder Robert Hamilton. Subsequently, appellate counsel, Richard S. Stolker, droped the ball in Adams's case by refusing to consult with his client and present stronger issues than appellate counsel presented on direct appeal; and to exacerbate counsel's errors, the issues he presented were not argued properly - such as the Sterling Johnson issue as to Johnson's proposition to sell his testimony. Appellate counsel should have argued trial counsel was placed into the position of having a conflict of interest - not trial counsel rendered ineffective assistance for failing to cross-examine Johnson about this matter, because trial counsel was placed into the position he could not cross-examine Johnson under the advocate-witness rule. And appellate counsel, having been put on notice with the record and Adams's unsuccessful attempts to get appellate counsel to raise trial counsel's ineffectiveness for clearly refusing to call alibi witnesses, two of which had been subpoenaed by trial counsel (in the record), rendered ineffective assistance of appellate counsel for failing to raise an obvious and stronger issue than the issue counsel raised about trial counsel not visiting the crime scene. Adams's unsuccessfully attempted to have attorney Stolker removed from his case, due to irreconcilable differences.

Thus, for the years that followed his trial and appeal, George Leon Adams, like other victims of an injust, broken judicial system, has stumbled through the complex maze of the legal system, proceeding **pro se** without the help of an investigator or an attorney, obtaining affidavits from alibi witnesses when ever and however he could with very little help from anyone - especially not the courts who were sworn to uphold his constitutional rights. And each time Adams has presented these affidavits of eye witnesses who were not at trial, the courts have stated: "Well you knew about these witnesses during trial - why didn't you call them then - this is not new evidence of your innocence." However, the courts have never answered the questions: (1) Was that not why the courts appointed Adams a trial attorney, to place the Government's case to the adversarial test? Or (2): Once trial counsel dropped the ball, was that not why the courts appointed Adams an appellate attorney - to investigate the record and the facts of Adams's case, research the law relevant to Adams's case, and bring the strongest issues to the appellate court's attention?

The record reflects, Adams has tried at every juncture - from as far back as his trial and direct appeal - to bring to light evidence through eye witnesses of his whereabouts on July 22, 1995, at the time Robert Hamilton was shot on the other side of town, proving it was physically impossible for Adams to have been at two places at the same time, establishing his innocence due to faulty eye witness accounts from witnesses heavily drugged and one willing to testify to anything for money or dropped charges by authorities. However, Adams received no help from those appointed to represent him, and

neither attorney rendered effective assistance by attempting to contact the **numerous witnesses** available to testify to Adams's whereabouts on the morning of July 22, 1995. Thus, "[P]erhaps, [Adams] could have dispatched a pigeon from his [jail/prison] cell[s] with a message for the [affiants and other potential alibi witnesses]" in his case to come to trial and testify, or to later submit their affidavits to the court of appeals once appellate counsel refused to research and investigate the facts of his client's case and bring to the appellate court's attention evidence of Adams's actual innocence. **Washington v. Smith, 219 F.3d 620, 631 (7th Cir. 2000).** Other than dispatching a pigeon from his places of incarceration, Adams was at the mercy of his two attorneys; one of which Adams made a failed attempt through the courts to have substituted with another attorney, when appellate counsel refused to obtain statements from these alibi witnesses. And the courts have failed to explain how an indigent, incarcerated, legally illiterate prisoner was suppose to timely bring these alibi witnesses's affidavits to the trial and appellate courts' attention without the help of an investigator or an attorney. Plus, coupled with the unreasonable application of Supreme Court holdings and unreasonable rulings as to facts of Adams's case, "the government's case depended on witnesses 'whose credibility a jury might have assessed differently' if it had heard the testimony proffered in ... [Adams's previous] § 23-110 motion[s]." **Long v. United States, 910 A.2d 298, 310 (D.C. 2006).**'" Without a hearing to assess the credibility of the witness[es], however, [the courts] cannot tell what a jury might have done.'" **Id.,** (quoting **Newman, 705 A.2d at 262.** "'[The D.C. Court of Appeals] have consistently held that credibility

34

determinations cannot be based on affidavits or countered by conclusory statements but may be resolved only by recourse to a full evidentiary hearing.'" **Id., Newman, 705 S.2d at 261.** $\underline{5/}$

The question before this Court is whether a COA should be issued on the ground as to whether appellate counsel rendered ineffective assistance because counsel failed to raise on direct appeal, trial counsel's ineffectiveness for failing to call alibi witnesses. Movant points this Court to the Supreme Court's holdings in **Evitts v. Lucey, 469 U.S. 387 (1985)**, where the Court stated that a defendant is denied due process if the deficient performance of his appellate attorney deprived him of "'an adequate opportunity to present his claims fairly in the context of the State's appellate process.'" **id., at 469 U.S. at 402** (quoting **Ross v. Moffitt, 417 U.S. 600, 616 (1974)**). Such a deprivation occurred in **Evitts** when counsel's failure to file a "statement of appeal" as required by state procedural rules "essentially waived respondent's opportunity to make a case on the merits." **469 U.S. at 395 n. 6.**

Under the law of the District of Columbia, the mandatory feature of the direct appeal process requires available claims of ineffective assistance of trial counsel to be brought in a § 23-110 motion and

Note 5: It is obvious by reviewing Adams's previous pleadings that he was not one learned in the law. And only as time passed, with the help and advice of "jailhouse lawyers," did Adams become aware of the procedures to bring his claims to the courts' attention – such as procuring affidavits from witnesses who were never called to testify; but at no fault of his own, his attempt to locate these individuals was hampered and delayed because Adams was incarcerated and relying on another, Melvin Jones, to locate and obtain these witnesses statements. And the other issues raised, such as trial counsel's failure to impeach Sterling Johnson with Johnson's proposal to sell his testimony, the courts were obligated to construe Adams's pleadings liberally, i.e., even, like in this case, where Adams failed to cite proper legal authorities and confused the legal issue as to trial counsel's ineffectiveness due to counsel's conflict of interest. See **Haines v. Kerner, 404 U.S. 519 (1972); Boag v . MacDougall, 454 U.S. 364 (1982)**

are "essentially waived" if the claims are not pursued during the pendency of the direct appeal by means of a motion in the trial court pursuant to D.C. Code § 23-110. **783 A.2d at 605.** Although such Sixth Amendment claims are more likely to require amplification of the record, in principle they are "no different from any of the [other] myriad claims that may be raised on direct appeal." Under **Sheppard v. United States, 533 A.2d 1278, 1280 (D.C. 1987)** and **Doe v. United States, 583 A.2d 670, 674 (D.C. 1990)**, such claims therefore "must ... be raised within the framework of the direct appeal by the attorney appointed for the appeal." **Id.**

The United States Supreme Court stated in **Massaro v. United States, 538 U.S. 500, 123 S.Ct. 1690 (2003)**, that claims as to ineffective assistance of counsel do not necessarily have to be reserved for collateral review. And that there may be cases in which trial counsel's ineffectiveness is so apparent from the record that appellate counsel would consider it advisable to raise the issue on direct appeal. **id., at 509.** The Court went on to state, though, that the preferred method is to raise ineffective assistance of counsel claims in collateral proceedings. **6/**

As noted by Justice Stevens, with whom Justice Kennedy and Justice Souter joined in the dissenting opinion in **Dretke v. Haley, 541 U.S. 386, 124 S.Ct. 1847, 158 L.Ed.2d 659, 671 (2004)**, "[T]he

Note 6: It should be noted, on April 26, 1999, Judge Robert I. Richter issued an opinion, stating that Movant "was represented by a highly experienced and able counsel." (Def's. Reply; Doc. 20-1). And appellate counsel, Richard S. Stolker, was appellate counsel of record in **Jones v. United States, 918 A.2d 389 (D.C. 2006)**, of which was remanded back to the lower under the same circumstances as Movant has raised herein, where the court stated "[t]he exculpatory value of the evidence proffered by appellant turns at bottom on the credibility ... of the witnesses specifically identified in [his] § 23-110 motion." **id. at 412** (citing **Newman, 705 A.2d at 261** (quoting **Rice v. U.S., 580 A.2d 119, 122-23 (D.C. 1990)**)).

unending search for symmetry in the law can cause judges to forget about justice." And as in the case **sub judice,** "[T]his should be a simple case." **Id.** Movant has produced alibi eyewitnesses that were not presented at trial - and the reason they were not presented at trial was due to the ineffectiveness of trial counsel. Appellate counsel had the record before him, including a defendant who did his best to have counsel to raise this issue and obtained statements from these witnesses, but even after the appellant tried to counsel removed from his case because of irreconcilable issues, appellate counsel still refused to adhere to the Movant's request. Thus, in prison without the assistant of an investigator or counsel, and without the funds to hire either, Movant has diligently sought what few affidavits of his innocence he could obtain under his dire circumstances - utilizing an deceased individual in society to obtain these affiants' statements. Movant's trial counsel has never had to give a reason for failing to present readily available alibi witnesses, and appellate counsel has never had to give an explanation for failing to raise trial counsel's ineffectiveness on this matter.

WHEREFORE AND IN CONCLUSION, in the interest of justice, George Leon Adams moves this Honorable Court to issue a Certificate of Appealability as to whether appellate counsel rendered ineffective assistance of counsel for failing to raise trial counsel's ineffectiveness due to trial counsel's failure to call alibi witnesses.

Dated: May 29, 2012.

Respectfully submitted,

GEORGE LEON ADAMS
REG. NO. 12021-007
FEDERAL CORRECTIONAL COMPLEX
USP 1
P.O. BOX 1033
COLEMAN, FLORIDA 33521-1033