UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GEORGE LEON ADAMS,
     Movant,

v.                                      Case No. 10-1945(ESH)

UNITED STATES OF AMERICA,
     Respondent.

# Exhibit A

### AND ATTACHED EXHIBITS

### TO MOVANT'S SUPPLEMENT TO HIS APPLICATION FOR A COA

GEORGE LEON ADAMS
REG. NO. 12021-007
PRO SE PRISONER
FEDERAL CORRECTIONAL COMPLEX
USP 1
P.O. BOX 1033
COLEMAN, FLORIDA 33521-1033

GEORGE LEON ADAMS,
    Petitioner,

vs.

Case No. 11-5268

(Underlying Dist. Ct. Civil No.
10-1945 (ESH))

UNITED STATES OF AMERICA,
    Respondent.

---

### PETITIONER'S REPLY TO GOVERNMENT'S MOTION TO DISMISS APPEAL
### FOR LACK OF CERTIFICATE OF APPEALABILITY

---

COMES NOW, George Leon Adams, (hereinafter "Petitioner"), in the above-styled cause, respectfully moving this Honorable Court to grant Petitioner a certificate of appealability ("COA"), and to find the Government's motion to dismiss without merit. In support of Petitioner's application for a COA, he states the following:

### JURISDICTION

Pursuant to 28 U.S.C. § 2253(c) this Honorable Court has jurisdiction to grant a COA once the lower court refused to issue a COA.

### ISSUES PETITIONER REQUESTED A COA TO BE ISSUED ON

Petitioner requested the lower court, and this Honorable Court, to issue a COA on five grounds (listed in Petitioner's Application For A Certificate Of Appealability); however, the crux of Petitioner's arguments can be grouped into two specific issues; (1) Petitioner is actually innocent of the charges leveled against him; and (2) due to trial and appellate counsel's ineffective assistance, evidence of Petitioner's innocence was never presented to the jury or raised on direct appeal. However, even though Petitioner has made a greater showing than a **prima facia** standard or a standard under the preponderance of the evidence, Petitioner has never been given a proper hearing to allow his witnesses to be

1

heard in open court as to his actual innocence claim. Each of these witnesses were uninterested witnesses, placing Petitioner, aka - Bay Bro, on the other side of the city and about an hour away from where the victim, Robert Hamilton, was shot on July 22, 1995. Each witness's affidavit confirmed the same; that George Leon Adams, aka Bay-Bro, was with them between the hours of 8:00 am to 10:00 am on July 22, 1995, near the East Capital Dwellings. (See Exhibits 1, 2, & 3). Petitioner himself submitted an affidavit, under the penalty of perjury as to the same. (See Exhibit 4; hereinafter, abbreviated as "Ex." or "Exs."; Exhibits attached in separate Appendix).

However, as will be shown below, Petitioner has never had a proper hearing to allow his new evidence of his innocence to be presented in court. This error, coupled with additional factors, such as a violation of his Sixth Amendment right to effective assistance of counsel at trial and on direct appeal, has prevented Petitioner from adequately establishing his innocence. Moreover, even though Petitioner raised ineffective assistance of counsel claims in previous proceedings through and acting **pro se**, the courts have failed to properly review Petitioner's **pro se** pleadings under the proper standard and have skirted their duty to construe a **pro se** prisoner's pleadings liberally, and give Petitioner a fair determination under the facts of his case and the proper federal law applicable to his claims.

### ARGUMENT

The courts have ruled Petitioner's actual innocence claim is either procedurally barred, or have failed to properly consider the evidence presented in the affidavits, denying Petitioner his right to prove his innocence of the robbery and murder of Robert Hamilton. And because the courts have failed to follow federal laws as to prisoners' actual innocence claims, this Court should grant George Leon Adams a COA on his actual innocence claim.

In **Barefoot v. Estelle, 463 U.S. 880 (1983)**, the Supreme Court there recognized that to be allowed to appeal in a habeas case, "[o]bviously the petitioner need not show that he should prevail on the merits. He has already failed in that endeavor."

2

**Id. at 893 n. 4.** Instead, the Court set forth four standards, all less stringent and all alternative, to separate appeals which deserve to be heard from those too weightless to continue further. Under **Barefoot**, a certificate should issue if the appeal presents at least one "question of some substance" (1) which is "debatable among jurists of reason," or (2) "that a court could resolve in a different manner," or (3) that is "adequate to deserve encouragement to proceed further," or (4) that is not "squarely foreclosed by statute, rule, or authoritative court decision, or ... lacking any factual basis in the record." **Id.**

The standards set forth in **Barefoot** were later codified in 28 U.S.C. § 2253(c). See, e.g., **Slack v. McDaniel, 529 U.S. 473, 483-84 (2000); Miller-El v. Cockrell, 537 U.S. 322, 336 (2003); Tennard v. Dretke, 542 U.S. 274, 282 (2004).**

Petitioner raised questions of his innocence that were debatable among jurists, that could be resolved in a different manner, such as an evidentiary hearing, and were adequate to proceed further. The new evidence of Petitioner's actual innocence was never in his trial or appeal records.

Under Supreme Court decisions, once a Petitioner raises a claim under the umbrella of actual innocence, it is the duty of the court to adjudicate procedurally defaulted claims where the petitioner establishes that a constitutional error "has probably resulted in the conviction of one who is actually innocent," and when a failure to do so would result in a "fundamental miscarriage of justice." **Dretke v. Haley, 541 U.S. 386, 393-94 (2004);** see also, **Bousley v. United States, 523 U.S. 614, 623-24 (1998); Schlup v. Delo, 513 U.S. 298, 319-20 (1995); Sawyer v. Whitley, 505 U.S. 337, 339-40 (1992); Coleman v. Thompson, 501 U.S. 722, 750 (1991); McClesky v. Zant, 499 U.S. 467, 495 (1991); Kuhlman v. Wilson, 477 U.S. 436, 452 (1986); Smith v. Murray, 477 U.S. 527, 537 (1986); Murray v. Carrier, 477 U.S. 478, 496 (1986); Engle v. Issac, 456 U.S. 107, 135 (1982).** Furthermore, the Supreme Court has held that, "[w]here specific allegations before the court show reason to believe

3

that the petitioner may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relieve, it is the duty of the courts to provide the necessary facilities and procedures for an adequate inquiry." **Bracy v. Gramley, 520 U.S. 899, 908-909 (1997)**; see also, **McFarland v. Scott, 512 U.S. 849, 859-860 (1994); Keeney v. Tamayo-Reyes, 504 U.S. 1, 14-15 (1992); Harris v. Nelson, 394 U.S. 286, 299 (1969).**

The facts of Petitioner's innocence, alibi witnesses' affidavits, were procurred by Petitioner himself. Neither his trial or appellate attorneys made an effort to obtain these affidavits even though Petitioner made both attorneys aware that he was with these people on July 22, 1995, the day Robert Hamilton was murdered. These witnesses, with nothing to gain or lose, have sworn to facts that place George Leon Adams in another part of the city, well away from the spot Robert Hamilton was shot. However, even though James ("Tink") Owens, Carl Clark, and Jackie Wilson have sworn to facts that prove Petitioner could not have been the perpetrator of this murder and robbery on July 22, 1995, the lower courts have turned a blind eye to this newly discovered evidence. Unfortunately, as noted by many reknown attorneys and politicians throughout our great nation, the America system of justice is broken; and George Adams case is just one example of how broken our system of justice is; and a compelling example of such are the recent cases of prisoners being exonerated by DNA testing - with many of these prisoners serving many years in prison, and some on death-row, that have been completely innocent of the crimes to which they lost their freedom. However, and unfortunately, George Leon Adams cannot produce DNA evidence of his innocence; but he has produced affidavits from witnesses that are willing to come forth and testify that Adams could not have been the man who shot Robert Hamilton because, Adams was a distance of about an hour away from the place Hamilton was murdered and at the time Hamilton was murdered. And these witnesses affidavits should have been enough to warrant an evidentiary hearing on

4

Petitioner's actual innocence claim. But, contrary to what was stated within these affidavits, the Government and the courts have tried to explain away the facts of Petitioner's innocence by alleging at times that Petitioner could have committed the murder in time to have returned to the spot where these people were who gave these affidavits; but that would have been physically impossible - unless Petitioner was air-lifted by helicopter from the shooting location to the location of these witnesses, of which that never happened.

The Government's case against George Leon Adams was far from overwhelming, and if anything, it was very, very weak. And the Government admitted that it needed to combine the robbery of Sterling Johnson by George Leon Adams to even make a case against Adams. Looking at the facts of the Government's case, the only vague connection the Government used to support the conviction of Petitioner as to the Robert Hamilton murder was the lone statement Petitioner allegedly made to Sterling Johnson the day Johnson claimed Petitioner Adams robbed Johnson; with Sterling Johnson testifying that Petitioner stated: "[y]ou don't want to wind up like that white boy Bobby." (Trial Tr. 12/2/29 at 218). That was basically the only evidence to link Petitioner to the crime committed two days prior to the robbery of Sterling Johnson; all other evidence was suspect at best, with witnesses changing their stories at various times depending on who was questioning them. Thus, the credibility of Sterling Johnson was a very significant part of the Government's case; where even the prosecutor stated in his closing rebuttal argument (Ex. 5), that: "[T]here's actually been no attack on the credibility of Sterling Johnson at all. He told you what happened on July 24th, and that's now been accepted by the defense. So let's begin with that because the concession is extremely important. I'm going to submit to you that it shows beyond any doubt that this is the man who shot Robert Hamilton." (Trial Tr. 12/4/96 at 56). This admission alone proves how important Sterling Johnson's testimony was to the Government's

5

case. Therefore, any testimony or evidence that would have cast a reasonable doubt in the jurors mind as to the credibility of Sterling Johnson's testimony was crucial to Petitioner's case, and defense counsel had an obligation to produce testimony or evidence to impeach Johnson's testimony; and in light of the facts of this case, counsel had such evidence available to counsel because counsel himself should have testified. For example:

1. Sterling Johnson filed a complaint on July 27, 1995, alleging he was robbed by George Leon Adams (aka Bay brother & Bay bro). Before Officer Robert N. Saunders, of the Metropolitan Police Department, Washington, DC, Johnson alleged Adams robbed him on July 24, 1995 at gun point. Johnson alleged the robbery took place on a Monday, and on the following Tuesday morning, he was conversing with a friend and explaining to this person what happened to him during the robbery, and that is when Johnson claimed to have seen the same car that Adams got into just after robbing Johnson the day before. It should be noted that, in this initial report, Sterling Johnson makes no mention of anyone being with him the day he claimed he was robbed; nothing was stated about any other witness to this event; Johnson only mentions speaking with a friend the following day about him being robbed. (See Ex. 6).

2. In Sgt. Darrell Darles notes of his interview with Sterling Johnson (aka Rocky) on August 10, Johnson now stated that a man by the name of Patrick, who walked with crutches, and Patrick's wife witnessed Johnson being robbed on July 24, 1995. It should be noted that, once again Johnson states that he spoke with a man by the name of Tommy the following day (July 25, 1994); who later would be indentified as Tommy Facen. (See Ex. 7).

Prior to trial, defense counsel never interviewed or made an attempt to locate the man known as Patrick, or his wife, or spoke with Tommy Facen. Why? It was counsel's duty to follow all possible leads that may have exonerated his client.

3. During Sterling Johnson's grand jury testimony, Johnson testified that on

Tuesday the 25th of July, 1995, he is talking to the cigarette man - whose name is Tom - confirming once again that Sterling did not speak about this robbery to Tom - Tommy - the cigarette man - Tommy Facen, until the next day after Johnson was robbed. (See Ex. 8).

4. However, at George Leon Adams' trial, Sterling Johnson testified that the man by the name of Tommy, the guy who sells cigarettes, was standing there when Johnson was robbed on the 24th; alleging Tommy was an arms length away. It should be noted, there was no testimony as to the man named Patrick being present when Johnson is robbed; Patrick being the man who walked with crutches; nor any mention of Patrick's wife being present either - only the cigarette man, who Johnson stated twice previously that, he only spoke to Tom, Tommy, the cigarette man on the following day after Johnson was robbed, on the 25th of July. (See Ex. 9).

Incredibly, Tommy Facen was a surprise witness; never giving any statement to the authorities and only coming forward two weeks before Adams's trial.

5. Tommy Facen testified that, the robber pulled up in a car in front of the bus stop where he and Sterling Johnson ("Rock") were standing; got out of the car and came towards Johnson, and told Johnson to give it up. Facen then testified that he fled the scene, leaving Johnson and Adams alone. (See Ex. 10).

6. But, Sterling Johnson testified to another version; alleging that Adams came from around the corner from Big Ben's Liquor Store; that Adams came walking around the corner from New York Avenue to North Capital. Sterling's version was different from Tommy Facen's - who testified that Adams pulled right up in front of the bus stop - right in front of them; not from around the corner of New York Avenue. (See Ex. 11).

7. Even though Johnson testified before the grand jury that he spoke to cigarette man, Tommy Facen, on July 25th about the color and type of car the robber drove off in, Tommy Facen testified that Johnson never told Facen anything about

Z

the car the perpetrator was driving. (See Ex. 12).

8. During Sterling Johnson's grand jury testimony, he testified that Adams said nothing after Adams robbed him on the 24th of July. (Ex. 8, p. 10 ). However, during Johnson's trial testimony, Johnson now alleged that Adams made a statement after taking Johnson's drugs from him, claiming Adams said: "you don't want to wind up like that white boy Bobby." (See Ex. 11, p. 218).

9. Sterling Johnson testified before the grand jury that he called the police the day he was robbed, speaking to a Detective Leach, (Ex. 8, p.25 ); however, Det. Leach testified at Adams's preliminary hearing that the first time he spoke to Johnson about Johnson being robbed was on the 26th - not the 24th. Det. Leach adamantly denied speaking to Johnson on the 24th. (See Ex. 13 ).

Adams made a request under the Freedom of Information Act, requesting any information as to a phone call from Sterling Johnson to a Detective Leach on or about July 24th, 1995. The person who researched the request has confirmed that there is no record of a phone call coming into the police station from a Sterling Johnson to a Detective Leach on the 24th of July, 1995. (See Ex. 14).

10. Sterling Johnson admitted during cross-examination that his memory was much better at the time he testified before the grand jury than it was now as he testified at trial. (See Ex. 15).

11. Most importantly, though, is the undisputed fact that, Sterling Johnson made an offer to George Leon Adams's defense counsel, Ronald E. Horton , to sway Johnson's testimony if Adams (or his attorney, Mr. Horton) would give him some money; claiming Johnson wanted an amount equal to the dollar amount Johnson had in the drugs Adams took off of Johnson the day Johnson was robbed. It should be noted, the Honorable Judge Robert I. Richter also confirmed in his opinion that Johnson made such an offer to defense counsel, Mr. Horton. (See Exs. 16 & 17 ; Affidavit Of Ronald E. Horton & Order, dated April 26, 1996; Superior Court Of The District Of Columbia (Criminal Division - Felony Branch) respectively).

The fact Sterling Johnson made such an offer to defense counsel, coupled with the fact, Johnson was a chief Government witness against Adams in this trial, placed Georger Leon Adams' attorney in a position of being a crucial witness in Adams' case; and under the Advocate-Witness Rule, defense counsel had the obligation to notify the trial court of a possible conflict of interest once Sterling Johnson made it known that his testimony could be bought for the right amount of money.

Trial counsel, Mr. Horton, never notified his client of Sterling Johnson's improper proposal, nor did counsel inform the trial court of this potential ccnflict of interest. Mr. Horton admitted Johnson made this offer to him in Mr. Horton's affidavit to the court; attempting to explain his blunder by alleging he considered pursuing this line of cross-examination based on Mr. Johnson's offer, but claiming it was his strategic decision not to do so and that counsel believed cross-examination on this point would have had limited value. (See Ex. 16).

First and foremost, defense counsel had not only an obligation to his client and the court to bring this matter to the court's attention, but counsel also had an ethical obligation to notify the court that one of the Government's witnesses had offered to sell his testimony for money. Plus, contrary to Mr. Horton's affidavit, counsel was not in the position to cross-examine Sterling Johnson about Johnson's offer to defense counsel because, if Johnson denied his improper proposal, counsel would not have been in the position to contradict Johnson's testimony. Under the Advocate-Witness Rule, defense counsel Horton could not have taken the witness stand after Johnson denied offering to sway his testimony for payment; and Mr. Ronald E. Horton, with all his years of experience of defending defendants in criminal trials, as he so states in his affidavit, should have known this.

And more importantly, contrary to Mr. Horton's frivolous excuse for failing to notify the court, and his client, and filing a motion to withdraw so that Mr. Horton cculd have been a witness for George Leon Adams, Mr. Horton's

testimony would have carried an enormous amount of weight with the jury in discrediting Sterling Johnson's testimony; after all, Johnson's testimony was up for sale to the highest bidder, and had the jury heard of Johnson's offer to sell his testimony, the jury would have questioned not only Johnson's truthfulness and credibility, but also Johnson's motivation behind his testimony. This theory is further supported in additional interview notes of defense counsel Horton's.

In Ronald E. Horton's interview notes of Sterling Johnson taken on August 21, 1996, with Public Defender Investigator Sarah Dumont present also, Johnson told Mr. Horton about the authorities catching Johnson red-handed selling prescription pills, with Johnson stepping on the detective's toes when Johnson backed up. The police told Johnson that they had him and placed him into hand cuffs; placed Johnson into the police car and drove him a couple blocks from the police station before they took Johnson's cuffs off. While driving Johnson to the precinct, Johnson said the officers explained to Johnson that they picked him up because of the homicide, and even though they caught Johnson selling drugs (sinquan pills), the authorities never charged Johnson; they took him to the police station and questioned Johnson about his knowledge of a homicide. Thus, Sterling Johnson already had been given a break by the detectives catching Johnson with a bag of pills; to which Johnson had no prescription for, leading this drug dealer/addict to believe he could get off scott-free for just providing the authorities with some type of information about a homicide. Defense counsel had this in his notes; notes that Sterling Johnson signed himself after Johnson's interview. (See Ex. 18).

Thus, armed with such damaging evidence - evidence that one of the Government's key witnesses against his client had his testimony up for sale, and had already been given one break by the authorities once they caught Johnson selling pills on a street corner, and possibly additional breaks by the authorities if this

matter would have been further investigated, or had he been properly cross-examined in this area - trial counsel should have notified the court (and his client) and moved the court to withdraw as counsel for Adams due to the possible conflict of interest. See, e.g., **United States v. Kliti, 156 F.3d 150, 155-57 (2d Cir. 1998)** (and cases cited within); **United States v. Irizzo, 786 F.2d 52, 57-59 (2d Cir. 1986).** [1/]

And contrary to the Superior Court's findings about the extortion offer made by Sterling Johnson to Ronald Horton, Petitioner's attorney, and trial counsel's decision not to cross-examine Johnson about Johnson's offer to perjure himself for money as being sound trial strategy; it was far from being anything close to sound trial strategy; and the Supreme Court has held that an attorney cannot hide behind the shield of trial strategy to justify his every action or omission. See **Wiggins v. Smith, 539 U.S. 510, 524 (2003).** Petitioner's attorney at trial admitted in his affidavit that the offer to Mr. Horton by Sterling Johnson actually took place during an interview of Johnson. And even though Sterling Johnson's testimony was up for sale to the highest bidder, defense counsel never notified the trial court about this matter. And contrary to the trial court's assessment of trial counsel's blunder, had Sterling Johnson denied ever making this statement to defense counsel, Ronald Horton, Petitioner's counsel would not have been in the position to impeach Johnson under the Advocate-Witness Rule. Trial counsel would have been "confronted with an unavoidable conflict of

_____

Note 1:  The defendant in the case **sub judice**, never actually raised the conflict of interest claim in the Superior Court of the District of Columbia; however, he did raise this claim under ineffective assistance of counsel. That being said, a **pro se** litigant's pleadings are to be construed liberally by the courts, **Coulter v. Gramley, 93 F.3d 394, 397 (7th Cir. 1996)**, and the courts "must give the [defendant] credit for everything that might be reasonably [be] proved in support of the complaint." **Acme Propane Inc. v. Tenexco, Inc. 844 F.2d 1317, 1325 (7th Cir. 1988).** Once Adams raised a claim of ineffective assistance of counsel regarding counsel's knowledge of Johnson's offer to sale his testimony, the court had the obligation to review Adams's claim under the proper standard of law; of which in this situation was under **Cuyler v. Sullivan, 446 U.S. 335 (1980)**, because counsel was in a conflict of interest position.

11

interest. [Johnson] was the key government witness against [Adams]." **United States v. Irizzo, 786 F.2d 52, 57 (2d Cir. 1986).** Sterling Johnson's previous statement to defense attorney Horton was clearly relevant to Petitioner's case and Johnson's credibility, and his prior statement to defense counsel could not have been used to attack Johnson's credibility without putting defense counsel's credibility before the jury. **Id.** Trial counsel should then been available to testify to discredit Johnson's credibility, dispelling any reliability of the drug dealer/ drug addict and admitted perjurer's testimony. But, as noted in **Irizzo,** and other cases supporting the same conclusion, any argument by defense counsel as to what Johnson had previously said to Attorney Horton would have been viewed as a statement of a witness as well as of an advocate, and under such circumstances this situation constituted a disqualifying conflict of interest. See **Irizzo, at 57; CIAK v. United States, 59 F.3d 296, 305-306 & n.5 (2d Cir. 1995); United States v. Edwards, 154 F.3d 915, 921 (9th Cir. 1998); United States v. Prantil, 764 F.2d 548, 552-53 (9th Cir. 1985).**

Moreover, the existence of the unavoidable conflict of interest led defense counsel, admittedly, to forgo a most relevant line of inquiry. **Irizzo, at 57.** "As the government's key witness, [Johnson's] credibility went directly to the guilt and innocence of the defendant. A key witness' prior statements ... that cast doubt upon the accuracy of his trial testimony are an obvious subject of potential cross-examination. Had this cross-examination been foreclosed on the grounds of relevance by an evidentiary ruling of the trial court, that surely would have been reversible error." **Id.**

"The decision to forgo inquiry into [Johnson's] prior [statement] was not the result of a tactical judgment by a conflict-free lawyer that such evidence would not be helpful to [Adams]." **Id. at 58.** "The decision to forgo inquiry [and the excuse for such] was thus made solely to protect the interests of

12

defense counsel." **Id.**

"Supreme Court decisions require [the courts] to reverse the convictions in such circumstances. Defendants who make ineffective assistance claims based solely on errors or omissions in pretrial investigations or trial strategy must, to succeed, meet a more stringent test than those who base such a claim on an attorney's conflict of interest. In the former case, the defendant must show: 'First ... that counsel's performance was deficient ... second, ... that the deficient performance prejudiced the defense.' **Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).** However, a defendant claiming that the assistance of counsel was ineffective due to counsel's conflict of interest need not establish prejudice. Rather, prejudice is presumed when counsel is

> burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, see, e.g., Fed. Rule Crim. Proc. 44(c), it is reasonable for the criminal justice system to maintain fairly rigid rule of presumed prejudiced for conflicts of interest. Even so, the rule is not quite the **per se** rule of prejudice that exists for the Sixth Amendment claims mentioned above. Prejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and 'that an actual conflict of interest adversely affected his lawyer's performance.' **Cuyler v. Sullivan, ... 466 U.S., at 350, 348, 90 S.Ct., at 1719, 1718** (footnote omitted). **Strickland v. Washington, supra, 104 S.Ct. at 2067.** "

**Irizzo, supra, at 58.** "Thus, once a defendant establishes that there was an actual conflict, he need not prove prejudice, but simply that a 'lapse in representation,' **Cuyler v. Sullivan, 446 U.S. 335, 349, 64 L.Ed.2d 333, 100 S.Ct. 1708 (1980),** resulted from the conflict." **Irizzo, at 58.**

"Such a lapse occurred in the present case when trial counsel abandoned his cross-examination of the government's key witness as to [a] prior [statement]"

made to trial counsel before trial, inferring Johnson's testimony could be bought. "This examination never got off the ground because ... based solely on defense counsel's [apparent knowledge of a] conflict of interest," to which trial counsel successfully explained away as mere trial strategy in his affidavit. Adams, however, "was entitled to a counsel unburdened by the ... constraints" of being an advocate-witness, **id. at** 58; especially due to the importance of Johnson's testimony.

The Government was allowed to combine Robert Hamilton robbery and murder and the Sterling Johnson robbery because, under the Government's theory, these two cases were similar in nature. At first, the cases had been severed; later, though, under a new judge, the Government successfully had that decision overturned and was granted permission to combine the cases for trial; thus, because of the lack of evidence as to Petitioner being the actual perpetrator of the Hamilton murder, so conceded by the Government, its case as to the Hamilton murder was based on Johnson's testimony - where Johnson alledged that Petitioner stated that Johnson did not want to wind up like the white boy Bobby. In other words, simply put, Sterling Johnson's testimony was the Government's linchpin in the convictions of Petitioner as to the Robert Hamilton robbery and murder charges. And for that reason, trial counsel, armed with such damaging evidence as to Sterling Johnson's offer to sell his testimony, should have notified the trial court of the conflict of interest, due to counsel's potential impeaching testimony, and filed a motion to withdraw as George Leon Adams' counsel, so that counsel could have testified regarding Johnson's improper proposal. "Standing alone, becoming an unsworn witness is a basis for disqualification of an attorney." **Ciak v. United States, 59 F.3d 296, 304-305 & n.5 (2d Cir. 1995)**; see also **United States v. Levy, 25 F.3d 146, 153 & n. 5 (2d Cir. 1994).** "The advocate-witness rule prohibits an attorney from appearing as both a witness and an advocate in the same litigation." **United States v. Sayakhom, 186 F.3d 928, 943 (9th Cir. 1999).** And "[I]f counsel were to cross-

14

examine the witness as to [the witness's] conversations with him, argue the credibility of [the witness's] testimony to the jury, or suggest alternative interpretations of [the witness's] account of the conversation, he would place himself in the position of an unsworn witness and implicitly put his own credibility at issue.... The Sixth Amendment interest of counsel of choice must give way when chosen counsel is so compromised." **United States v. McKeon, 738 F.2d 26, 34-35 (2d Cir. 1984).**

Contrary to lower courts' opinions, alibi witnesses James ("Tink") Owens, Carl Clark, and Jackie Wilson were not the only alibi witnesses that Petitioner notified trial counsel of. $\frac{2}{}$     As noted in George Leon Adams' affidavit (Ex. 4), at paragraph 3, Adams stated, under the penalty of perjury that, "[O]n the morning of July 22, 1995, I left Mr. Receese house at 58th & Aim St. N.E., Washington D.C. about 8:00 to 8:20 a.m." What has never been brought to the courts' attention is, Mr. Receese, whose actual name is Carroll Maurice Jenkins, was interviewed by Ms. Sarah Dumont prior to trial; Ms Dumont was the Public Defenders' investigator working with Attorney Ronald Horton on Petitioner's case.  Petitioner also notified defense counsel of others who were at Mr. Jenkins's residence that morning of July 22, 1995, who also could have testified that Petitioner was at Mr. Jenkins's (aka - Mr. Receece) residence that morning around the time Robert Hamilton was murdered on the other side of the city. Also present at Jenkins' residence was Ms. Sharon Henrey, Jeffery Wilkinson, and a Sgt. (FNU) Williams, who was called Sergeant Williams because he was once a sergeant in the Army.

---

Note 2: Throughout Petitioner's attempts to prove his innocence in past proceedings, he has acted **pro se** without the help of an investigator or counsel, obtaining alibi witnesses' affidavits on his own. Due to the fact Petitioner was not one trained in the law and unaware that additional favorable evidence of his innocence should have been brought to the courts' attention, he failed in the past to understand the significance of the other alibi witnesses he informed counsel of prior to trial; additional witnesses that placed Petitioner on the other side of the city at the exact time and date of Robert Hamilton's murder. This brief, though, is being prepared by an experienced paralegal/jailhouse lawyer in an attempt to see a miscarriage of justice corrected.

Also it should be noted, in James Owens affidavit, Owens makes mention of others who was present with him and Carl Clark on the morning of July 22, 1995; such as Nise Baskins, Nise Bradford, and a "few other individuals that [he] only Kn[e]w by [their] face." (Ex. 1 ). And the other individual who was present that morning, Robert (Cowboy) Sims, was subpoenaed to trial, and he came, but was not placed on the witness stand by defense counsel. Furthermore, George Adams' wife was never interviewed or called as a witness. His wife, Denise (Adams) Barnes could have testified that she saw her husband leave their residence around 8:10 on the morning of July 22nd, 1995; that he was walking because her husband had no drivers licence or a car; that he walked in the same direction he normally did most mornings, towards Carroll Maurice Jenkins' residence (aka - Mr. Receece).

Thus, James (Tink) Owens, Carl Clark, and Jackie Wilson were not the only alibi witnesses available to defense counsel; and had counsel called all these witnesses to trial; laid out to the jury the chain of events on the morning of July 22, 1995; and showed the jury where Petitioner was and the numerous people he was with from 8:00 am until 10:00 am on the same morning Petitioner was allegedly across town, robbing and murdering Robert Hamilton, then the jury would have reached a different result and conclusion about the Government's case; especially so if defense counsel would have did the proper thing and filed a motion to withdraw so that counsel himself could have testified about Johnson's attempted subornation of perjury for personal gains. But the record will reflect, none of the alibi witnesses were called by defense counsel; and during a discussion between defense counsel and Petitioner, regarding calling Carroll Maurice Jenkins, Sharon Henry, Jeffery Wilkinson, and Sgt. Williams, counsel told Petitioner he was not going to call these witnesses because Mr. Jenkins (aka - Mr. Receece) allegedly sold drugs out of his residence.

Why defense counsel chose not to call alibi witnesses that would have exonerated

16

his client was unexplainable; and to not call all these alibi witnesses because Mr. Jenkins was selling drugs out of his residence was unexcusable. George Leon Adams, his client, was charged with robbing and murdering a man, not selling or distributing drugs, and therefore, all these witnesses testimony was crucial to his client's defense. It mattered not if they used or sold drugs; all the Government's key witnesses were drug addicts, and many had pending charges and a couple were presently in jail when they testified. Thus, to try to explain counsel's obvious deficient performance, failing to call at least eleven alibi witnesses (and possibly more if a thorough investigation had been done), by alleging it was counsel's trial strategy not to call these witnesses who had nothing to gain or lose that could have exonerated George Leon Adams of the robbery and murder of Robert Hamilton, cannot be viewed as nothing more than a case of deficient performance, falling below the norms of a competent attorney. And the prejudice is obvious; Petitioner stands convicted of crimes to which he is actually innocent, and due to erroneous rulings that are inconsistent with federal laws, Petitioner Adams has never had a fair opportunity to prove his innocence. Why counsel failed to call Robert (Cowboy) Sims and Carl Clark to the witness stand when both were alibi witnesses who were subpoenaed and showed up to testify is incomprehensible; especially due to the fact the 911-call from Walter Mountjoy regarding the shooting of Robert Hamilton came into the police station around 0939 hours. Walter Mountjoy gave a statement that he ran from the wooded area where Robert Hamilton was shot to a McDonalds restaurant and called 911 seconds after Mountjoy heard the gun shot that killed Hamilton; thus, the alibi witnesses counsel failed to call put Petitioner in another part of the city at the exact time Hamilton was murdered on July 22, 1995. And it should be noted, prior to the police intimidation of witnesses, most agreed the perpetrators were around the age of 18-24 years of age, between 5'8" to 5'10" tall, weighing around

17

155-160 pounds, and importantly, driving a small bright blue car; described by one witness as a Plymouth Duster. Ronald Wright told the authorities on two separate occasions that the car the perpetrators drove off in was a small car with a odd blue paint job. George Leon Adams, at the time this crime was committed and the time of his arrest, was fourty-two years old; he was 6'1"; and he weighed well over two-hundred pounds; and he was arrested in a black car - not an older blue car with an odd paint job.

Trial counsel's failure to interview and call alibi witnesses, placing his client miles away from the Robert Hamilton murder, can be considered nothing less than ineffective assistance of counsel; a plethora of case law holds the same conclusion. See, e.g., **Brown v. Myers, 137 F.3d 1154 (9th Cir. 1998); United States v. Dawson, 857 F.2d 923 (3rd Cir. 1988)** (trial counsel's failure to call alibi witnesses who put the defendant in another town at the time of the crime, constituted performance below an objective standard of reasonableness); **Thames v. Dugger, 848 F.2d 149 (11th Cir. 1988); Tosh v. Lockhart, 879 F.2d 412 (8th Cir. 1989)** (failure to call three alibi witnesses, constituted ineffetive assistance); **Lawrence v. Armontrout, 900 F.2d 127 (8th Cir. 1990)** (failure to contact and investigate all potential alibi witnesses when counsel was provided their names, constituted ineffective assistance fo counsel); **Nealy v. Cabana, 764 F.2d 1173 (5th Cir. 1985)** (trial counsel's failure to contact potential alibi witnesses constitutes ineffective assistance of counsel); **Lopez v. United States, 801 A.2d 39, 46 (D.C. 2002)** (same); **Frederick v. United States, 741 A.2d 427 (D.C. 1999)** (noting that: "[i]f the testimony of exculpatory witnesses has no constitutional importance, it is hard to imagine what kind of defense evidence has any importance."); **Gills v. United States, 586 A.2d 726 (D.C. App. 1991)** (evidentiary hearing required on ineffective assistance of counsel claim based on trial counsel's failure to call

security guards as witnesses who would have placed the defendant in their custody at the time of the shooting); **Moore v. Marr, 254 F.3d 1235, 1241 (10th Cir. 2001)** (COA granted on counsel's failure to impeach key prosecution witness).

As clearly stated above, and admitted in trial counsel's affidavit, trial counsel himself should have been a witness for Petitioner; impeaching the most important witness to the Government's case - Sterling Johnson. But, because the lower courts have ignored the proper standard of law applicable to Petitioner's case, he was denied his due process rights and equal protection rights under the law.

The proper cases that should have been used to evaluate both Petitioner's trial counsel's and appellate counsel's ineffective assistance of counsel claims were **Wood v. Georgia, 450 U.S. 261, 271 (1981); Cuyler v. Sullivan, 446 U.S. 335 (1980);** and **Holloway v. Arkansas, 435 U.S. 475, 481-82 (1978);** even though **Strickland v. Washington**'s standard is applicable, the courts ignored the actual facts and basis of the Petitioner's claims; and by doing so, denied a prisoner his rights under federal law to have his pleadings construed liberally and ruled on according to the facts of his case, even though Petitioner failed to cite to the proper legal authority and was confused about the legal theories. See **Haines v. Kerner, 404 U.S. 519 (1972); Boag v. MacDougall, 454 U.S. 364 (1982); Richardson v. United States, 193 F.3d 545 (D.C. Cir. 1999) ; United States v. Sanchez, 88 F.3d 1243 (D.C. Cir. 1996)** (courts should go to particular pains to protect pro se litigants against consequences of technical errors if injustice would otherwise result).

In evaluating Adams' actual innocence claim in the case **sub judice**, the district court allowed his ineffective assistance of appellate counsel to proceed; but, even recognizing that James (Tink) Owens affidavit was recent, the court reasoned that Owens affidavit was no more useful than those of Clark and Wilson; and held these

19

affiants failed to state they were with Adams for any extended period of time; and Adams arguably could have committed the offenses he was convicted of and traveled back across town afterwards. (See Doc. 22, pgs. 10-11). Contrarily, though, a review of the affidavits establishes, unequivocally, these potential witnesses were attesting to being with Petitioner between the hours of 8:00 am and 10:00 am on the morning of July 22, 1995; and within their affidavits they gave the names of other potential witnesses who were present too. (See Exs. 1, 2, & 3). Thus, as noted **supra,** at pages 6 ¶4, 15 ¶2, 16 ¶1&2, and 17, other alibi witnesses were readily available to testify (if a proper investigation had been conducted). This blunder, coupled with trial counsel's failure to withdraw and become a key witness for the defense to impeach the Government's key witness, denied Adams his Sixth Amendment right to effective assistance of counsel; and because appellate counsel failed to bring these facts to the Superior Court of District of Columbia's attention, Petitioner was also denied his Sixth Amendment right to effective assistance of counsel on direct appeal. [3]/

Pursuant to federal law, and in light of the facts of this case and the undisputed affidavits of Petitioner's innocence, at a bare minimum, an evidentiary hearing was warranted, to allow Adams his chance to prove his innocence; actual innocence claims does away with any procedural bar. However, the lower courts have shirked their duties, failing "to provide the necessary facilities and procedures for an adequate inquiry," **Bracy v. Gramley, 520 U.S. 899, 908-09 (1997),** and ignoring Supreme Court decisional authority as to actual innocence cases, such as the case at bar; and it is because the District of Columbia Courts' decisions were "contrary to, [and] involved ... unreasonable application[s] of, clearly established federal law, as determined by the Supreme Court, [and were] based on an unreasonable determination of the facts," that this Court should grant a COA. **Williams v. Taylor, 529 U.S. 362, 405 (2000).**

Note 3: It should be noted that, Petitioner filed a motion to the Superior Court, moving the court for substitute counsel due to irreconcilable differences. The Superior Court sent the motion down to the trial court, and the trial court refused to grant substitute counsel.

Dated: March 23, 2012.

Respectfully submitted,

*[signature: George Leon Adams]*

GEORGE LEON ADAMS
REG. NO. 12021-007
FEDERAL CORRECTIONAL COMPLEX
USP 1
P.O. BOX 1033
COLEMAN, FLORIDA 33521-1033

## CERTIFICATE OF SERVICE

I, George Leon Adams, hereby declare and certify that, I have forwarded a correct and true copy of my (Petitioner's) Reply To Government's Motion To Dismiss Appeal For Lack Of Certificate Of Appealability to the address below, with First-Class postage attached thereto, on this _____ day of March, 2012; signed under the penalty of perjury pursuant to 28 U.S.C. § 1746.

Dated: March 23, 2012.

/s/ *[signature: George Leon Adams]*

GEORGE LEON ADAMS

Mailed to: John P. Mannarino
Assistant U.S. Attorney
555 Fourth Street, N.W., Room 8104
Washington, DC 20530

No. 11-5268

---

IN THE

UNITED STATES COURT OF APPEALS

FOR THE DISTRICT OF COLUMBIA

---

GEORGE LEON ADAMS  -  Petitioner-Appellant,


vs.


UNITED STATES OF AMERICA  -  Respondent-Appellant.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

APPENDIX

---

GEORGE LEON ADAMS
PRO SE LITIGANT - PRISONER
REG. NO. 12021-077
FEDERAL CORRECTIONAL COMPLEX
USP 1
P.O. BOX 1033
COLEMAN, FLORIDA 33521-1033

# TABLE OF CONTENTS

Exhibit 1  -  Affidavit of James (Tink) Owens

Exhibit 2  -  Affidavit of Carl Clark

Exhibit 3  -  Affidavit of Jackie Wilson

Exhibit 4  -  Affidavit of George Leon Adams

Exhibit 5  -  Rebuttal Argument On Behalf Of the Government, page 56

Exhibit 6  -  Officer Robert N. Sauder's report of Sterling Johnson's interview

Exhibit 7  -  Sergeant Darrell Darles report of Sterling Johnson's interview

Exhibit 8  -  Grand Jury Testimony of Sterling Johnson, pgs. 8, 9, 10, 11, 12 & 25

Exhibit 9  -  Trial Testimony of Sterling Johnson, pg. 214

Exhibit 10 -  Trial Testimony of Tommy Facen, pgs. 17-18

Exhibit 11 -  Trial Testimony of Sterling Johnson, pgs. 216, 217 & 218

Exhibit 12 -  Trial Testimony of Tommy Facen, pg. 20

Exhibit 13 -  Preliminary Hearing Testimony of Detective

Exhibit 14 -  Response to Freedom of Information Act request regarding phone call allegedly made to police on July 24, 1995 by Sterling Johnson

Exhibit 15 -  Trial Testimony of Sterling Johnson, pg. 237

Exhibit 16 -  Affidavit of Trial Counsel for Defendant, Ronald E. Horton

Exhibit 17 -  U.S. District Judge Robert I. Richter's Order, at pgs. 4-5

Exhibit 18 -  Interview notes of Sterling Johnson by defense counsel Robert Horton; signed by Sterling Johnson, dated 8-20-1996

Exhibit 1

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

CRIMIAL DIVISION-FELONY BRANCH

Exhibit (2)

This is number (4) four of the
exculpatory testimony that was
excluded in trial

GEORGE ADAMS                  :
        Defendant             :
                              :
                              : Crim. Case. No. F-6136-95
    v.                        :
                              :
                              :
UNITED STATES                 :


AFFIDAVIT OF JAMES (TINK) OWENS

I, James (Tink) Owens, having duly sworn, do hereby declare that
the following is true to the best of my knowledge:

I state for the record, that I am not being threatende nor am
I being persuaded nor seeking proceeds. I am doing this freely and
willing on my own accord.

On July 22, 1995, (Saturday morning) between the hours of 8:00
am to 10:30 am, I was sitting in the cut of the projects (East Capitol
Dwelling), which is located on 56th. place and Central Ave. S.E.
Washington, D.C. Myself and other individuals were having a talk about
the next event that the community was about to have, (cook out, father's
day etc.). I was accompanied by the defendant George Adams (baybro),
Robert (cowboy) Simms, Carl Clark, Nise Baskins, Nise Bradford, and
a few other indivduals that I only know by face.

About 9:00 am Baybro (geroge Adams) walked to the top of the hill, which is about ten to fifteen yards, in eye view. He was tlaking to a woman name Jackie and a dude name Melvin jones. He talked for about ten minutes [10 minutes] to fifteen minutes [15 minutes] before he came back down the hill.

I will testify to this statement in open court.

The foregoing is true and correct to the best of my recollection under the penalty of perjury.

District of Columbia: SS
Subscribed and sworn to before me, in my presence,
this ___ day of _____, 2011
_____
Notary Public, D.C.
My commission expires _____

James Owens-Affiant
2-2-11

*Exhibit 2*

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CRIMINAL DIVISION - FELONY BRANCH

| | |
|---|---|
| GEORGE ADAMS | : |
| Defendant | : |
| v. | : Crim. Case. No. F=6136-95 |
| UNITED STATES | : |

### AFFIDAVIT OF CARL CLARK

I, Carl Clark, having being duly sworn, do hereby aver that the
following is true to the best of my personal knowledge:

   1. I state for the record, that I am not being threatened
nor am I being persuaded nor seeking proceeds. I am doing this
freely and willing on my own accord.

   2. On July 22, 1995, Saturday morning, between the hours
of 8:00 a.m. to 10:00 a.m., I was sitting out on a wall in the
back side of the 100 block of 56th & Central Avenue, S.E.,
Washington, D.C..
I and other individuals were having a conversation about the
next event to come about, I was accompanied by a Robert Simms,
known as "Cowboy"; Brother George Admas, the Defendant herein
this criminal matter; Melvin, Tink and a few other individuals
that I only come to know by nicknames.

   3. On December 3,1996, I was subpened to come to court
to be a witness in the matters of this criminal case and on
behalf of george Adams, but once I got to the Court and Court
Room, A Mr. Horton, I take as Brother George Adams' Counsel,
told me that I did not have to come into the court room as to
taking the witness stand in behalf of Brother George Adams.
I was never placed on the witness stand by Brother Adams'
defense counsel as an alibi witness to testify to brother Adams'
actual innocence in this criminal matter, why?.
When I asked Mr. Horton how was the case coming, Mr. Horton
stated these words," What you think!."
The foregoing is true and correct to the best of my recollection

under the penalty of perjury.

_Carl Clark_
Carl Clark-Affiant

District of Columbia,        ss:

Signed and Affirmed before Me on this 19 day of May ,2003,
by Carl Clark.

_Bertha M. Williams_
NOTARY PUBLIC, D.C.

BERTHA M. WILLIAMS
NOTARY PUBLIC
PRINCE GEORGE'S COUNTY
STATE OF MARYLAND
COMM. EXP. 12-01-05

My Commission expires:_____

2 of 2



Superior Court of the District of Columbia
Criminal Division
Felony Branch

George Adams,      *
  Defendant

v        *   Criminal Case No. F-6136-95

United States of America  &ast;

**Affidavit**

I Jackie Wilson, having been duly sworn, do hereby declare that the following is true to the best of my knowledge:

1. I state for the record, that I am not being threatened, nor am I being persuaded, nor seeking proceeds. I am doing these statements freely and willingly, and on my own.

2. On July 22, 1995, I left my house about 8:45 to 9:00 a.m., enroute to the grocery store, which opens at 9:00 a.m. The grocery store is located in the one hundred block of Central Ave., and 56th Street. S.E. I first went to the black top (which is in between 57th Place and 56th Street), where I came in contact with Melvin Jones and George Adams (known as Bay Brother). We got into a heated argument over money. Five to fifteen minutes later, I went to the store. I received information a few days later, that he was incarcerated for homicide, at the same time that he was out on the black top. I cantacted his attorney, and gave hime this information, that I am swearing to now.

Affidavit Cont......

I asked his attorney, to send his investigator to me, so that I could make the same statement to him. I also informed the Attorney that he could subpeeanor me to come to court so that I could testify in George Adams defence. I talked with his Attorney on several occasion and his attitude was always indefferent and negative.

The foregoing is true and correct to the best of my recollection.

I state this under the penalty of perjury.

MR. Jackie Wilson

SUBSCRIBED AND SWORN TO BEFORE
ME THIS 23rd DAY OF FEB 2004

JEANNE S. GAULT
NOTARY PUBLIC IN D.C.   10-14-06
MY COMMISSION EXPIRES _____

*Ex. 4*

### Superior Court of the District of Columbia
### Criminal Division-Felony Branch

George Adams        *

      v                *       Criminal Case NO. F-6136-95

United States of America    *

### Affidavit of George Adams

I, George Adams, Affiant, Defendant, being duly affirmed, depose and state as follows, to the best of my knowledge.

I state that every word, statements and fact contained herein this document titled Affidavit of George Adams is true and correct, and that I, George Adams, the Defendant in this criminal matter is Actual Innocent of the crime in which I have been convicted of, in this criminal matter.

On the moring of July 22, 1995, I left Mr. Receese house at 58th & Aim St. N.E., Washington D.C. about 8:00 to 8:20 a.m. I was walking toward the blacktop on the back side of 56th St. S.E., where I met up with Carl Clark, Robert Simms, and Melvin Jones (and a few other people, that I only know by nick-names). Melvin Jones and I walked to the top of the black top, where I came across Ms Jackie Wilson. We got into a heated argument about money. Ten minutes later, she walked away, and went back down the hill from where I came. My step-father Clarence Bradfor and I came walking up the back side, with his girlfriend (Ms Day). I stopped him, and asked him to loan me a few dollars and he left. I stayed there in that particular area up until noon.

The foregoing is true and correct and accurate, to the best of my knowledge.

*George Adams* 2/4/04
George Adams-Affiant



Notary Public, State at Large, Kentucky
My Commission Expires: 10/07

M DILLIAN CLE
2/4/04



1          (Thereupon, at approximately 11:43 a.m.,

2      the jury entered the courtroom.)

3          THE COURT:  All right, ladies and gentlemen,

4   we'll proceed with the rebuttal argument, and then I

5   will instruct you.

6          Mr. Bohling.

7          MR. BOHLING:  Thank you, Your Honor.

8   **REBUTTAL ARGUMENT ON BEHALF OF THE GOVERNMENT**

9          MR. BOHLING:  I would like to begin with Mr.

10  Horton's apparent concession that the robbery of

11  Sterling Johnson occurred.  There's actually been no

12  attack on the credibility of Sterling Johnson at all.

13  He told you what happened on July 24th, and that's now

14  been accepted by the defense.  So let's begin with that

15  because that concession is extremely important.  I'm

16  going to submit to you that it shows you beyond any

17  doubt that this is the man who shot Robert Hamilton on

18  July 22nd, 1995.

19          Let's begin with Mr. Horton's argument to you

20  that there are such -- so many dissimilarities in these

21  two events that it shows you that Mr. Adams could not

22  be the person who was involved in the robbery of Mr.

23  Hamilton.  Nothing could be further from the truth.  In

24  fact, the similarities are so striking that it shows

25  precisely the opposite.

*Exhibit* **6**

METROPOLITAN POLICE DEPARTMENT
Washington, D.C.

**COMPLAINANT/WITNESS STATEMENT**

P.D. 119 REV. 10/89

| | |
|---|---|
| **1. COMPLAINT NO.** | 95-436359 |

| 2. NATURE OF INVESTIGATION | 3. UNIT FILE NO. |
|---|---|
| HOMICIDE INVESTIGATION | HO95-837 |

| 4. STATEMENT OF: (Last, First, Middle) | 5. DOB | 6. SEX |
|---|---|---|
| JOHNSON, STERLING | 12/12/53 | MALE |

| 7. HOME ADDRESS | 8. HOME PHONE |
|---|---|
| 425 2ND STREET NW, WASHINGTON, DC | 202-393-1909 |

| 9. EMPLOYMENT (Occupation and Location) | 10. BUSINESS PHONE |
|---|---|
| | |

| 11. LOCATION STATEMENT TAKEN |
|---|
| HOMICIDE BRANCH |

| 12. NAME OF OFFICER TAKING STATEMENT (If other than block 18 include signature) | 13. DATE/TIME STARTED |
|---|---|
| SAUNDERS, ROBERT N. (2494) | 07/27/95 15:00 |

**14. STATEMENT**

Mr. Johnson, this office is investigating a complaint of a robbery that you are reporting and that you were a victim of, that occurred at North Capitol and NewYork Avenue on Monday July, 24, 1995 at approximately 1:00 or 2:00 pm in the afternoon. In your own words, will you please tell me exactly what happened on that day and who it was that robbed you.

A. Monday evening at approximately 1:00 or 2:00 that evening, Bay brother asked me how was Bill Blass dope and I told him that it was alright. He said that I looked like I was high and I told him that I was enrolled in the methadone clinic and that I was on 100mg and it won't do me any good because I won't feel it. At this time, he asked me foe three bags of Bill Blass and at that time I took out the stuff for him. As I looked up, he was cocking what appeared to be a 25 or a 22 semiautomatic pistol and said just give it to me, you don't want to end up like that white boy Bobby. As he takes the bags, he walked off towards NewYork Avenue, west bound and got inside of a black car with Maryland tag #245 which was the last three digits. On Tuesday morning approximately 8:00 and 9:00 am, I was conversing with a friend and was telling him about what happened to me on the day before and was describing the car that was used when I was robbed, and that's when I saw the same car again on N. street. At that time I walked over to get the tag number which was AME-245 MD, and then I saw Baybrother and another dude walking fast from out of the woods from where they robbed another guy of his $20.00. On the following day, which was Wednesday, they came back and robbed another guy, thinking that he was selling dope and they took his five dollars. The man don't even sell dope but they took his money any way. I did'nt see that robbery, but every body told about it.

Q. Who was the guy that got robbed in the woods on Tuesday?

| 15. I HAVE READ THIS STATEMENT GIVEN BY ME OR HAVE HAD IT READ TO ME. I FULLY UNDERSTAND IT AND CERTIFY THAT IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND RECOLLECTION. "I UNDERSTAND THAT MAKING OF A FALSE STATEMENT IS PUNISHABLE BY CRIMINAL PENALTIES (D.C. CODE SECTION 22-2514)". | |
|---|---|
| *Sterling Johnson* (Signature of Person Giving Statement) | **16. DATE/TIME ENDED** 07/27/95 15:50 |
| | 17. Page 1 of 3 Pages |

| 18. OFFICER OBTAINING THE SIGNATURE IN BLOCK 15: | 19. PERSON WITNESSING THE SIGNATURE IN BLOCK 15: |
|---|---|
| *Robert Saunders* (Name and Signature) | (Name and Signature) |

*Ex. 6*

| 1. COMPLAINT NO. | | |
|---|---|---|
| 95-436359 | | |

| 2. NATURE OF INVESTIGATION | 3. UNIT FILE NO. | |
|---|---|---|
| HOMICIDE INVESTIGATION | H095-837 | |

| 4. STATEMENT OF: (Last, First, Middle) | 5. DOB | 6. SEX |
|---|---|---|
| JOHNSON, STERLING | 12/12/53 | MALE |

| 7. HOME ADDRESS | 8. HOME PHONE |
|---|---|
| 425 2ND STREET NW, WASHINGTON, DC | 202-393-1909 |

| 9. EMPLOYMENT (Occupation and Location) | 10. BUSINESS PHONE |
|---|---|
| | |

| 11. LOCATION STATEMENT TAKEN | |
|---|---|
| HOMICIDE BRANCH | |

| 12. NAME OF OFFICER TAKING STATEMENT (If other than block 18 include signature) | 13. DATE/TIME STARTED |
|---|---|
| SAUNDERS, ROBERT N. (2494) | 07/27/95 15:00 |

**14. STATEMENT**

A. His name was Joe, he sells herion that's called power.

Q. Where does Joe sell his drugs and tell me if he is a white male or a black male?

A. He sells over there by the 24 hour store on NewYork Avenue and he's a black guy, I don't know where he lives at.

Q. Who was the guy that got robbed on Wednesday?

A. I don't know he was, they just came running to me and telling me what happened.

Q. Are you sure that the black car that you saw Baybrother get inside of on Tuesday, was the same car that he got inside of on Monday?

A. Yes, I thought it was a Honda or a Mazda, but I Know that it was the same car.

Q.To your knowledge, what type of guy is Baybrother?

A. He surprised me, he was never like that in the past, but I guess that dope got the best of him. I'm surprised that they did'nt get up there today to robbed anybody.

Q. Is there anything else that you can think of in refference to this case.

A. Yes, Baybrother said to me, You don't want to end up like that white boy Bobby. There was approximately siv other people who saw when I got

**15.** I HAVE READ THIS STATEMENT GIVEN BY ME OR HAVE HAD IT READ TO ME. I FULLY UNDERSTAND IT AND CERTIFY THAT IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND RECOLLECTION. **"I UNDERSTAND THAT MAKING OF A FALSE STATEMENT IS PUNISHABLE BY CRIMINAL PENALTIES (D.C. CODE SECTION 22-2514)".**

*Sterling Johnson*
Signature of Person Giving Statement

| 16. DATE/TIME ENDED |
|---|
| 07/27/95 15:50 |

| 17. Page 2 of 3 Pages |
|---|

| 18. OFFICER OBTAINING THE SIGNATURE IN BLOCK 15: | 19. PERSON WITNESSING THE SIGNATURE IN BLOCK 15: |
|---|---|
| *Robert Saunders* | |
| (Name and Signature) | (Name and Signature) |

METROPOLITAN POLICE DEPARTMENT
Washington, D.C.
**COMPLAINANT/WITNESS STATEMENT**

P.D. 119 REV. 10/89

| 1. COMPLAINT NO. 95-436359 | | |
|---|---|---|

| 2. NATURE OF INVESTIGATION HOMICIDE INVESTIGATION | 3. UNIT FILE NO. HO95-837 | |
|---|---|---|

| 4. STATEMENT OF: (Last, First, Middle) JOHNSON, STERLING | 5. DOB 12/12/53 | 6. SEX MALE |
|---|---|---|

| 7. HOME ADDRESS 425 2ND STREET NW, WASHINGTON, DC | 8. HOME PHONE 202-393-1909 |
|---|---|

| 9. EMPLOYMENT (Occupation and Location) | 10. BUSINESS PHONE |
|---|---|

| 11. LOCATION STATEMENT TAKEN HOMICIDE BRANCH | |
|---|---|

| 12. NAME OF OFFICER TAKING STATEMENT (If other than block 18 include signature) SAUNDERS, ROBERT N. (2494) | 13. DATE/TIME STARTED 07/27/95 15:00 |
|---|---|

**14. STATEMENT**

robbed and I'll get you there names a little later for you.

Q. On Saturday, did you see Baybrother in the area of North Capitol and Newyork Avenue?

A. Yes, I saw him on N. street, east bound in a car as the passenger at approximately 7:30 and 8:00 am.

Q. Can you think of anything else.

A. No sir.


NOTE: Prior to taking this statement, an array of photo's was shown to Mr. Johnson containing nine colored polaroid photo's, one of which was a picture of George Leon Adams. The picture of Mr. Adams was in position number three and at 1437 hours, Mr. Sterling Johnson positively identified right away with out hessitation, the picture of Mr. George Leon Adams, AKA, Baybrother as the person who robbed him at gun point. As Mr. Johnson came to the picture of Geoge Adams, he stated to this writer," That's Baybrother right here," an immediate response.

After being shown the array of pictures, the witness was shown several pictures of a car in which he described and asked if he recognized it, and his immediate response to this was " That's tha car, it looks like a Mazda to me but that's it".

15. I HAVE READ THIS STATEMENT GIVEN BY ME OR HAVE HAD IT READ TO ME. I FULLY UNDERSTAND IT AND CERTIFY THAT IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND RECOLLEC-TION. "I UNDERSTAND THAT MAKING OF A FALSE STATEMENT IS PUNISHABLE BY CRIMINAL PENALTIES (D.C. CODE SECTION 22-2514)".

*Sterling Johnson*
Signature of Person Giving Statement

| 16. DATE/TIME ENDED 07/27/95 15:50 |
|---|
| 17. Page 3 of 3 Pages |

| 18. OFFICER OBTAINING THE SIGNATURE IN BLOCK 15: *Robert Saunders* (Name and Signature) | 19. PERSON WITNESSING THE SIGNATURE IN BLOCK 15: (Name and Signature) |
|---|---|

Sterling Johnson
Statement of the Aleged Robbery

STERLING JOHNSON AKA "ROCKY" 12-12-53
425 MITCH SNYDER PL. 2ND + D ST SHELTER
217 60 6138

ON MON. BETWEEN 1 + 2 PM ROCKY WAS
STANDING AT N. CAPITOL + NY AVE BY
BIG BEN LIQUOR STORE. BY BUS STOP.
BIG BROTHER WALKED UP + SAID, NOW IS
THAT BILL BLASS DOPE? ROCKY SAID + YEAH
ITS PRETTY GOOD. I HAVE IT. BIG BROTHER
ASKED WHAT ABOUT THE BROAD? ROCKY SAID
THE GIRL ACROSS THE STREET WAS SOME. AS
WE WERE WALKING ACROSS THE BRIDGE. BIG
BROTHERS BOY CALLED HIM BACK FROM THE CAR.
BLACK HONDA OR MAZDA 4 DR MD AME 245

BIG BROTHER WAS IN THE FRONT PASSENGER SEAT
S-2 BACK RIGHT
S-3 DRIVER.

CARS ON NY.
ROCKY + BIG BROTHER IN N. CAP AT BUS STOP
(WELL SO AHEAD ILL GET THREE OF THEM + I
HAVE THE MONEY. HAVE $60.) ROCKY HAD
FOUR QUARTER + WAS COUNTING OUT THREE.
BIG BROTHER PULLED OUT A GUN FROM HIS RIGHT
POCKET. IT WAS A SMALL BLACK HANDGUN WITH
BROWN GRIPS. .22 OR 25. IT WAS A SEMI AUTO
HE PULLED THE SLIDE BACK. (YOU KNOW WHAT THIS
IS GIVE IT TO ME) SO ROCKY GAVE IT TO HIM.
BIG BROTHER WALKED BACK + GOT INTO CAR

8/10

1300

ROCKY SAW RAVBROTHER IN THE F.R. PASSENGER SEAT OF THE SAME CAR ON SAT. 7/22 @ 8°° AM. AT N. CAPITOL ST + N ST NE. THE (SAME) PERSON IN THE B.R. PASSENGER SEAT APPEARED TO BE THE SAME PERSON WHO GOT OUT OF THE CAR DURING THE ROBBER ON MON 7/24 + TUE 7/25.

WHEN ROCKY SAW THE DRIVER OF THE CAR ON TUE 7/25 HE SEEM TALL BECAUSE THE SEAT WAS PUSHED BACK + HE WAS LEANING BA

PATRICK WAS A WITNESS AT THE BUS STOP ROBBERY ON 7/24 B/M , DK , 5'8" - 5'10" , WALKS WITH CRUTCHES . PATRICK'S WIFE WAS ALSO A WITNESS.

TOMMY IS THE PERSON THAT ROCKY WAS TALKING TO ON TUE 7/25 WHEN JOE WAS ROBBED . TOMMY , B/M , VERY LIGHT COM HUSTLES CIGARETTES . 6'0" 190 , SUNGLASSES , CARRYS A BROWN LEATHER TOTE BAG . JOE - SELLS "POWER" HEROIN . B/M , DK 5'10" , CHUBBY , CLOSE CUT HAIR.

ROB TOLD ROCKY THAT LIGHTFOOT MAY HAVE SEEN BUDDY GET SHOT . ROB , B/M , MED-DK , 40's , 5'10" SUNGLASSES , DARK KNAPSACK . LIGHTFOOT - B/M 50's HAS ARTHRITIS IN RIGHT HAND AND USES A CANE.

SGT DARRELL DARLES - 7Y611
L/W HECTOR FELIX FOR UCSA / POSS HEROIN , HE MAY HAVE INFORMATION ABOUT THIS CASE. THREATS TO HIM BY SAME SUSPECTS.


1    to N Street.  It's right there at New York Avenue and N --

2    the 24-hour store.

3        Q    Did you get all the way across?

4        A    No, we didn't.  We got stopped midway across the

5    bridge.

6        Q    What did you get stopped by?

7        A    The other passenger in the vehicle, that was

8    sitting in the back seat.  He got out of the automobile

9    and asked him where in the hell he was going at.

10       Q    What happened then?

11       A    Bay Brother said, "Come on, man, we can't go over

12   there because they're getting pissed off at me."

13       Q    He said that to you?

14       A    Yeah.

15       Q    Did you turn back and go back in the direction you

16   had come?

17       A    We turned around, we came back from which we left

18   from, and sat down on, like, a flower bed -- something made

19   like this (indicating), full of dirt.  They done sat on the

20   flowers, and the flowers ain't had a chance to grow, they

21   done sat on it so long.

22       Q    After you sat down there, what happened after that?

23       A    Bay Brother asked me for three bags of dope.  In

24   turn, I asked how much money was he working with.  He said,

25   "I have it all."  And I said, "Okay."

1        So as we sat, he said, "You sit on this side, and

2    I'll sit over here." And what he did, he pulled out -- he

3    cocked a gun. It was a either a .25 or a .22 semiautomatic

4    -- what you call a Saturday night special, one of them kind

5    that goes off by themselves.

6        Q    Did you see where he took the gun from?

7        A    He got the gun from out his right pocket.

8        Q    Did you see the gun itself?

9        A    I saw the gun. Oh, yes, sir, I saw it.

10       Q    What color was it?

11       A    Brown handle; what's that -- cold steel was the top

12   part of it; and the cocky part that clicks back, from there

13   on down was brown, except for where the finger trigger is.

14       Q    And you said when he took out the gun -- did he

15   cock it?

16       A    Yes, he did.

17       Q    What happened next?

18       A    I told him he ain't had to go no further. And then

19   after I told him that, you know, I just gave him the dope.

20       Q    How much did you give him?

21       A    Eighty dollars worth.

22       Q    How many bags is that?

23       A    Four.

24       Q    Is that all you had?

25       A    I had -- that's all I had in my possession at that

Exhibit 8

10

1    time.

2        Q    Did you give him any cash?

3        A    No, I ain't give him any cash at all.  I don't keep

4    cash on me.

5        Q    What did Bay Brother do or say after he took the

6    four bags of heroin from you?

7        A    He didn't say anything.  He just took it and forced

8    it into his pocket, and he walked away from the bus stop with

9    the pistol his hand.

10       Q    Where did he go?

11       A    He went around the corner on the New York Avenue

12   side, he got into a black car.  And the only thing I can

13   catch was a 245 number.

14       Q    Was it the same car that he pulled up in?

15       A    Correct.  That's the same car he had pulled up in.

16       Q    Now, you said there was a person in the back seat

17   of that car; is that right?

18       A    Correct.

19       Q    Was there also a person driving the car?

20       A    Yes, it was.

21       Q    Did you get any type of good look at the person who

22   was in the back seat of the car?

23       A    I really couldn't.  He had a hat over his head.  He

24   seemed like a peanut, and the hat covered his whole face

25   almost.



1    Q    How about the driver -- did you get a chance to

2    look at him?

3    A    No, he towel wrapped around his neck, looking like

4    a damn walrus, throwing the towel over his face.

5    Q    Did you see which direction the car drove off in?

6    A    Yes, it went up -- I would say, east to west, it

7    was headed west.

8    Q    On what street?

9    A    New York Avenue.

10   Q    When did you lose sight of him?

11   A    When he went over the hill.

12   Q    Did you see Bay Brother again that day -- the 24th?

13   A    Not that day.  I saw him the next day -- the day

14   following.

15   Q    So you saw him on Tuesday, July 25, 1995?

16   A    Correct.

17   Q    Do you remember approximately when that was?

18   A    Yeah, it was between -- oh, shit, 8:00 to maybe --

19   -- from 8 o'clock to 9 o'clock, baseball figure time.

20   Q    In the morning?

21   A    In the morning -- a.m.

22   Q    Where did you see him?

23   A    At that time I saw him, he was on N Street, on the

24   east side of New York Avenue.  That's the east street because

25   it's running across -- no, excuse me.  That street, north

*Exhibit* **8**

12

1  street, run across New York Avenue and North Capitol Street.

2  Q    How far away would that be from where the robbery

3  occurred the day before?

4  A    Across the street.

5  Q    Did you see the same car?

6  A    Same car.  That's how I got the first three

7  letters of the tag number.

8  Q    When you saw Bay Brother on July 5 -- the first

9  time you saw him -- where was he?

10  A    The 25th -- what day was that, Monday?

11  Q    That was Tuesday, the day after the robbery.

12  A    Oh, Tuesday?  Okay, Tuesday, I was talking to the

13  cigarette man and telling him what happened and what kind of

14  car, it was a black car, like that, I remember the last three

15  numbers of the tag was 245.

16  And at that point in time, a black car had pulled

17  up and parked about 10, 15 feet away from us.  And I was

18  explaining to the cigarette man -- his name is Tom -- that

19  the dude was driving -- I told him I got robbed, and he was

20  driving a black car with 245 was the tag number.

21  And I looked over, I said, "It's a tag number like

22  that car."  I said, "Hold on, man, that's the car right

23  there."

24  So him and I walked up there together.  I told him

25  -- I whispered to him, I said, "That's the car right here,



1 | coming out.

2      Q     All right. I'd like to direct your attention to

3 after the robbery and ask you when you first talked to the

4 police about that robbery.

5      A     I had called -- the day I got robbed, I had called

6 then, because the word that was going around was that he was

7 shot with a .22 or a .25.

8      Q     You mean Bobby was shot with a .22 or .25?

9      A     Bobby was shot with a .22 or a .25. And at

10 that point in time, I went and got on the phone -- and

11 that could have been the same weapon that killed Bobby.

12 He damn sure wasn't going to use it on me. I'd make sure

13 of that.

14      Q     So you're saying you called the police on Tuesday,

15 the 24th?

16      A     I called them that Monday.

17      Q     I'm sorry, Monday.

18      A     I believe I called them the same day it happened.

19 I believe I did.

20      Q     Did you actually talk to an officer in person that

21 day?

22      A     Yes, I did. I talked to Detective Leach.

23      Q     Do you recall that there was a time sometime later

24 in the week when you were asked to look at a photographic

25 spread?

1      Q    Do you recall specifically whether a person

2  named Tommy was around at that time?

3      A    Yes.

4      Q    And where was Tommy, if you remember?

5      A    Yes.  He was standing around selling

6  cigarettes.  He's a guy that sell cigarettes.

7      Q    And how far was Tommy from you?

8      A    Hands reach.  He wasn't far.

9      Q    Now, where was Bey Brother when you first saw

10  him?

11      A    When I first saw him he was walking around

12  the corner from New York Avenue to North Capitol

13  Street.

14      Q    Okay.  I'm going to show you what has been

15  marked as Government's Exhibit No. 1.  Do you recognize

16  this exhibit, Mr. Johnson?

17      A    Let me take a look at this.

18      Q    Take your time.

19      A    Yeah.  I know the area.

20      Q    What area is this?

21      A    This right here is New York Avenue.  This

22  right here is First Street.  This is North Capitol.

23      Q    Now, you had told us that when you first saw

24  Mr. Adams, Bey Brother, he was coming around the

25  corner, you say?

*Exhibit 10*

1    towards Chinatown.

2         Q    And when you're talking about Rock, do you know

3    Rock's real name?

4         A    To be honest with you, I don't know Rock; I just

5    always called him Rock, you know.

6         Q    Have you seen this person recently?

7         A    Oh, yes, I see Rock nearly everyday.

8         Q    Have you seen him down here in the courthourse?

9         A    He's out there this morning, uh-huh.

10        Q    And what, what were you doing that morning with,

11   with Rocky?

12        A    Well, I was waiting for the bus, P-6 bus myself.

13        Q    Uh-huh.

14        A    And Rock was just over there.  I don't know, I

15   don't know whether Rock -- Rock got a car, I don't think he

16   was waiting for no bus.  I don't know exactly what Rock was

17   doing personally.

18        Q    At some point, did, did anyone approach where you

19   were standing and Rock was standing?

20        A    Oh, yes.

21        Q    Do you remember where that person came from?

22        A    Yeah, out of a car.  A car pulled up, got out of

23   the car.

24        Q    Do you remember where that car pulled up?

25        A    Right there in front of him.  Right there at the

# Exhibit 10

1    bus stop.

2        Q    And what happened when this person came up to

3    where he was standing?

4        A    First he got out of the car, came up to Rock and,

5    and said nigger, give it up, robbery in other words.

6        Q    Did you -- did this person have a weapon that you

7    could see?

8        A    I didn't see no weapon per se but he had a hand

9    like in his pocket like he had a weapon, you know.

10        Q    And how far away were you from Rock at the time

11    that you heard this statement?

12        A    Two, three feet, because we were just standing

13    there talking.

14        Q    What did you do?

15        A    Well, while he was busy with Rock I ran.

16        Q    Which direction did you run?

17        A    I ran towards straight up North Capitol about a

18    half a block.  I ran across the street, New York Avenue and.

19    I got just about a half a block and I stopped, just stood

20    there and looked.

21        Q    Do you remember how much time passed between the

22    time you heard this statement that made you think it was a

23    robbery and the time that you ran?

24        A    How much time passed when I ran?

25        Q    Between, you said that you heard this person say

1    A    Umm-hmm.

2         (Witness returned to the stand.)

3    Q    Mr. Johnson, did you see where Mr. Adams come

4    from?

5    A    Yes.  He came from around the corner from Big

6    Ben's Liquor Store.  He got out of an automobile.

7    Q    Did you see that car at that time?

8    A    It was a black car.

9    Q    And how long did it take for Mr. Adams to

10   walk from that car to where you were standing?

11   A    I really didn't time him.  It wasn't long.

12   Q    What happened when he got to where you were?

13   A    Well, when he approached me he was asking me

14   about drugs out there.  He asked me what was good.

15   What was bad.

16   Q    What did ou tell him?

17   A    I told him I was selling Bill Blast and it

18   was pretty good.

19   Q    Bill Blast, what is that?

20   A    That is the name of the heroin that I was

21   selling.

22   Q    Why is it called Bill Blast, if you know?

23   A    I don't know.  Usually dealers mark their own

24   drugs that they sell.

25   Q    What happened next?

216

1      A    Well, he asked me, who had it.  I told him I

2  had some.  And then he asked me where can he get some

3  shake at, which is called cocaine.  I told him it was

4  across the street, which is on N Street.

5      Q    What happened next?

6      A    And we started to go over there and the guy

7  got out of the back seat of the car and called him

8  back.  And Bey Brother said, come on let's go back

9  where we were, man, because the guy is kind of pissed

10  off waiting.

11      Q    Now, when you say "car," which car are you

12  referring to?

13      A    The car that he got out of.

14      Q    And do you know, when this guy got out of

15  that car, do you remember where the car was?

16      A    Yes.  The car was parked on New York Avenue

17  in front of Big Ben's Liquor Store.

18      Q    Where was it that you and Mr. Adams were

19  going.

20      A    We were on the North Capitol Street side.

21      Q    So did you go back across with Mr. Adams when

22  he asked you to?

23      A    Yes.  We came back.  We started across the

24  street on bridge on the New York Avenue side.  By the

25  time we got halfway there, the guy called us back, so



1     we came right on back.

2           Q     What happened next?

3           A     Then I went back to where I was originally at

4     from the beginning.  He said, well, let me get three of

5     those Billies you got.  When he did that, he cocked the

6     gun.

7           Q     Did he have a gun before that?

8           A     Well, nobody handed it to him.  He had it in

9     his pocket obviously.

10          Q     Did you see where the gun came from?

11          A     Yes.  Came out of his right pocket.

12          Q     How far away was he from you when he pulled

13    the gun out?

14          A     Just as close as this young lady is in front

15    of me.

16                MR. BOHLI  :  Let the record reflect that the

17    witness is pointing to the court reporter, who is

18    directly in front of the witness.

19                BY MR. BOHLING:

20          Q     Did he say anything to you at that point?

21          A     Yes, he did.

22          Q     What did he day say?

23          A     He said, just give me the Billies.  He cocked

24    a weapon.  He said, you don't want to wind up like that

25    white boy Bobby.

                                                          218

Exhibit 12

1    was just right around the corner waiting and they left.

2        Q    Now, did you get any opportunity to see the car?

3        A    Oh, yes, the same car, the same car, the same

4    dark blue photo car with Maryland tag on it.

5        Q    At that point, do you remember if you had any

6    other talks and discussions with Rock?  Without telling us

7    what was said.

8        A    What, that day you're talking about?

9        Q    Right after, after the robbery.

10       A    Yeah, because after he left I, I went on back

11   over there, you know, see what, talk to Rock, see what, you

12   know, was he all right, what's happened, you know.

13       Q    Okay.  And did, did you have any discussions

14   about the car that the robber got in?

15           MR. HORTON:  Objection, Your Honor.

16           THE COURT:  Overruled.

17           BY MR. BOHLING:

18       Q    I'm not asking -- I don't want you to tell us yet

19   what was said, just whether or not you talked to Rock about

20   the car.

21       A    Yeah, we, we, you know, mentioned the car, you

22   know.

23       Q    Did Rock give you any information about the car?

24       A    No.

25       Q    Okay.  Did there come a time when you saw this

1  to you to be under the influence of drugs or

2  medication or alcohol at the time you interviewed

3  the witness?

4      A    No.

5      Q    Correct me if I'm wrong, but as I

6  understand your testimony, witness number 2 claims

7  that it was robbed of drugs.  Is that correct?

8      A    That is correct.

9      Q    Now, did witness number 2 report it to

10 the police, report that robbery to the police on

11 July 24th in the afternoon?

12     A    No, it wasn't until the 26th.

13     Q    That's the first time the witness

14 mentioned the alleged robbery to the police; is that

15 correct?

16     A    To my knowledge.

17     Q    Now, at the time the witness, witness

18 number 2, mentioned that it had been robbed, was

19 that witness in police custody?

20     A    The witness?  No, it was not.

21     Q    Under arrest?

22     A    No.

23     Q    Was the witness suspected of involvement

24 in criminal activity at the time the witness was

25 interviewed?



**U.S. Department of Justice**

*Ex-* *14*



NOV 3 0 2004

*Executive Office for United States Attorneys*
*Freedom of Information/Privacy Act Staff*
*600 E Street, N.W., Room 7300*
*Washington, D.C. 20530*
*202-616-6757  Fax 202-616-6478*

Requester:___**George Adams**_____Request Number:___**03-4098**_____

Subject of Request:__**Self / Specific Docs**_____

Dear Requester:

       Your request for records under the Freedom of Information Act/Privacy Act has been processed. This letter constitutes a reply from the Executive Office for United States Attorneys, the official record-keeper for all records located in this office and the various United States Attorneys' Offices.

       To provide you the greatest degree of access authorized by the Freedom of Information Act and the Privacy Act, we have considered your request in light of the provisions of both statutes.

       The records you seek are located in a Privacy Act system of records that, in accordance with regulations promulgated by the Attorney General, is exempt from the access provisions of the Privacy Act. 28 C.F.R. §16.81. We have also processed your request under the Freedom of Information Act and are making all records required to be released, or considered appropriate for release as a matter of discretion, available to you. This letter is a [ **X** ] partial release [    ] full denial.

       Enclosed please find:

__**22**___ page(s) are being released in full (RIF);
__**5**___ page(s) are being released in part (RIP);
_____ page(s) are withheld in full (WIF).  **The redacted/withheld documents were reviewed to determine if any information could be segregated for release.**

       **Please note that nothing was found responsive to your request for 911 call regarding robbery of a "Sterling Johnson".**

       The exemption(s) cited for withholding records or portions of records are marked below.  An enclosure to this letter explains the exemptions in more detail.

|      Section 552      |                    |                    |      Section 552a      |
| --- | --- | --- | --- |
| [    ] (b)(1) | [    ] (b)(4) | [    ] (b)(7)(B) | [ **X** ] (j)(2) |
| [    ] (b)(2) | [    ] (b)(5) | [ **X** ] (b)(7)(C) | [    ] (k)(2) |
| [    ] (b)(3) | [    ] (b)(6) | [    ] (b)(7)(D) | [    ] (k)(5) |
| _____ | [    ] (b)(7)(A) | [    ] (b)(7)(E) | [    ] _____ |
| _____ |  | [    ] (b)(7)(F) |  |

       [    ] In addition, this office is withholding grand jury material which is retained in the District.

Form No. 021- no fee - 2/04

1    July 22nd, that morning you saw Mr. Adams in this car,

2    this black car.  Right?

3         A    Correct.

4         Q    You didn't see him in a blue car?

5         A    No.  He wasn't in a blue car.

6         Q    An older model blue car?

7         A    Nah.

8         Q    With a funny paint job; you didn't see him in

9    a car like that, did you?

10        A    No.

11        Q    Now, you've known Mr. Adams -- strike that.

12   Before I get off that.  At about the time that you saw

13   Mr. Adams in that car on Saturday, July 22nd, it was

14   about between 7:45 and 8:30.  Right?

15        A    Correct.  I'm saying approximately 7:30.

16        Q    Okay.  Well, in the grand jury -- you

17   testified in the grand jury back in August 10th of '95.

18   Right?

19        A    Correct.

20        Q    And certainly your memory back then was a lot

21   better than it is now.  Would you agree with me?

22        A    Oh, I agree.

23        Q    All right.  And this is on Page 17, on Line

24   19, referring to when you saw Mr. Adams in the car on

25   July -- Saturday morning, July 22nd, you said, it was

MAP-11-1999  12:10                                      2025148784   P.02/03

**Ex. 16**

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CRIMINAL DIVISION - FELONY BRANCH

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Criminal No. F-6136-95 |
| | ) |
| v. | ) Judge Robert Richter |
| | ) |
| GEORGE LEON ADAMS, | ) |
| | ) |
| _____Defendant_____ | ) |

## AFFIDAVIT OF RONALD E. HORTON

COMES NOW the undersigned Affiant, RONALD E. HORTON, ESQ. after first having been duly sworn and states as follows:

1.      My name is Ronald E. Horton and I represented George Leon Adams in his criminal trial in the above-referenced case before the Honorable Robert I. Richter. I am familiar with the facts of this case

2.      I was admitted to the Bar in the District of Columbia in 1985. To date, I have represented approximately sixty-five criminal defendants at trial in the Superior Court of the District of Columbia; approximately twenty of these defendants were on trial for homicide. I have reviewed Mr. Adams's motion for a new trial pursuant to D.C. Code § 23-110, and now submit this affidavit.

3.      In his motion, defendant claims that I "failed to make an on-site inspection of the crime scene and immediate vicinity[.]" Supl. Mem. at 14. This allegation is false. In preparation of Mr. Adam's defense, I visited the crime scene (the area around First and N Streets, Northeast, Washington, D.C.) on several occasions, and became familiar with the area before the trial began.

4.      Defendant also claims in his motion that, "on information and belief, government witness Sterling Johnson made an offer to trial counsel to not press charges in exchange for a payment of money. Counsel failed to examine the witness as to his extortionate-out-of-court offer." Supl. Mem. at 16. It is true that I conducted a pre-trial interview of Sterling Johnson after Mr. Johnson was identified as a government witness who was prepared to testify regarding Mr. Adams's purported robbery of him on July 24, 1995. During my pre-trial interview, Mr. Johnson offered to "drop" the July 24 robbery charge if Mr. Adams paid him a sum of money which was equal to the worth of the drugs stolen from him by Mr. Adams. While I considered pursuing a line of cross-examination based on Mr. Johnson's offer, I made a strategic decision not to do so. I believed that cross-examination on this point would have limited value, since Mr. Johnson never asserted or hinted that he was not robbed or that Mr. Adams was not the person who robbed him. In addition, I believed that a cross-examination of Mr. Johnson regarding this offer would merely have depicted Mr. Johnson as a reasonable person who only wanted to be made whole by Mr. Adams.

5.      The forgoing is true and accurate to the best of my recollection.

_____
Ronald E. Horton, Esq.

Subscribed and sworn to before me this

_11th_ day of March ___, 1999.

_____
Notary Public

My Commission Expires November 14,1999


the record. In its Opposition, the Government attached an affidavit of trial counsel stating that he did indeed visit the crime scene. In addition, during the trial, trial counsel used photographs of the crime scene and demonstrated a familiarity of the area when he vigorously impeached the testimony of witnesses at the scene of the crime.

Defendant next argues that trial counsel did not adequately examine witnesses concerning the color of the getaway car. Once more this allegation is wholly unsupported by the record. Indeed, the record indicates that trial counsel examined both government and defense witnesses about the color and make of the supposed getaway car. Moreover, in his closing argument, counsel attempted once more to exploit the disparity in the description of the car. *See, e.g. 12/4/96* Trial Transcript at 43-44, 47. Clearly, trial counsel did not err in his treatment of this evidence and testimony.

Defendant argues that trial counsel should have moved to suppress evidence of a July 24, 1995 robbery from the trial of the July 22, 1995 crimes. On April 5, 1996, the Honorable Truman A. Morrison, III severed the July 22 charges from the July 24 charges, but he did not rule on whether the robbery evidence was admissible in the murder trial. During the trial of the July 24 charges, the subject of this appeal, the Court ruled that references to the attempted robbery of two days earlier which directly proved identification in the charged case  were admissible because the probative value of such evidence outweighed its prejudicial effect. Defendant claims that trial counsel failed to "argue vigorously to exclude evidence" of the attempted robbery. Defendant's contention, however, is unsupported by the record. A review of the transcript reveals that trial counsel engaged the Court in a lengthy colloquy in attempt to exclude this evidence. *See 11/26/96* Tr. at 210-19, 270-90, 285-89. Although trial counsel's efforts were ultimately unsuccessful, counsel ably and competently presented his arguments. Thus, trial counsel sufficiently advocated defendant's rights.

Finally, defendant argues that trial counsel failed to cross-examine government witness, Sterling Johnson, about an extortionate offer Johnson made to trial counsel regarding Johnson's testimony. It is

undisputed that during a pre-trial interview, Johnson offered to deny knowledge of defendant's role in the

July 22 robbery in exchange for money Johnson lost in a drug deal with the defendant. Trial counsel opted

not to pursue this line of questioning during his cross-examination of Johnson deciding that impeaching

Johnson on this point would not yield significant value. Indeed, trial counsel even felt that impeaching

Johnson on his offer would have shown Johnson to be a sympathetic sort who only wished to recoup money

taken from him by the defendant. Trial counsel exercised his own discretion in deciding not to pursue this

line of questioning and such strategy was reasonably determined and not prejudicial.

Defendant was represented at trial by highly experience and able counsel. Defendant has not

demonstrated that the challenged decisions were beneath the standards of competency, and certainly has not

shown that there was any material prejudice from trial counsel's choices.

Therefore, for the above reasons, it is, this 26th day of April 1999,

**ORDERED** that Defendant's Motion For a New Trial Pursuant to D.C. Code 23-110 is **DENIED.**

JUDGE ROBERT I. RICHTER

Exhibit 18
(0

them myself - it's been

over a year ago. Within

a week's time the detectives

came by I had my back

to them. I was serving

(DOXEPINS)
Psyliquan to somebody - and

when I backed up I stepped

right on the detectives toes.

The detective said I got

you - what else you got.

I showed him the pills I

had in the bag. He put

handcuffs on me and put

me in the car. He drove

to about two blocks from

the police station and told

me to turn around and took

the handcuffs off me. He
said "you know why we're
picking you up don't you --
because of the homicide." I
said to myself "I figured that" on
the way to the precinct they
asked me how long I had been
up there selling. I said a
good little while. They
knew my name and Nickname.
I don't know how. After
they got the handcuffs
off me they told me I
wasn't being charged with anything

At the homicide office they
wanted to know about how I
was robbed and about Bobby's
death

About a week later, they showed me a bunch of individual photographs. As I flipped through them I saw Bay brother's face and told them ~~that~~ that was Bay brother. I looked at the photographs at Homicide. On the morning Bobby was killed I didn't see who shot him. I didn't see any one running out of the woods, I was on First Street towards the Amtrak. I wasn't in a position to see anything. But I heard about three shots - they sounded like a cap gun.

I have read and have had read to me the statement on the preceeding 12 pages. I have had the chance to make any changes, corrections, additions or deletions I wanted to. It is true and correct to the best of my ability to remember.

8-20-96
Date

Sterling Johnson Jr.
Sterling Johnson